

**OUTTEN & GOLDEN LLP**
Laurence Moy (LM 3687)
ReNika Moore (RM 3484)
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000

RECEIVED
MAR 0 5 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---

SUSAN YOSS,

              Plaintiff,

   - against -

IGPS COMPANY LLC; PEGASUS CAPITAL
ADVISORS, LP; PEGASUS CAPITAL
ADVISORS G.P., LLC; PEGASUS CAPITAL
ADVISORS III, LP; PEGASUS INVESTORS III, LP;
PEGASUS INVESTORS III G.P., LLC,

              Defendants.

**COMPLAINT**
**(Trial by Jury Demanded)**

---

SUSAN YOSS, by her attorneys, for her complaint, alleges:

1.    This action concerns the efforts by IGPS Company LLC ("IGPS") and various Pegasus entities, (collectively, "Defendants") to avoid their obligation to pay Ms. Yoss bonus pay, vesting of her equity interest in IGPS, severance, and other benefits due her under a written March 1, 2007 Employment Agreement (the "Contract") despite having fired Ms. Yoss without "Cause," as that term is defined by the Agreement.

2.    Defendants have refused to honor their written commitments to Ms. Yoss. To the contrary, Defendants have sought to portray their conduct in forcing Ms. Yoss out of IGPS as a voluntary resignation. Curiously, Defendants have insisted that Ms. Yoss quit her job despite the facts that:

(a)   Ms. Yoss never stated that she was resigning from her employment;

(b)   The Contract required – as a condition precedent – that notice of resignation be provided in writing, and no such writing exists;

(c)   Ms. Yoss had no financial or other incentive to resign, especially given her substantial equity interest in IGPS; and

(d)   Both Defendants and Ms. Yoss have at all times conducted themselves in a manner consistent with what actually took place, i.e., Defendants terminated Ms. Yoss's employment without Cause.

## JURISDICTION AND VENUE

3.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

4.     The amount in controversy in this matter exceeds $75,000, exclusive of interest or costs.

5.     This controversy is between parties from different states. Plaintiff is a resident of New York. Defendants are citizens, as defined by 28 U.S.C. § 1332(c)(1), of states other than New York.

6.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(a)(2).

## THE PARTIES

7.     Plaintiff, Susan Yoss, is an individual residing within the State and County of New York.

8.     Ms. Yoss was employed as the Chief Financial Officer of IGPS.

9.     Defendant IGPS is a limited liability corporation incorporated under the laws of the State of Delaware with its principal place of business at 201 South Orange Avenue, Suite 425, Orlando, Florida, 32801 with additional offices in Texas, New York,

2

and Arkansas. IGPS provides manufacturers, suppliers, and shippers with plastic pallets which can be tracked using radio frequency identification tags attached to the pallets.

10.    Defendant Pegasus Capital Advisors LP is a limited partnership organized under the laws of the State of Delaware with its principal place of business in 99 River Road, Cos Cob, Connecticut 06807.

11.    Defendant Pegasus Capital Advisors III LP is a limited partnership organized under the laws of the State of Delaware with its principal place of business in 99 River Road, Cos Cob, Connecticut 06807.

12.    Defendant Pegasus Capital Advisors, GP, LLC is a limited partnership organized under the laws of the State of Delaware with its principal place of business in 99 River Road, Cos Cob, Connecticut 06807.

13.    Defendant Pegasus Investors III, L.P. is a limited partnership organized under the laws of the State of Delaware with its principal place of business in 99 River Road, Cos Cob, Connecticut 06807.

14.    Defendant Pegasus Investors III G.P., LLC is a limited liability corporation organized under the laws of the State of Delaware with its principal place of business in 99 River Road, Cos Cob, Connecticut 06807.

15.    Pegasus Capital Advisors LP, Pegasus Capital Advisors III LP, Pegasus Capital Advisors, GP, LLC, Pegasus Investors III, L.P., and Pegasus Investors III G.P., LLC are collectively referred to hereinafter as "Pegasus."

## FACTS

16.    On March 1, 2007, Ms. Yoss began her employment with IGPS as its Chief Financial Officer.

3

17.    Ms. Yoss was employed in IGPS's offices in New York, New York.

18.    Indeed, Ms. Yoss was the senior-most employee working in IGPS's New York City office.

19.    As part of Defendants' efforts to recruit Ms. Yoss, Richard Weinberg ("Weinberg"), an IGPS board member and partner of Pegasus-operated funds, and other Pegasus executives recruited Ms. Yoss with the express commitment to involve her in Pegasus activities. To this end, Defendants appointed Ms. Yoss Operating Advisor to Pegasus.

20.    As Operating Advisor, among other things, Ms. Yoss provided business and financial advice to other Pegasus portfolio companies and attended Pegasus meetings.

21.    At least until December 5, 2007, Pegasus was primary shareholder of IGPS.

22.    On or about March 1, 2007, Ms. Yoss and IGPS entered into the Contract, which was dated as of March 1, 2007. (A copy of the Contract is annexed to this Complaint as Exhibit A.)

23.    The Contract provided that IGPS could terminate Ms. Yoss's employment with Cause, but only under limited circumstances. "Cause" was defined in the Contract to mean:

> "(i)    willful refusal by the Executive [Ms. Yoss] to substantially perform, or a material breach by the Executive of, her employment-related duties and responsibilities (other than as a result of Disability) which is not remedied within ten days after receipt of written notice from the Company Board specifying such breach;

4

(ii)    willful misconduct or breach of fiduciary duty related to the Company by the Executive;

(iii)    the Executive's conviction of, or plea of guilty or nolo contendere to, a crime involving moral turpitude or constituting a felony;

(iv)    any act of dishonesty by the Executive that is economically detrimental in any material respect to the interest of the Company;

(v)    failure by the Executive to follow the lawful directives of the Company Board, which directives are consistent with the Executive's duties and responsibilities hereunder which is not remedied within ten days after receipt of written notice from the Company Board specifying each breach; or

(vi)    The Executive's breach or material default under any provision of this Agreement which is not remedied within ten days after receipt of written notice from the Company specifying such breach or material default."

See Contract, Exhibit A hereto, at ¶ 1(e).

24.    The Contract also provided that, "The Executive may terminate her employment without Good Reason [a term which is not relevant in this action] at any time, **provided she gives at least 90 days' advance written notice**." See Contract, Exhibit A hereto, at ¶ 8(e) (emphasis added).

25.    In March 2007, in connection with Ms. Yoss's hire, she was provided equity in IGPS in the form of 10,000,000 Class A Common Units.

26.    From March 2007 through mid-July 2007, Ms. Yoss worked out of a conference room in Pegasus-leased office on 505 Park Ave, New York, NY.

27.    In May 2007, IGPS appointed Ms. Yoss to the IGPS Board of Directors, Executive Committee, and Compensation Committee. In addition, IGPS appointed Ms. Yoss to be the Corporate Secretary of the IGPS Board.

28.     Seven of the eight IGPS board members maintained other high-ranking positions with Pegasus. Every member of the Executive and Compensation Committees of the IGPS Board has been affiliated with Pegasus.

29.     Also in or about April 2007, Ms. Yoss was awarded additional equity in the form of 10,000,000 Class E Units. At all times since award of Class E Units, Defendants apprised Ms. Yoss that Class E Units would be treated the same as Class A Units.

30.     The purpose of awarding Ms. Yoss the E Units was to maintain Ms. Yoss's percentage of ownership in IGPS following the issuance of $34 million in additional equity. In other words, the E Units were provided to Ms. Yoss as a means of preventing dilution in Ms. Yoss's ownership interest in IGPS.

31.     In June 2007, IGPS increased Ms. Yoss's ownership interest by providing her with an additional 12,285,000 Class E Units.

32.     After joining IGPS, Ms. Yoss worked hard, traveling approximately 80% of the time, often working seven days a week, and often working from 8:30 or 9:00 in the morning until 10:00 or 11:00 in the evening.

33.     IGPS recognized Ms. Yoss's contributions, effort and performance by, among other things, awarding Ms. Yoss additional equity, as noted above.

34.     In addition, Bobby Moore ("Moore"), the Chairman and Chief Executive Officer of IGPS and Pegasus Operating Advisor, and Rex Lowe ("Lowe"), President of IGPS, made comments concerning their and Ms. Yoss's shared commitment to the company, referring to themselves and Ms. Yoss as "The Three Amigos."

6

35. Throughout Ms. Yoss's tenure, Pegasus executives, including Weinberg, were actively involved in almost every type of decision and were involved in the daily monitoring of IGPS's business activities.

36. Weinberg and Lewis Taffer, IGPS Board Member and Pegasus Operating Advisor, served as employees of IGPS and received compensation and benefits directly from IGPS for their services.

37. Ms. Yoss continued to devote herself fully to her employment with IGPS. By the Fall of 2007, however, Moore, Lowe, and Ms. Yoss were all under pressure due to the difficulty IGPS was facing in terms of obtaining financing for its business. Further, Moore and Ms. Yoss at times argued over various business matters, and Defendants began to exclude Ms. Yoss from meetings to which she should have been invited as the CFO.

38. In addition, Ms. Yoss understood that one of her key functions was to help IGPS locate and secure financing, and once those goals were within reach, Defendants might view Ms. Yoss as expendable.

39. On October 22, 2007, Ms. Yoss complained to Moore that Weinberg had suggested to Ms. Yoss that if she was unhappy with her job at IGPS, she should leave. Moore stated to Ms. Yoss that Weinberg did not mean what he had said, and stated that he (Moore) wanted Ms. Yoss to remain with the company.

40. Later on October 22, 2007, Moore asked Ms. Yoss why she should even think about leaving IGPS, and Ms. Yoss discussed with Moore the difficulties and frustrations she was facing in trying to perform her job.

41. At no time, however, did Ms. Yoss ever resign her employment.

7

42.    Ms. Yoss never sent a notice or writing of any kind stating – or even suggesting -- that she was resigning, or had resigned, from IGPS.

43.    Ms. Yoss's employment situation continued to deteriorate, however.  In early November 2007, Moore asked Ms. Yoss whether she was interviewing for other positions after an incident where Ms. Yoss had arrived at a meeting later than usual.  Ms. Yoss replied – truthfully – that she was not interviewing for any other jobs.

44.    Despite making the work atmosphere for Ms. Yoss difficult, it was clear as of November 2007, that IGPS viewed Ms. Yoss as an employee in good standing who had not resigned her employment.

45.    In November 1, 2007, IGPS moved into new space at 600 Madison Avenue in Manhattan for its New York office.

46.    Ms. Yoss was the sole senior presence for IGPS in New York City, and there was no reason to move into the 600 Madison Avenue location absent Ms. Yoss's employment.  (Indeed, after IGPS fired Ms. Yoss, it ceased occupying the 600 Madison Avenue space.)

47.    During discussions with Moore in mid-November 2007, Ms. Yoss confirmed her commitment to IGPS and her employment with IGPS.

48.    Although Ms. Yoss was the third most senior officer within IGPS, and a member of its Executive and Compensation Committees, and a member of its Board of Directors, at no time during October and November 2007 did IGPS ever announce that Ms. Yoss had resigned.

8

49.    During the October, November and early December 2007 timeframe, Ms. Yoss was actively engaged on behalf of IGPS with respect to more than 12 financial institutions that were contemplating investing in IGPS.

50.    Despite the materiality of the resignation of a senior officer such as Ms. Yoss to entities that were contemplating making a large financial investment in IGPS, throughout October, November or December 2007 up until the date of her termination, IGPS never notified any potential investor or investor that Ms. Yoss had resigned her employment.

51.    IGPS had prepared a "data room" containing all the information deemed material to potential investors in IGPS.  Defendants and Ms. Yoss also engaged in numerous due diligence discussions with potential investors and their legal and financial advisors.

52.    The IGPS data room did not contain any indication that Ms. Yoss had resigned her employment.  Nor did Defendants ever indicate in any due diligence discussions that Ms. Yoss had resigned her employment.

53.    On November 30, 2007, however, Moore told Ms. Yoss that partners of Pegasus "no longer wanted to deal with you [Ms. Yoss]."

54.    By early December 2007, Ms. Yoss was still working on critical IGPS business, including a companywide presentation of the 5-year strategic plan, commencement of the 2008 planning process, and negotiation of long-term agreements. Ms. Yoss also performed CFO duties relating to closing the $225 million investment in IGPS (through an equity transaction) by Kelso & Co., Pegasus, and others.

9

55.    On December 11, 2007, Moore terminated Ms. Yoss's employment,

advising her that IGPS's controller, Tod Sizemore, had difficulty working with Ms. Yoss

and that it was time for her to separate from the company. Moore assured Ms. Yoss that

she would be treated "fairly" upon her exit, and added that Ms. Yoss's formal separation

from IGPS would occur after the holidays, perhaps effective January 10 or 11, 2008.

56.    Moore never contended that IGPS was terminating Ms. Yoss's

employment for Cause under the Contract.

57.    IGPS never sent Ms. Yoss any notice stating or contending that Ms.

Yoss's employment had been terminated for Cause.

58.    On December 14, 2007, Moore advised Ms. Yoss in an email that it was

taking the position that Ms. Yoss had voluntarily resigned her employment on October

22, 2007 and that Ms. Yoss had supposedly confirmed her "resignation" during other

discussions after October 22, 2007.

59.    Ms. Yoss continued to work for IGPS into early January 2008.

60.    During a telephone call on January 3, 2008, IGPS advised that it wanted

Ms. Yoss's employment to end effective the next payroll date, which IGPS advised was

January 11, 2008.

61.    IGPS has failed and refused to provide Ms. Yoss the payments and

benefits due her under the written Contract based on a termination of employment

without Cause.

62.    Such payments and benefits include:

    (a)    An "Annual Bonus" (as that term is defined by the Contract) for 2007 in
the amount of $250,000.  See Contract, Exhibit A hereto, at ¶ 8(d) (ii).

    (b)    18 months of base salary, totaling $450,000.  See Contract at ¶ 8(d) (iii).

    (c)    18 months of bonus pay, totaling $450,000. <u>See</u> Contract at ¶ 8(d)(iv).

    (d)    COBRA insurance payments. <u>See</u> Contract at ¶ 8(d)(v).

    (e)    Full vesting of Ms. Yoss's 10,000,000 in Class A Units and 22,285,000 in Class E Units, which equity has a total value of not less than $9.7 million. <u>See</u> Contract at ¶ 8(f).

63.    Ms. Yoss has in all respects honored her obligations under the Contract.

### FIRST CAUSE OF ACTION

64.    Defendants' conduct, as alleged above, constitutes a breach of the Contract.

65.    By reason of Defendants' breach, Ms. Yoss was deprived of payments and benefits she would have received had Defendants honored the Contract.

### DEMAND FOR RELIEF

66.    Based on Defendants' failure and refusal to honor their obligations under the written Contract, Ms. Yoss demands the following relief:

    (a)    Not less than $10.85 million in damages or, alternatively, not less than $1.15 million in damages plus full vesting and delivery of Ms. Yoss's Class A and Class E Units;

    (b)    Interest at the statutory rate of 9% per annum;

    (c)    Fees and costs, including attorneys' fees; and

    (d)    Such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

67.    Ms. Yoss hereby demands a trial by jury pursuant to Rule 38(b) of the

Federal Rules of Civil Procedure.

Dated: New York, New York
       March 5, 2008

                                    Respectfully submitted,

                                    **OUTTEN & GOLDEN LLP**

                                    Laurence S. Moy (LM 3687)

                                    ReNika Moore (RM 3484)
                                    3 Park Avenue, 29th Floor
                                    New York, New York 10016
                                    Telephone:  212-245-1000
                                    **Attorneys for Plaintiff**

# EMPLOYMENT AGREEMENT

**EMPLOYMENT AGREEMENT** (hereinafter the "*Agreement*") dated as of March 1, 2007, by and between IGPS COMPANY LLC (the "*Company*") and Susan Yoss (the "*Executive*").

**WHEREAS**, the Company wishes to secure the services of the Executive as its Chief Financial Officer for a period of three years, and the Executive is willing to serve the Company in such capacity, all on the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of the premises and mutual covenants contained herein and for other good and valuable consideration, the receipt and adequacy of which are mutually acknowledged, the Company and the Executive agree as follows:

1.    <u>Definitions</u>. For purposes of this Agreement, the following terms shall have the following meanings:

(a)    "*Annual Bonus*" has the meaning set forth in Section 5.

(b)    "*Average Bonus*" means the average of the Annual Bonuses received by the Executive for the two full years immediately preceding the termination of the Executive's employment. If the Executive's employment is terminated prior to the receipt of the first year's bonus, then the Average Bonus shall be equal to $300,000. If the Executive's employment is terminated after receipt of the first year's Annual Bonus but prior to the receipt of the second year's Annual Bonus, then the Average Bonus shall be equal to the average between $300,000 and the first year's Annual Bonus.

(c)    "*Base Salary*" means the salary provided for in Section 4 or any increased salary granted to the Executive pursuant to Section 4.

(d)    "*Bonus Plan*" has the meaning set forth in Section 5.

(e)    "*Cause*" means:

(i)    willful refusal by the Executive to substantially perform, or a material breach by the Executive of, her employment-related duties and responsibilities (other than as a result of Disability) which is not remedied within ten days after receipt of written notice from the Company Board specifying such breach;

(ii)    willful misconduct or breach of a fiduciary duty related to the Company by the Executive;

(iii)    the Executive's conviction of, or plea of guilty or <u>nolo contendere</u> to, a crime involving moral turpitude or constituting a felony;

(iv)    any act of dishonesty by the Executive that is economically detrimental in any material respect to the interests of the Company;

-1-
237

(v)    failure by the Executive to follow the lawful directives of the Company Board, which directives are consistent with the Executive's duties and responsibilities hereunder which is not remedied within ten days after receipt of written notice from the Company Board specifying each breach; or

(vi)    The Executive's breach or material default under any provision of this Agreement which is not remedied within ten days after receipt of written notice from the Company specifying such breach or material default.

(f)    *"Change in Control"* means (i) any event or transaction as a result of which one or more third parties who are not affiliated with the Pegasus Members holds a majority of the issued and outstanding membership interests of the Company which are generally entitled to vote in the election of the Company Board or the Pegasus Members no longer have representatives on the Company Board constituting a majority of the Company Board or (ii) any sale or disposition by the Company of all or substantially all of its assets to any Person which is not a direct or indirect majority-owned subsidiary of the Company.

(g)    *"Company Board"* means the Board of Managers of the Company.

(h)    *"Confidential Information"* has the meaning set forth in Section 11(a).

(i)    *"Disability"* means the Executive's inability to substantially fulfill the positions, duties, responsibilities and obligations set forth in this Agreement because of reasonably documented physical, mental or emotional incapacity that shall have prevented Executive from performing her duties on a full-time basis for a period of more than 90 days, or for a total of at least four months in any consecutive twelve-month period.

(j)    *"Effective Date"* means the date of this Agreement.

(k)    *"Executive's Base Location"* means any area within a 25 mile radius of Manhattan, New York or any area within a 25 mile radius of Cos Cob, Connecticut that is not further from Manhattan than Cos Cob, Connecticut.

(l)    *"Extension Term"* has the meaning set forth in Section 15.

(m)    *"Good Reason"* means:

(i)    the removal of the Executive as Chief Financial Officer of the Company other than in connection with a termination of the Executive for Cause or Executive's death or Disability;

(ii)    the assignment to the Executive of duties or responsibilities that are materially inconsistent with the duties and responsibilities customarily performed by a chief financial officer and/or as set forth in Section 3 (it being understood that the addition of responsibilities or duties, consistent with the Executive's position as aforesaid, shall not constitute Good Reason pursuant to this clause (ii));

(iii)    any material diminution of the Executive's responsibilities or authority other than temporarily during periods when Executive is unable to perform as a result of Executive's Disability;

(iv)    a reduction by the Company in the Executive's rate of annual Base Salary, other than reductions in salary applicable to all executive officers and recommended to the Company Board by the Chief Executive Officer, a reduction in the Annual Bonus opportunity described in Section 5 or a reduction in any other material benefit provided to the Executive hereunder, other than to the extent of a Company-wide reduction in a group benefit;

(v)    any requirement by the Company that the Executive relocate outside of Executive's Base Location;

(vi)    a material breach by the Company of its obligations to the Executive pursuant to this Agreement; or

(vii)    a material breach by the Pegasus Members of their funding obligations pursuant to Section 7.4 of the LLC Agreement.

Notwithstanding the foregoing, with respect to each of the foregoing, an action taken in good faith and which, if susceptible to cure, is remedied by the Company within ten days after receipt of written notice thereof given by the Executive shall not constitute Good Reason.

(n)    "*IGPS Companies*" means the Company and its direct or indirect majority-owned subsidiaries.

(o)    "*LLC Agreement*" means that certain Second Amended and Restated Limited Liability Company Agreement of the Company dated as of December 6, 2006 by and among the Executive, the Pegasus Members and the other members signatory thereto, as such agreement may be modified, amended or restated from time to time.

(p)    "*Non-Compete Period*" has the meaning set forth in Section 12(a).

(q)    "*Pegasus Members*" means Pegasus Partners III (AIV), LP, Pegasus Partners III IGPS LLC and Pegasus Investors III, L.P. and any of their Affiliates.

(r)    "*Person*" means any individual, corporation, partnership, limited liability company, joint venture, trust, estate, board, committee, agency, body, employee benefit plan or other person or entity.

(s)    "*Proceeding*" means any threatened or actual action, suit or proceeding, whether civil, criminal, administrative, investigative, appellate or other.

(t)    "*Release*" has the meaning set forth in Section 12(d).

(u)    "*Renewal Notice*" has the meaning set forth in Section 15.

(v)     "*Standard Benefit*" means any amounts earned, accrued or owing to the Executive but not yet paid as of any date of termination, including, without limitation, Base Salary, Annual Bonus for the year prior to the date of termination, receipt of other benefits, if any, in accordance with applicable plans and programs of the Company, and reimbursement in accordance with Section 7 of any business expenses properly incurred by the Executive but not yet reimbursed as of the date of termination.

(w)     "*Term of Employment*" means the period specified in Section 2 and includes any Extension Term which becomes effective in accordance with Section 15.

2.     Term of Employment.  The Company agrees to employ the Executive under this Agreement, and the Executive accepts such employment, for a period commencing on the Effective Date and ending March 1, 2010, subject to extension pursuant to Section 15 and termination pursuant to Section 8.

3.     Positions; Duties; Responsibilities; and Place of Employment.

(a)     During the Term of Employment, the Executive shall be employed as the Chief Financial Officer of the Company and shall have such duties, authority and responsibilities as shall customarily pertain to such office and as may reasonably be assigned by the Company Board consistent with Executive's duties and responsibilities under this Agreement taking into consideration the size and scope of the Company's operations.  The Executive, in carrying out her executive duties under this Agreement, shall report solely and directly to the Chief Executive Officer and the Company Board.  The Executive shall travel as reasonably necessary to carry out her duties and obligations hereunder but shall not be required to relocate from the Executive's Base Location.  Without limiting the generality of the foregoing, Executive shall undertake to perform her duties in a manner consistent with the best interests of the Company, and shall perform all duties, services and responsibilities in accordance with the guidelines, policies and procedures established by the Company Board, and shall be subject to the supervision of the Company Board.

(b)     During the Term of Employment, Executive shall devote substantially all of her time, attention, and efforts during regular business hours to the business and affairs of the Company and shall not, without the prior written consent of the Company Board, engage in any business enterprise unrelated to the performance of her duties hereunder which requires her personal time, attention or efforts.  Notwithstanding the foregoing and so long as her activities do not materially interfere with the performance of her duties hereunder, Executive may acquire, own or deal in securities or other investments in another business enterprise, except that without the prior written consent of the Company Board, Executive may not invest in any business which Executive knows, or has reason to know, competes or has material relations with the Company at the time such investment is made, unless the securities of such business are listed on a national securities exchange or traded in the over-the-counter market and Executive's interest does not exceed 2% of the outstanding securities of any class of that business.  Notwithstanding anything herein to the contrary, nothing shall preclude the Executive from (i) serving on the boards of directors of a reasonable number of other corporations, subject to prior approval by the Company Board (which shall not be unreasonably withheld), or the boards of a reasonable number of trade associations and/or charitable organizations, (ii) engaging in charitable activities and community

affairs, including political activities, (iii) managing her personal investments and affairs, provided that such activities do not materially interfere with the proper performance of her duties and responsibilities as the Chief Financial Officer, and (iv) serving as an operating advisor to Pegasus Capital Advisors L.P. and/or its affiliates and performing Executive's duties and obligations in connection therewith.

4.    Base Salary.  The Company shall pay the Executive Base Salary of no less than $300,000 per annum.  Base Salary shall be payable at intervals in accordance with the regular payroll practices of the Company applicable to executives, but no less frequently than monthly. The Company Board shall review the Base Salary no less frequently than annually (on each anniversary of the Effective Date) for purposes of potential increase.  If increased, Base Salary shall not thereafter be decreased, except for any reductions in salary applicable to all executive officers and recommended to the Company Board by the Chief Executive Officer.  If Executive is not employed by the Company for the full calendar year (including, for example, the initial calendar year of this Agreement), the Base Salary for such calendar year shall be prorated based on the portion of the calendar year during which Executive is so employed.

5.    Annual Incentive Awards.  The Executive shall be eligible for an annual incentive bonus award (the "*Annual Bonus*") from the Company in respect of each calendar year which ends during the Term of Employment and for each partial year, on a pro rata basis.  The Executive shall be eligible to earn the Annual Bonus if certain performance criteria is met. Annexed hereto as Annex 1 is the description of performance criteria that the Executive must meet in order to obtain the Annual Bonus with respect to a calendar year and the amount of the Annual Bonus that will be received if the performance criteria for such calendar year is met ("*Bonus Plan*").  The Company shall pay the Executive the Annual Bonus (subject to any applicable withholdings, deductions and other applicable laws) in respect of any year (or partial year) at the same time as bonuses are paid to other executive officers of the Company, but in no event later than the later of (i) April 1 of the year immediately following the end of the year to which the Annual Bonus relates or (ii) 15 days after receipt by the Company Board of the audited consolidated financial statements of the Company for the calendar year for which the Annual Bonus is payable.

6.    Other Benefits.

(a)    Executive Benefits.  During the Term of Employment, the Executive shall be eligible to participate in all employee benefit plans, programs and arrangements made available generally to the Company's executives in accordance with the terms and subject to the conditions of such plans, programs and arrangements, including, without limitation, stock option, profit-sharing, savings (qualified and non-qualified) and other defined contribution retirement plans or programs, medical, dental, hospitalization, vision, short-term and long-term disability and life insurance plans or programs, accidental death and dismemberment protection, travel accident insurance, and any other employee welfare benefit plans or programs that may, from time to time, be sponsored by the Company for the benefit of the Company's employees, including any plans or programs that supplement the above-listed types of plans or programs, whether funded or unfunded.  The terms and conditions pursuant to which any benefits are provided to Executive shall be governed exclusively by the applicable plan documents, except as modified herein.  The Company does not by reason of this Agreement obligate itself to continue

such benefits at all, to continue such benefits according to their terms presently in effect, to make any such benefits available to Executive or the Company's employees generally, or to fund the cost of any such benefits, and the Company reserves the right to change the terms of, or terminate, such benefits as if this Agreement had not been entered.

(b) <u>Perquisites</u>. During the Term of Employment, the Executive shall participate in any fringe benefits and perquisites which the Company Board in its discretion makes available to executives of the Company at levels and on terms and conditions that are commensurate with her positions and responsibilities. The Company shall provide Executive with a car allowance of $1,500.00 per month (subject to any applicable withholdings, deductions and other applicable laws) in connection with Executive's use of her automobile for business purposes which amount may be used to cover lease payments, maintenance, repairs and garage. The Executive also shall receive such additional fringe benefits and perquisites as the Company, in its discretion, from time to time may elect to provide.

(c) <u>Vacation, Holidays, and Leave</u>. During the Term of Employment, the Executive shall be entitled to four weeks paid vacation per year as well as holidays and leave in accordance with the practices of the Company.

(d) <u>Professional Fees</u>. The Company shall promptly reimburse the Executive for up to $5,000 for legal expenses incurred by the Executive solely in connection with the negotiation of this Agreement and the LLC Agreement, subject to documentation in accordance with the policies of the Company.

(e) <u>Board Membership</u>. The Executive is entitled to be a member of the Board of Managers of the Company. This right shall terminate immediately upon the termination of the Executive's employment for any reason.

(f) <u>Tax Distributions</u>. Notwithstanding anything in Section 10.6 of the LLC Agreement to the contrary, the Company shall only make a distribution and not a loan to the Executive from time to time to pay taxes on any income or gain allocated to the Executive.

7. <u>Reimbursement of Business and Other Expenses</u>. The Executive shall be entitled to reimbursement for actual and documented expenses reasonably incurred by her in furtherance of the business of the Company and in the performance of her duties hereunder promptly following (and in any event within 60 days following) the submission of appropriate documentation with respect thereto and in accordance with the Company's policies.

8. <u>Termination of Employment</u>.

(a) <u>Termination Due to Death</u>. If the Executive's employment hereunder is terminated due to her death, notice of such termination shall be delivered to the Executive (or her estate or legal representatives) and her estate or her beneficiaries (as the case may be) shall be entitled to the following:

(i) payment of Base Salary, in accordance with the Company's regular payroll practices (based on the Executive's rate of annual Base Salary at the time of her death), for 90 days following the Executive's death;

(ii)    the Annual Bonus for the year in which the Executive's death occurs, prorated based on the Average Bonus and the number of days worked in the year in which death occurs, payable by the Company in a lump sum promptly after (and in any event within 30 days of) her death; and

(iii)    payment of the Standard Benefit.

(b)    Termination Due to Disability. If the Executive's employment hereunder is terminated due to Disability, notice of such termination shall be delivered to the Executive (or her estate or legal representatives) and the Executive shall be entitled to the following:

(i)    payment of Base Salary, in accordance with the Company's regular payroll practices (based on the Executive's rate of annual Base Salary at the time of the Executive's termination of employment), until commencement of long-term disability payments, but in no event for longer than 180 days after the date of termination;

(ii)    the Annual Bonus for the year in which the Executive's employment terminates, prorated based on the Average Bonus and the number of days worked in such year to the date of termination, and payable by the Company in a lump sum promptly following (and in any event within 30 days of) the last day of the Executive's employment; and

(iii)    payment of the Standard Benefit.

(c)    Termination by the Company for Cause. The Company may terminate the Executive's employment for Cause at any time on notice to the Executive. If the Executive's employment hereunder is terminated by the Company for Cause, the Executive shall be entitled solely to payment of the Standard Benefit.

(d)    Termination Without Cause; Termination by the Executive for Good Reason. The Company may terminate the Executive's employment without Cause at any time on notice to the Executive and the Executive may terminate her employment for Good Reason at any time on notice to the Company. If the Executive's employment hereunder is terminated by the Company without Cause (and other than due to death or Disability), or if the Executive terminates her employment for Good Reason, the Executive shall be entitled to:

(i)    payment of the Standard Benefit;

(ii)    the Annual Bonus for the year in which the termination occurs, prorated based on the Average Bonus and the number of days worked in the year in which termination occurs, payable by the Company in a lump sum promptly following (and in any event within 30 days of) termination;

(iii)    continued payment of Base Salary, in accordance with the Company's regular payroll practices, for a period of 18 months from the date of termination;

(iv)    for as long as the Executive receives continued payments of Base Salary, the Executive also will receive payments, on the same payment schedule as Base Salary, equal to the Average Bonus, pro rated based on the Base Salary payment schedule (e.g., if Base

Salary is paid monthly, each such payment will include an amount equal to one twelfth of the Average Bonus) (the "**Bonus Payment**"); and

(v)     for so long as the Executive receives continued payments of Base Salary, continued participation at the Company's expense for the Executive and each of the Executive's dependents in all medical, dental, hospitalization and other employee welfare benefit plans, programs and arrangements covered by COBRA in which each such dependent was participating as of the date of the Executive's termination (the "**COBRA Payment**").

(e)     <u>Voluntary Termination Without Good Reason</u>. The Executive may terminate her employment without Good Reason at any time, provided she gives at least 90 days' advance written notice. If the Executive terminates her employment with the Company without Good Reason (and not because of her death or due to Disability), the Executive shall have the same entitlements hereunder as provided in Section 8(c) in the case of a termination by the Company for Cause.

(f)     <u>Equity Compensation</u>.

(i)     Executive is entitled to receive 10,000,000 Class A Common Units the terms of which are governed by the LLC Agreement, except as otherwise provided herein. All vested Class A Common Units owned by the Executive at the time of her termination of employment shall remain in full force and effect and shall be subject to the provisions of the LLC Agreement. With respect to any unvested Class A Common Units of the Company owned by the Executive at the time of her termination of employment, notwithstanding any provision of the LLC Agreement to the contrary:

(1)     50% of such remaining unvested Class A Common Units shall vest if the termination of the Executive's employment is a termination without Cause or a termination by the Executive for Good Reason.

(2)     25% of such remaining unvested Class A Common Units shall vest if the termination of the Executive's employment is due to death or Disability.

(3)     In the event that the Executive's employment is terminated at, in contemplation of or after a Change in Control (i) by the Company due to death, Disability, without Cause or (ii) by the Executive for Good Reason, 100% of such remaining unvested Class A Common Units shall vest.

(ii)     Notwithstanding any provision in the LLC Agreement to the contrary,

(1)     The Company shall only have a Call Right (as defined in the LLC Agreement) on the Units owned by the Executive if the Executive's employment is terminated by the Company for Cause or if the Executive terminates her employment without Good Reason; provided that the expiration of this Agreement in accordance with Section 15 shall not give rise to a Call Right by the Company.

(2)     In the event of a termination of Executive's employment for Cause, the Call Price (as defined in the LLC Agreement) with respect to the Callable Shares (as defined in the LLC Agreement) shall be an amount equal to the lesser of (x) the Call Value per Unit (as defined in the LLC Agreement) of such Callable Shares, as reflected on the books and records of the Company and (y) the Capital Contribution (as defined in the LLC Agreement) attributable to such Callable Shares plus interest thereon calculated from the date of such Capital Contribution until the Call Right Closing Date (as defined in the LLC Agreement) at an annual rate equal to the then three (3) month LIBOR rate plus 1% calculated daily based on a 365-day year and compounded annually, less the amount of distributions made in respect of such Callable Shares prior to the Call Right Closing Date in respect of such Callable Shares. In the event of a termination of Executive's employment by the Executive without Good Reason, the Call Price shall be an amount equal to the Fair Market Value of the Callable Shares. The Call Price shall be paid in one installment at the time of the repurchase of the Callable Shares.

(3)     Once a Call Right Notice is sent to the Executive such Call Right Notice is irrevocable. If the Company defaults in its obligation to complete the transaction contemplated by the Call Right, then the Executive shall be entitled to all available legal and equitable remedies against the Company, including specific performance by the Company of its obligation to complete such transaction and recovery of all losses of the Executive caused by such default (including attorney's fees and costs paid or incurred in any legal or equitable action)

(g)     Executive shall not be required to seek other employment or to attempt in any way to reduce amounts payable to him pursuant to this Agreement, nor shall the amount of any payment provided for in Article 8 of this Agreement be reduced by any compensation earned by Executive as the result of employment by another employer or otherwise.

(h)     Notwithstanding any other provision contained herein, if the Executive is a "specified employee" as defined under Section 409A of the Internal Revenue Code of 1986, as amended ("*Section 409A*") or any regulations or Treasury guidance promulgated thereunder, any amounts of "deferred compensation", within the meaning of Section 409A, that would be paid to Executive within six (6) months after her separation from service shall be delayed and paid to her at the earlier of her death or immediately after the end of such six (6) month period. The provisions of this Section 8(h) shall apply only if necessary to avoid the imposition of taxes and penalties under Section 409A relating to the payment of Deferred Compensation to "specified employees" upon their separation from service.

9.     Indemnification and Officers' & Directors' Insurance. The Company shall indemnify the Executive (and her legal representatives or other successors and heirs), to the fullest extent permitted by the laws of the State of Delaware, as in effect at the time of the subject act or omission, or the Certificate of Formation and Limited Liability Company Agreement of the Company as in effect at such time or on the date of this Agreement, whichever affords or afforded greater protection to the Executive; and the Executive shall be entitled to the

protection of any insurance policies which the Company elects to maintain generally for the benefit of the Company's directors and officers, against all costs, charges and expenses whatsoever incurred or sustained by the Executive or her legal representatives in connection with any Proceeding to which she (or her legal representative or other successors and heirs) may be made a party by reason of her being or having been a director, officer or employee of the Company. If any Proceeding is brought or threatened against the Executive in respect of which indemnity may be sought against the Company pursuant to the foregoing, the Executive shall notify the Company promptly in writing of the institution of such Proceeding and the Company shall assume the defense thereof and the employment of counsel and payment of all fees and expenses, provided, however, that if the Company is advised by counsel that a conflict of interest exists between the Company and the Executive such that it is not legally practicable for the Company to assume the Executive's defense, the Executive shall be entitled to retain separate counsel reasonably acceptable to the Company and the Company shall assume payment of all fees and expenses in connection therewith as and when incurred.

10.    Assignability; Binding Nature; Successors.

(a)    This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, heirs (in the case of the Executive) and permitted assigns.

(b)    This Agreement shall not be terminated by any merger, consolidation, share exchange, sale of all or substantially all of the assets of the Company or similar event involving the Company whereby the Company is or is not the surviving or resulting entity. In the event of any merger, consolidation, share exchange, sale of all or substantially all of the assets of the Company or similar event, the provisions of this Agreement shall be binding upon the surviving or resulting person to which the Company's assets are transferred. This provision shall not act as a novation of any obligations of the Company hereunder.

(c)    No rights or obligations of the Executive under this Agreement may be assigned or transferred by the Executive other than her rights to compensation and benefits, which may be transferred only by will or as provided in Section 17(e), or as provided in Section 17(e). Except as otherwise provided in Section 10(b), no rights and obligations of the Company under this Agreement may be assigned or transferred by the Company.

11.    Confidentiality; Company Property.

(a)    Confidentiality. The Executive acknowledges that during the course of her employment, she has and will have access to and participate in the development of, or be acquainted with, confidential or proprietary information and trade secrets related to the business and proposed business of the Company or its subsidiaries including, but not limited to, (A) business plans, operating plans, marketing plans, products, strategies, proposals, financial reports, operating data, budgets, wage and salary rates, pricing information, terms of agreements with suppliers or customers and others, customer and sourcing lists, designs, formulas, patents, devices, software programs, reports, correspondence, tapes, discs, tangible property and specifications owned by or used in the business of the Company and/or its subsidiaries, operating strengths and weaknesses of the officers, directors, managers, executives, agents, suppliers and customers of the Company or its subsidiaries, (B) information pertaining to future developments

such as, but not limited to, product development, research, future marketing, distribution, delivery or merchandising plans or ideas, and potential new distribution or business locations, and (C) other tangible and intangible property, which are used in the business and operations of the Company and/or its subsidiaries but not made publicly available, including confidential information relating to executives, customers or suppliers of the Company and/or its subsidiaries (collectively, "*Confidential Information*"). Notwithstanding the foregoing, Confidential Information shall not include (i) any information to the extent it becomes known to Persons not associated with the Company or its subsidiaries through no fault of the Executive, or (ii) information known by the Executive prior to employment by the Company hereunder.

Executive acknowledges and agrees that, to the extent protectable under applicable law, all Confidential Information that comes into Executive's possession or knowledge any time during the Term of Employment, whether or not developed by Executive and whether or not during working hours, is the exclusive property of the Company and Executive waives any rights therein. At the Company Board's request, Executive shall execute and deliver to the Company such documents prepared by the Company as may be reasonably appropriate to evidence or implement the immediately preceding sentence.

Executive covenants and agrees that she shall not during the Term of Employment or at any time thereafter, directly or indirectly, use for her own purpose or for the benefit of any person or entity other than the Company, nor otherwise disclose, any Confidential Information to any individual or entity unless such disclosure has been authorized in writing by the Company Board or is otherwise required by law. Executive shall promptly notify the Company of any legal process served on her requiring disclosure of Confidential Information so that the Company may seek an appropriate protective order and/or other appropriate remedy or waive compliance with this provision. Absent any relief, Executive may disclose only such of the Confidential Information to the party compelling disclosure of such information as, in the opinion of Executive's counsel, is required by law to comply with such legal process.

(b)    Promptly after the termination of Executive's employment with the Company, Executive shall deliver to the Company all copies of data, information and knowledge of the Company in her possession, including, without limitation, all Confidential Information, documents, correspondence, notebooks, reports, computer programs, names, lists, and all other materials and copies thereof (including computer discs and other electronic media) relating in any way to the business of the Company or its subsidiaries, in any way obtained by Executive during the period of her employment with the Company, but excluding Executive's personal effects, Rolodexes and similar items. Promptly after the termination of Executive's employment with the Company, Executive shall deliver to the Company all tangible property belonging to, leased or licensed to the Company in the possession of Executive.

12.    Post-Termination Covenants.

(a)    Non-solicitation; Non-competition. The Executive agrees that, during the period of her employment hereunder and for a period of 24 months following the termination of her employment for Cause or without Good Reason (or for a period of 18 months following the termination of her employment without Cause or by the Executive for Good Reason) provided, however, if the Company ceases to make payments to the Executive in violation of Section 8(d)

in the event of a termination of Executive's employment by the Company without Cause or by the Executive for Good Reason and the Executive is not otherwise in breach of this Agreement, the Non-Compete Period shall end on the date the Company ceases making payments under Section 8(d) (the "*Non-Compete Period*"), the Executive will not directly or indirectly through another Person (i) (A) induce or attempt to induce any employee of the IGPS Companies (which, for purposes of this Section, includes any person who was an employee of the IGPS Companies within six months prior to the termination of the Executive's employment), to leave the employ of the IGPS Companies; or in any way interfere with the relationship between the IGPS Companies, on the one hand, and any employee thereof, on the other hand, or (B) engage any such employee of the IGPS Companies as a consultant or employee, (ii) solicit or attempt to solicit business from any supplier or customer of the IGPS Companies (provided that the Executive may solicit or attempt to solicit business from any such supplier or customer that does not violate (iii) below) or in any way interfere with the relationship between any such supplier or customer and the IGPS Companies, on the other hand, or (iii) directly or indirectly, alone or as a partner, joint venturer, officer, director, member, employee, consultant, agent, independent contractor, or equity interest holder of, or lender to, any Person or business, engage in any business related to the manufacture, sale, leasing or pooling of pallets and/or any business involved in logistics related thereto, in each case in the geographic locations in which the Company engages in any such activities as of the date of termination. Notwithstanding the foregoing, after the first 12 months following the termination of Executive's employment by the Company without Cause or by the Executive for Good Reason, the Company can notify the Executive, no later than 30 days prior to the end of such 12 month period, that it will extend the Non-Compete Period for an additional six months and in such event, the Company will continue to the make the payments set forth in Section 8(d) during that six month period. Further, the Company may, at its option, following the termination of the Executive's employment as a result of the expiration of this Agreement in accordance with its terms, agree to pay the Executive her Base Salary, in accordance with the Company's regular payroll practices (based on the Executive's rate of annual Base Salary at the time of the Executive's termination of employment), Bonus Payment and COBRA Payment for up to 24 months, in which event the Executive will be subject to the provisions of this Section 12 so long as the Company is making such payments. In addition, the Company may, at its option, following the termination of the Executive's employment due to Disability, agree to pay the Executive her Base Salary in accordance with the Company's regular payroll practices (based on the Executive's rate of annual Base Salary at the time of termination), the Bonus Payment and COBRA Payment (less any payments the Executive is receiving pursuant to disability insurance provided by the Company) for up to 24 months, in which event the Executive will be subject to the provisions of this Section 12 so long as the Company is making such payments, provided that the Executive must provide notice to the Company that the Executive no longer has a Disability and is seeking employment. Notwithstanding anything herein to the contrary, if at any time while the Company is making payments to the Executive pursuant to this Section 12 the Executive obtains new employment and becomes eligible for medical coverage pursuant to her new employment, the COBRA Payments shall terminate, in accordance with applicable law. Notwithstanding anything set forth herein to the contrary, in the event that the Executive's employment is terminated in connection with a Change in Control in which the Executive receives a distribution in accordance with Section 10 of the LLC Agreement, the Executive shall be subject to the provisions of this Section 12 for a period of 24 months following the termination of the

Executive's employment and no severance payments need be made by the Company, other than the severance payments set forth in Section 8.

(b)     Cooperation.  Following termination of employment with the Company for any reason, Executive shall reasonably cooperate with the Company, as reasonably requested by the Company, to effect a transition of her responsibilities and to ensure that the Company is aware of all matters being handled by Executive.  In addition, Executive shall, upon reasonable notice and upon reimbursement for reasonable expenses, reasonably cooperate with the Company regarding any claim, dispute, litigation, inquiry, investigation or proceeding concerning any matter with which Executive was involved while working for the Company.

(c)     Continuing Obligations.  Following the expiration of the Term of Employment or the earlier termination of employment with the Company for any reason, Executive acknowledges and agrees that all of her obligations under Sections 11 and 12 of this Agreement shall survive such expiration and/or termination, except that Section 12(a) shall survive only for the periods of time set forth therein.

(d)     No Further Liability; Release.  Payment made and performance by the Company in accordance with Section 8 shall operate to fully discharge and release the Company and its directors, officers, employees, subsidiaries, parent companies, affiliates, stockholders, successors, assigns, benefit plans, benefit plan administrators, benefit plan trustees, agents and representatives from any further obligation or liability with respect to Executive's employment and termination of employment.  Other than providing the compensation and benefits provided for in accordance with Section 8, the Company and its directors, officers, employees, subsidiaries, parent companies, Affiliates, stockholders, successors, assigns, benefit plans, benefit plan administrators, benefit plan trustees, agents and representatives shall have no further obligation or liability to Executive, except as otherwise required by law.  The payment of any amounts pursuant to Section 8 (other than payments required by law) is expressly conditioned upon the delivery by Executive to the Company of a release in the form of *Exhibit A* annexed hereto (the "*Release*") of any and all claims Executive may have against the Company and its directors, officers, employees, subsidiaries, parent companies, affiliates, stockholders, successors, assigns, benefit plans, benefit plan administrators, benefit plan trustees, agents and representatives arising out of or related to Executive's employment by the Company and the termination of such employment as provided in the Release.

(e)     Limitation of Remedies.  If Executive's employment terminates for any reason, she shall not be entitled to any payments, benefits, damages, awards or compensation other than as provided in this Agreement, except as otherwise required by law.

(f)     Specific Performance.  Executive acknowledges and agrees that a portion of the consideration for offering her employment and her compensation set forth in this Agreement is the noncompetition agreement set forth in 12(a) above.  Each party acknowledges and agrees that the other party would be damaged irreparably if any provision of this Section 12 is not performed in accordance with its specific terms or is otherwise breached.  Accordingly, each party agrees that the other party will be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions

of Section 12 in any action instituted hereunder, in addition to any other remedy to which they may be entitled at law or in equity.

(g)  Enforcement.  Executive acknowledges and agrees that, by virtue of her position, her services and access to and use of Confidential Information, any violation by her of any of the undertakings contained in this Section 12 would cause the Company immediate, substantial and irreparable injury for which it has no adequate remedy at law. Accordingly, Executive agrees and consents to the entry of an injunction or other equitable relief by a court of competent jurisdiction restraining any violation or threatened violation of any undertaking contained in this Section 12. Executive waives posting by the Company of any bond otherwise necessary to secure such injunction or other equitable relief. In addition, the rights and remedies provided for in this Section 12 are cumulative and shall be in addition to rights and remedies otherwise available to the parties hereunder or under any agreement or applicable law. In the event that any of the rights or restrictions contained or provided for herein shall be deemed to be unenforceable, unreasonable or inequitable by reason of the extent, duration, geographical scope, or other provision of Section 12, or any other provision of this Agreement, the parties hereto contemplate that a court may modify such provision to the extent necessary to make such rights or restrictions enforceable, reasonable and equitable, and enforce this Agreement, and specifically Section 12, in its modified form for all purposes in the manner contemplated hereby.

(h)  Executive understands that the provisions of this Section 12 may limit her ability to earn a livelihood in a business similar to the business of the Company but nevertheless agrees and hereby acknowledges that Company would be unwilling to enter into this Agreement but for the provisions of this Section 12 and that the consideration provided under this Agreement, including any amounts or benefits provided hereunder and other obligations undertaken by the Company, is sufficient to justify the restrictions contained in such provisions. In consideration thereof and in light of Executive's education, skills and abilities, Executive agrees that she will not assert in any forum that such provisions prevent her from earning a living or otherwise are void or unenforceable or should be held void or unenforceable.

13.  Other Obligations.  The parties hereto represent and warrant that they have the full power, authority and capacity to enter into and perform their obligations under this Agreement and that the performance of the parties' respective obligations hereunder will not conflict with or violate or otherwise are inconsistent with any other obligations, legal or otherwise, which the parties may have.

14.  Governing Law; Jurisdiction.  This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York, without reference to principles of conflicts or choice of law under which the law of any other jurisdiction would apply. Any dispute or controversy arising under or in connection with this Agreement shall be settled exclusively by the state and/or Federal courts in the City, County and State of New York. Each party hereto consents to personal jurisdiction in New York and voluntarily submits to the jurisdiction of the courts of New York in any action or proceeding with respect to this Agreement, including the federal district courts located in that State. The parties further agree to accept service of process as long as provided in accordance with the notice provisions of this Agreement.

1-
237

15.    Renewal. The Term of Employment shall be renewed for one or more additional two-year periods (each an "*Extension Term*"), upon written notice by one party to the other party ("*Renewal Notice*") that this Agreement shall be renewed for an Extension Term. Any such Renewal Notice shall be given by the Company or the Executive not less than six months prior to the end of the Term of Employment or the then-current Extension Term. All of the terms hereof shall apply to each Extension Term.

16.    Notices. Any notice required or desired to be delivered under this Agreement shall be in writing and shall be delivered personally, by courier service, by registered mail, return receipt requested, or by telecopy and shall be effective upon actual receipt by the party to which such notice shall be directed, and shall be addressed as follows (or to such other address as the Party entitled to notice shall hereafter designate in accordance with the terms hereof):

If to the Company:

IGPS Company LLC
201 South Orange Avenue
Suite 425
Orlando, FL 32801
Attn: Chief Executive Officer

If to the Executive, to her at her address:

Susan Yoss
425 East 58th Street
New York, NY 10022

17.    Miscellaneous.

(a)    Entire Agreement. This Agreement contains the entire understanding and agreement between the Parties concerning the subject matter hereof and, as of the Effective Date, supersedes all prior agreements, understandings, discussions, negotiations and undertakings, whether written or oral, between the parties with respect thereto.

(b)    Severability. If any provision of this Agreement or the application of any such provision to any party or circumstances shall be determined by any court to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to such person or circumstances other than those to which it is so determined to be invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be enforced to the fullest extent permitted by law. If any provision of this Agreement, or any part thereof, is held to be invalid or unenforceable because of the scope or duration of or the area covered by such provision, the parties hereto agree that the court making such determination shall reduce the scope, duration and/or area of such provision (and shall substitute appropriate provisions for any such invalid or unenforceable provisions) in order to make such provision enforceable to the fullest extent permitted by law and/or shall delete specific words and phrases, and such modified provision shall then be enforceable and shall be enforced. The parties hereto recognize that if, in any proceeding, a court shall refuse to enforce any of the separate covenants

J-
237

contained in this Agreement, then that invalid or unenforceable covenant contained in this Agreement shall be deemed eliminated from these provisions to the extent necessary to permit the remaining separate covenants to be enforced. In the event that any court determines that the time period or the area, or both, are unreasonable and that any of the covenants is to that extent invalid or unenforceable, the parties hereto agree that such covenants will remain in full force and effect, first, for the greatest time period, and second, in the greatest geographical area that would not render them unenforceable.

(c)     <u>Amendment or Waiver</u>. No provision in this Agreement may be amended unless such amendment is set forth in writing and signed by the parties. No waiver by either party of any breach of any condition or provision contained in this Agreement shall be deemed a waiver of any similar or dissimilar condition or provision at the same or any prior or subsequent time. To be effective, any waiver must be set forth in writing and signed by the waiving party.

(d)     <u>Headings</u>. The headings of the sections contained in this Agreement are for convenience only and shall not be deemed to control or affect the meaning or construction of any provision of this Agreement.

(e)     <u>Beneficiaries/References</u>. The Executive shall be entitled, to the extent permitted under any applicable law, to select and change a beneficiary or beneficiaries to receive any compensation or benefit hereunder following the Executive's death by giving the Company written notice thereof. In the event of the Executive's death or a judicial determination of her incompetence, reference in this Agreement to the Executive shall be deemed, where appropriate, to refer to her beneficiary, estate or other legal representative.

(f)     <u>Acknowledgement</u>. Executive acknowledges and represents that she has read this Agreement in its entirety, including all exhibits hereto, fully understands the terms of this Agreement and its exhibits, has had the opportunity to consult with counsel prior to executing this Agreement, and is signing the Agreement voluntarily and with full knowledge of its significance.

(g)     <u>Advice of Counsel and Construction</u>. The parties acknowledge that all parties to this Agreement have had the opportunity to be represented by counsel. Accordingly, the rule of construction of contract language by the drafting party is hereby waived by all parties.

(h)     <u>Survivorship</u>. Notwithstanding anything contained herein to the contrary, if the Executive's employment with the Company terminates during the Term of Employment, Sections 7, 8, 9, 10, 11, 12, 13, 14, 15 and 16 of this Agreement, and the parties' respective rights and obligations under such provisions, shall survive until all of the parties' obligations under such Sections are satisfied.

(i)     <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.

(j)     <u>Withholding</u>. The Company may withhold from all payments due to the Executive (or her beneficiary or estate) hereunder all taxes which, by applicable federal, state, local or other law, the Company is required to withhold therefrom.

}—
237

(k)    <u>Compliance with Section 409A of the Code</u>. This Agreement is intended to comply with Section 409A of the Code and shall be construed and interpreted in accordance with such intent. The Executive acknowledges and agrees that the Company shall revise any provision in this Agreement (including, without limitation, provisions concerning the timing of any payments described hereunder) to the extent necessary to comply with Section 409A of the Code and any regulations and/or guidance promulgated thereunder, but shall to the maximum extent possible maintain the same economic arrangements.

*[Signature follows on next page]*

**IN WITNESS WHEREOF,** the undersigned have executed and delivered this Agreement as of the date first set forth above.

IGPS COMPANY LLC

By: _____

**EXECUTIVE**

_____
Susan Yoss

[Signature Page to Employment Agreement]

## ANNEX 1
## Bonus Plan

Performance Category[1]                              Percentage of Plan

| IGPS Company LLC Executive Bonus structure | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | Performance Category[2] | | | | |
| % of Plan[1] | % added to or subtracted from bonus | Annual Bonus % of salary | A [ ]% | B [ ]% | C [ ]% | D [ ]% | Total 100% |
| Above | | 0.0% | | | | | |
| 139.0% | 1.0% | 200.0% | | | | | |
| 138.0% | 3.0% | 199.0% | | | | | |
| 137.0% | 3.0% | 196.0% | | | | | |
| 136.0% | 3.0% | 193.0% | | | | | |
| 135.0% | 3.0% | 190.0% | | | | | |
| 134.0% | 3.0% | 187.0% | | | | | |
| 133.0% | 3.0% | 184.0% | | | | | |
| 132.0% | 3.0% | 181.0% | | | | | |
| 131.0% | 3.0% | 178.0% | | | | | |
| 130.0% | 3.0% | 175.0% | | | | | |
| 129.0% | 3.0% | 172.0% | | | | | |
| 128.0% | 3.0% | 169.0% | | | | | |
| 127.0% | 3.0% | 166.0% | | | | | |
| 126.0% | 3.0% | 163.0% | | | | | |
| 125.0% | 3.0% | 160.0% | | | | | |
| 124.0% | 3.0% | 157.0% | | | | | |
| 123.0% | 3.0% | 154.0% | | | | | |
| 122.0% | 3.0% | 151.0% | | | | | |
| 121.0% | 3.0% | 148.0% | | | | | |
| 120.0% | 3.0% | 145.0% | | | | | |
| 119.0% | 3.0% | 142.0% | | | | | |
| 118.0% | 3.0% | 139.0% | | | | | |
| 117.0% | 3.0% | 136.0% | | | | | |
| 116.0% | 3.0% | 133.0% | | | | | |
| 115.0% | 3.0% | 130.0% | | | | | |
| 114.0% | 3.0% | 127.0% | | | | | |
| 113.0% | 3.0% | 124.0% | | | | | |
| 112.0% | 3.0% | 121.0% | | | | | |
| 111.0% | 3.0% | 118.0% | | | | | |
| 110.0% | 2.0% | 115.0% | | | | | |
| 109.0% | 2.0% | 113.0% | | | | | |

| % of Plan[1] | % added to or subtracted from bonus | Annual Bonus % of salary | Performance Category[2] | | | | |
|---|---|---|---|---|---|---|---|
| | | | A [ ]% | B [ ]% | C [ ]% | D [ ]% | Total 100% |
| 108.0% | 2.0% | 111.0% | | | | | |
| 107.0% | 2.0% | 109.0% | | | | | |
| 106.0% | 2.0% | 107.0% | | | | | |
| 105.0% | 1.0% | 105.0% | | | | | |
| 104.0% | 1.0% | 104.0% | | | | | |
| 103.0% | 1.0% | 103.0% | | | | | |
| 102.0% | 1.0% | 102.0% | | | | | |
| 101.0% | 1.0% | 101.0% | | | | | |
| 100.0% | 0.0% | 100.0% | | | | | |
| 99.0% | -1.0% | 99.0% | | | | | |
| 98.0% | -1.0% | 98.0% | | | | | |
| 97.0% | -1.0% | 97.0% | | | | | |
| 96.0% | -1.0% | 96.0% | | | | | |
| 95.0% | -1.0% | 95.0% | | | | | |
| 94.0% | -2.0% | 93.0% | | | | | |
| 93.0% | -2.0% | 91.0% | | | | | |
| 92.0% | -2.0% | 89.0% | | | | | |
| 91.0% | -2.0% | 87.0% | | | | | |
| 90.0% | -2.0% | 85.0% | | | | | |
| 89.0% | -3.0% | 82.0% | | | | | |
| 88.0% | -3.0% | 79.0% | | | | | |
| 87.0% | -3.0% | 76.0% | | | | | |
| 86.0% | -3.0% | 73.0% | | | | | |
| 85.0% | -3.0% | 70.0% | | | | | |
| 84.0% | -3.0% | 67.0% | | | | | |
| 83.0% | -3.0% | 64.0% | | | | | |
| 82.0% | -3.0% | 61.0% | | | | | |
| 81.0% | -3.0% | 58.0% | | | | | |
| 80.0% | -3.0% | 55.0% | | | | | |
| Below | | 0.0% | | | | | |

(1) The Plan is to be issued annually but not later than March 30 of the year to which the Plan relates by the Executive and agreed upon by the Company Board.
(2) The performance categories and their relative weight within the bonus plan will be determined by the Executive and the Company Board.

# EXHIBIT A
## Release

R E L E A S E

The undersigned, Susan Yoss, in consideration and as a condition of the agreement by IGPS Company LLC (the "*Company*") to provide certain benefits and payments to me as set forth in that certain Employment Agreement dated as of February ___, 2007, a copy of which is attached to this Release, for and on behalf of myself, my agents, heirs, executors, administrators, and assigns ("*Affiliated Releasing Parties*"), do hereby release and forever discharge the Company and its successors and assigns, and each of their respective present and former members, agents, managers, directors, officers, partners, employees, representatives, insurers, attorneys, subsidiaries, affiliates, and joint venturers, and each of them, from any and all claims that are based upon acts or events that occurred on or before the date on which this Release becomes enforceable, including any claim arising under any state or federal statute or common law, including, without limitation, all claims relating to my association and employment with the Company and the termination thereof, and all claims for or under, among other things, the United States Constitution, the Fair Labor Standards Act (29 U.S.C. §§ 201, et seq.), the Equal Pay Act (29 U.S.C. §206(a) and interpretive regulations), Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. §§ 2000e, et seq.), the Age Discrimination in Employment Act, including the Older Worker Benefits Protection Act (29 U.S.C. §§ 623, et seq.) (the "*ADEA*"), the Americans With Disabilities Act (42 U.S.C. §§ 12101, et seq.), the Family and Medical Leave Act (29 U.S.C. §§ 2601, et seq.), the Employee Retirement and Income Security Act (29 U.S.C. §§ 301, et seq.), the Uniformed Services Employment and Reemployment Rights Act (38 U.S.C. §§ 4301-4333), the Immigration Reform and Control Act of 1986 (8 U.S.C. §§ 1101, et seq.), the Worker Adjustment and Retraining Notification Act (29 U.S.C. §§ 2101, et seq.); all claims under the Sarbanes-Oxley Act of 2002 (Public Law 107-204), including whistleblowing claims under 18 U.S.C. sections 1514A and 1513(e); claims for retaliation, harassment, and discrimination; claims for breach of express or implied contract, including breach of the covenant of good faith and fair dealing; claims for unpaid wages, medical expenses, or other benefits or compensation; any actions or claims arising out of any and all employee handbooks, policy and procedure manuals, pension plans, benefit plans, and other policies and practices of the Company from the time of my initial employment to the present; claims for attorneys' fees; and any and all claims arising under any other federal, state or local laws, statutes, regulations or ordinances, as well as any and all common law legal or equitable claims, in each case whether absolute, contingent, direct or indirect, liquidated or unliquidated, whether known or unknown, suspected or unsuspected, material or immaterial (the "*Released Claims*"). The following rights of the undersigned are excluded from the foregoing release: (a) directors and officers insurance provided by the Company; (b) severance benefits pursuant to the Employment Agreement; (c) any rights to indemnification provided in the limited liability company agreement of the Company or as otherwise provided under the laws of the State of Delaware or any other agreement or plan; and (d) any vested benefits or vested equity.

I acknowledge and agree that this Release constitutes a voluntary waiver of any and all rights and claims I may have as of this date, including rights or claims arising under the ADEA. I have waived rights or claims pursuant to this Release in exchange for consideration, the value of which exceeds payment or remuneration to which I was entitled, and one-eighth of the consideration paid to me is attributable to this ADEA portion of the Release. I have been advised that I may consult with the attorney of my choosing concerning this Release prior to executing it.

683206.0001 EAST 7740599 v4

I also have been allowed a period of at least 21 days to consider the terms of this Release, and in the event I decide to execute this Agreement in fewer than 21 days, I have done so with the express understanding that I have been given and declined the opportunity to consider this Release for a full 21 days. I also understand that I may revoke the release contained in this Paragraph only (regarding claims under the ADEA), at any time during the seven days following the date of execution of this Agreement, and the release contained in this Paragraph only shall not become effective or enforceable until such revocation period has expired.

I acknowledge that there is a risk that after the execution of this Agreement, I will incur or suffer damage, loss or injury to person or property that is in some way caused by or connected with my employment with the Company and the termination thereof, but that is unknown or unanticipated at the time of the execution of this Agreement. I specifically assume that risk, and I agree that this release applies to all unknown or unanticipated claims and all matters caused by or connected with my employment with the Company and the termination thereof, as well as those claims currently known or anticipated. I hereby covenant not to (and I will cause my Affiliated Releasing Parties not to) bring any claim, suit or action arising out o f, related to, in respect of or in connection with the Released Claims.

I acknowledge and agree that this Release constitutes a voluntary waiver of any and all rights and claims I may have as of this date. I have waived rights or claims pursuant to this Release in exchange for consideration, the value of which exceeds payment or remuneration to which I was entitled.

I agree to refrain from taking actions or making statements, written or oral, that might disparage or defame the goodwill or reputation of the Company and/or its directors, officers, executives and employees or that could adversely affect the morale of other employees of the Company.

I have read this Release and understand all of its terms. I also have had the opportunity to consult with the counsel of my choice. I execute this Release voluntarily and with full knowledge of its significance, and I understand that this Release will be governed by New York law.

Signed at _____, New York, this ___ day of _____, 20__.


_____
Susan Yoss