**AKIN GUMP STRAUSS HAUER & FELD LLP**
Stephen M. Baldini (SB-2070)
Austin K. So (AS-8348)
590 Madison Avenue
New York, New York 10022
(212) 872-1000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUSAN YOSS,<br><br>                    Plaintiff,<br><br>  - against -<br><br>IGPS COMPANY, LLC; PEGASUS CAPITAL ADVISORS, LP; PEGASUS CAPITAL ADVISORS G.P., LLC; PEGASUS CAPITAL ADVISORS III, LP; PEGASUS INVESTORS III, LP; PEGASUS INVESTORS III G.P., LLC,<br><br>                    Defendants. | No. 08 CV 02212 (MGC) (MHD)<br><br>**ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS** |

## DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Defendant iGPS Company, LLC ("iGPS" or "Defendant"), hereby answers the Complaint of plaintiff Susan Yoss ("Yoss" or "Plaintiff") and asserts affirmative defenses and counterclaims as set for the below:

1.      iGPS denies the allegations set forth in paragraph 1 of the Complaint.

2.      iGPS admits that Yoss's employment contract with iGPS (the "Employment Contract") required advance written notice of her resignation and that she gave only verbal notice, but denies that a written notice was a condition precedent to her resignation. iGPS denies the remainder of the allegations set forth in paragraph 2 of the Complaint.

3.    Paragraph 3 of the Complaint contains conclusions of law to which no response is required.

4.    iGPS denies the allegations set forth in paragraph 4 of the Complaint.

5.    iGPS admits that it was formed under the laws of, and maintains its principal place of business in, states other than New York. iGPS denies knowledge or information sufficient to form a belief as to the residence of Plaintiff. The remainder of paragraph 5 of the Complaint contains conclusions of law to which no response is required.

6.    Paragraph 6 of the Complaint contains conclusions of law to which no response is required.

7.    iGPS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 7 of the Complaint and therefore denies those allegations.

8.    iGPS admits the allegations set forth in paragraph 8 of the Complaint.

9.    iGPS admits the allegations set forth in paragraph 9 of the Complaint except denies that it is a corporation.

10.    iGPS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 10 and therefore denies those allegations.

11.    iGPS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 11 of the Complaint and therefore denies those allegations.

12.    iGPS denies that Pegasus Capital Advisors, GP, LLC is a partnership. iGPS denies knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations set forth in paragraph 12 of the Complaint and therefore denies those allegations.

13.     iGPS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 13 of the Complaint and therefore denies those allegations.

14.     iGPS denies that Pegasus Investors III G.P., LLC is a corporation. iGPS denies knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations set forth in paragraph 14 of the Complaint and therefore denies those allegations.

15.     Paragraph 15 of the Complaint contains no allegations of fact or law to which a response is required.

16.     iGPS admits the allegations set forth in paragraph 16 of the Complaint.

17.     iGPS admits that Yoss performed portions of her duties as Chief Financial Officer in iGPS's offices in New York, New York. iGPS denies the remainder of the allegations set forth in paragraph 17 of the Complaint.

18.     iGPS admits that, at times, Yoss was the senior-most employee working in iGPS's New York City office. iGPS denies the remainder of the allegations set forth in paragraph 18 of the Complaint.

19.     iGPS admits that Richard Weinberg is a board member of iGPS and partner of certain Pegasus entities; that Weinberg, who had worked with Yoss prior to their joining iGPS, helped recruit Yoss to iGPS; and that, upon information and belief, Yoss served as Operating Advisor to certain Pegasus entities. iGPS denies the remainder of the allegations set forth in paragraph 19 of the Complaint.

20.     iGPS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 20 of the Complaint.

21.    iGPS admits that Pegasus is a shareholder of iGPS. iGPS denies knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations of paragraph 21 of the Complaint and therefore denies those allegations.

22.    iGPS admits that on or about March 1, 2007, Yoss and iGPS entered into the Employment Contract. The remainder of paragraph 22 of the Complaint contains no allegations of fact or law to which a response is required.

23.    iGPS admits that the Employment Contract provided that iGPS could terminate the Employment Contract for "Cause" but denies that iGPS could do so only under limited circumstances. For clarification, iGPS avers that iGPS could terminate the Employment Contract with or without Cause, and that Yoss could terminate the Employment Contract with or without Good Reason ("Cause" and "Good Reason" are defined terms in the Employment Contract). iGPS admits that the definition of "Cause" is accurately set forth in paragraph 23 of the Complaint.

24.    iGPS admits the allegations set forth in paragraph 24 of the Complaint except denies that "Good Reason" is a term that is not relevant to this action. For clarification, iGPS avers that Yoss could terminate the Employment Contract with or without Good Reason (as defined in the Employment Contract).

25.    iGPS admits that in March 2007, in connection with Yoss's hire, iGPS granted Yoss 10,000,000 Class A Common Units in iGPS subject to a vesting schedule.

26.    iGPS admits the allegations set forth in paragraph 26 of the Complaint except denies knowledge and information sufficient to form a belief as to the nature of Yoss's use of the conference room.

27.     iGPS admits that iGPS appointed Yoss to the iGPS board of directors on or about March 1, 2007; that iGPS appointed Yoss to the Executive Committee of the board and to the position of Corporate Secretary on or about June 1, 2007; and that Yoss attended meetings of the Compensation Committee. iGPS denies the remainder of the allegations set forth in paragraph 27 of the Complaint.

28.     iGPS admits that at various times, five or six iGPS board members were associated with various Pegasus entities, and that every member of the Executive and Compensation Committees of the iGPS board has been affiliated with Pegasus. iGPS denies the remainder of the allegations set forth in paragraph 28 of the Complaint.

29.     iGPS admits that it granted Yoss 10,000,000 Class E Units in iGPS in or about April 2007 subject to a vesting schedule. iGPS denies the remainder of the allegations set forth in paragraph 29 of the Complaint.

30.     iGPS admits the allegations set forth in paragraph 30 of the Complaint.

31.     iGPS admits that iGPS granted Yoss an additional 12,285,000 Class E Units in iGPS subject to a vesting schedule.

32.     iGPS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 32 of the Complaint.

33.     iGPS denies the allegations set forth in paragraph 33 of the Complaint except admits that iGPS granted her additional equity in iGPS.

34.     iGPS admits that Moore and Lowe used the term "Three Amigos" and that Moore and Lowe shared a commitment to iGPS. iGPS denies the remainder of the allegations set forth in paragraph 34 of the Complaint.

35.    iGPS denies the allegations set forth in paragraph 35 of the Complaint.

36.    iGPS admits the allegations set forth in paragraph 36 of the Complaint.

37.    iGPS admits that iGPS faced difficulty in obtaining financing for its business and that, at times, Moore and Yoss argued over various business matters.  iGPS denies the remainder of the allegations set forth in paragraph 37 of the Complaint.

38.    iGPS denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 38 of the Complaint and therefore denies those allegations.

39.    iGPS denies the allegations set forth in paragraph 39 of the Complaint.

40.    iGPS denies the allegations set forth in paragraph 40 of the Complaint except admits that Yoss discussed with Moore frustrations with her job.

41.    iGPS denies the allegations set forth in paragraph 41 of the Complaint.

42.    iGPS admits that Yoss failed to give written notice of her resignation to iGPS but denies the remainder of the allegations set forth in paragraph 42 of the Complaint.

43.    iGPS denies the allegations set forth in paragraph 43 of the Complaint except admits that Moore asked Yoss if she was interviewing for other positions, and that Yoss replied that she was not.

44.    iGPS denies the allegations set forth in paragraph 44 of the Complaint.

45.    iGPS admits the allegations set forth in paragraph 45 of the Complaint except denies that the office space was "new."  For clarification, iGPS avers that it was assigned, and moved into, unused portions of existing office space that was leased to an affiliate of Pegasus.

6

46.    iGPS denies the allegations set forth in paragraph 46 of the Complaint, except admits that sometime after Yoss resigned, iGPS ceased occupying the office space located at 600 Madison Avenue in New York City.

47.    iGPS denies the allegations set forth in paragraph 47 of the Complaint.

48.    iGPS denies the allegations set forth in paragraph 48 of the Complaint.

49.    iGPS admits that after her resignation as Chief Financial Officer, Yoss continued to assist iGPS with presentations to certain potential investors in iGPS as part of the transition of her duties, but denies the remainder of the allegations set forth in paragraph 49 of the Complaint.

50.    iGPS denies the allegations set forth in paragraph 50 of the Complaint.

51.    iGPS denies the allegations set forth in paragraph 51 of the Complaint except admits that iGPS prepared a "data room" for potential investors.

52.    iGPS denies the allegations set forth in paragraph 52 of the Complaint.

53.    iGPS admits that on or about November 30, 2007, Moore advised Yoss, in sum and substance, that iGPS would not reconsider her previous resignation and that, among other things, certain individuals associated with Pegasus concurred.

54.    iGPS admits that as part of the transition of her duties after she resigned as Chief Financial Officer, Yoss worked on certain matters for iGPS but denies the remainder of the allegations set forth in paragraph 54 of the Complaint.

55.    iGPS admits that Moore advised Yoss that Tod Sizemore had difficulty working with Yoss and that, in light of her resignation, Yoss would be treated fairly upon her separation from the Company, but denies the remainder of the allegations set forth in paragraph 55 of the Complaint.

56.    iGPS admits that Moore never contended that iGPS was terminating Yoss's employment, either for or without Cause.

57.    iGPS admits that iGPS never sent Yoss any notice stating or contending that Yoss's employment had been terminated, either for or without Cause.

58.    iGPS admits that in response to an email from Yoss on December 14, 2007, in which she attempted to recast her voluntary resignation as a termination by iGPS, Moore recounted the events surrounding her voluntary resignation on or about October 22, 2007. iGPS denies the remainder of the allegations set forth in paragraph 58 of the Complaint.

59.    iGPS admits the allegations set forth in paragraph 59 of the Complaint.

60.    iGPS admits that on or about January 3, 2008, iGPS informed Yoss that the transition of her duties would be complete as of January 11, 2008 and that she would be removed from iGPS's payroll as of that date. iGPS denies the remainder of the allegations set forth in paragraph 60 of the Complaint.

61.    iGPS denies the allegations set forth in paragraph 61 of the Complaint.

62.    iGPS denies the allegations set forth in paragraph 62 of the Complaint.

63.    iGPS denies the allegations set forth in paragraph 63 of the Complaint.

64.    iGPS denies the allegations set forth in paragraph 64 of the Complaint.

65.    iGPS denies the allegations set forth in paragraph 65 of the Complaint.

66.    iGPS denies the allegations set forth in paragraph 66 of the Complaint and that Yoss is entitled to the relief demanded.

67.    Paragraph 67 of the Complaint contains no allegations of fact or law to which a response is required.

## AFFIRMATIVE DEFENSES

1.    Plaintiff's claims are barred by the doctrines of estoppel and waiver.

2.    Plaintiff's claims are barred by the doctrines of unclean hands.

## COUNTERCLAIMS

1.    Counterclaim Plaintiff iGPS Company, LLC ("iGPS" or "Company") repeats and realleges the allegations contained in paragraphs 1 through 67, inclusive, of its Answer.

2.    iGPS, for its counterclaims against Counterclaim Defendant Susan Yoss ("Yoss"), alleges as follows.

## PRELIMINARY STATEMENT

3.    iGPS counterclaims for a declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, that Yoss unilaterally resigned from her position with iGPS without "Good Reason" (as defined in the employment contract between iGPS and Yoss (the "Employment Contract")) and, therefore, is not entitled to seek compensation under her Employment Contract as if she had been terminated by the Company without "Cause." iGPS also seeks damages for breach of contract.

4.    Yoss served as the Chief Financial Officer (the "CFO") of iGPS for nine months pursuant to an Employment Contract executed on or about March 1, 2007 (the "Employment Contract").

5.    From the beginning of her nine-month employment with iGPS, Yoss repeatedly expressed discontent over the duties and responsibilities she had to fulfill as the CFO—the very

duties and responsibilities she had agreed to in the Employment Contract. Wanting to retain its CFO during its growth phase, iGPS repeatedly placated Yoss with additional compensation.

6.     In October 2007, iGPS faced a crucial period in its brief existence. The Company needed an infusion of capital to help fund its operations and was actively soliciting potential third-party investors. Typically, this would have been a time for a company to rely heavily on its CFO.

7.     Instead, Yoss voluntarily and unilaterally resigned from her position without Good Reason on or about October 22, 2007, at a time when the chances of finding an outside investor seemed bleak and when the Company needed its CFO the most.

8.     However, when iGPS finally secured its much-needed outside investment (over a month after Yoss's resignation and without any meaningful contribution from her), Yoss attempted to rescind her resignation. When she failed to do so, she began to claim that she had not in fact resigned but that, instead, iGPS had terminated her without cause.

9.     The purpose of Yoss's fabrication is clear. By manufacturing a falsehood, she is attempting to claim compensation and benefits under the Employment Contract that she is not rightfully entitled to.

10.     Thus, despite having served as the Company's CFO for only nine months and having resigned her position when iGPS should have been able to rely on her the most, Yoss now claims that she is entitled to a king's ransom in severance payments and other benefits as if she had been terminated by the Company without cause.

11.     In light of her asserted attempt to claim payments and benefits she is not entitled to, it is necessary for iGPS to seek relief declaring that Yoss voluntarily resigned without Good Reason and that she is not entitled to the severance payments and other benefits she seeks under

her Employment Contract. Further, iGPS seeks damages for Yoss's breach of her Employment Contract.

## STATEMENT OF FACTS

### iGPS is an Innovative Start-up in the Pallet-Pooling Business

12.     Founded in March 2006, iGPS is an innovative start-up company in the pallet-pooling business. Pallet-pooling refers to a system of renting, rather than owning, pallets.

13.     Under this system, a customer—typically a manufacturer, distributor or retailer—orders a shipment of pallets from iGPS as needed. iGPS then delivers the order of ready-to-use plastic pallets to the customer's facility in truckload quantities. After the customer delivers its goods to its distribution network using the iGPS pallets, the customer returns the pallets to the Company. iGPS then inspects and prepares the pallets for reuse.

14.     Traditionally, pallets have been made from wood. iGPS is a relatively new entrant into the market and offers a new and innovative pallet made from plastic. In fact, iGPS is the first company in the world to offer an all-plastic pallet pool with embedded radio frequency identification ("RFID") tags.

15.     The Company's plastics pallets offer numerous advantages over traditional wooden pallets. Among other advantages, iGPS's plastic pallets are safer, more durable, more economical and more environmentally-responsible than wooden pallets. Plastic pallets eliminate protruding nails and splinters that can injure workers and damage equipment. Plastic pallets are also fire-retardant and more durable, reducing potential damage to the shipment of goods they carry. In addition, iGPS's plastic pallets can be tracked and traced thorough their embedded RFID tags, reducing the possibility of lost shipments. Lastly, plastic pallets are 100% recyclable, with an indefinite lifespan, and will not end up in landfills.

**Soon after Yoss Joins iGPS as its Chief Financial Officer, She Begins to Complain and Repeatedly Threatens to Resign**

16.    Yoss joined iGPS in or about March 2007 as the CFO of the Company pursuant to the Employment Contract.

17.    Section 3 of Yoss's Employment Contract set forth Yoss's duties and responsibilities as the CFO:

> During the Term of Employment, the Executive shall be employed as the Chief Financial Officer of the Company and shall have such duties, authority and responsibilities as shall customarily pertain to such office and as may reasonably be assigned by the Company Board consistent with Executive's duties and responsibilities under this Agreement taking into consideration the size and scope of the Company's operations. The Executive, in carrying out her executive duties under this Agreement, shall report solely and directly to the Chief Executive Officer and the Company Board . . . Without limiting the generality of the foregoing, Executive shall undertake to perform her duties in a manner consistent with the best interests of the Company, and shall perform all duties, services and responsibilities in accordance with the guidelines, policies and procedures established by the Company Board, and shall be subject to the supervision of the Company Board.

18.    Soon after the commencement of her employment in or about March 2007, Yoss began to express dissatisfaction with her duties, responsibilities and role as the Company's CFO. On numerous occasions, she advised iGPS's Chief Executive Officer, Bob Moore, the president of the Company's board, Rex Lowe, and numerous other employees and board members that she was "a deal junkie" who—notwithstanding the needs of the Company and the terms she agreed to in the Employment Contract—had neither the desire nor the skill set to be an "operational CFO."

19.    On several occasions, Yoss advised the Company's management and employees, in sum and substance, that iGPS might not be the best fit for her and that she might be better off

at another company.  Often, these statements were followed by threats to resign and accompanied by demands for a different role and/or more compensation.

### iGPS Repeatedly Caters to Yoss's Demands

20.     As a relatively young company in need of good leadership and management during its growth phase, iGPS wanted to retain its CFO.  Therefore, the Company repeatedly addressed Yoss's complaints and catered to both her demands for a different role and for more compensation.

21.     For example, when Yoss complained of being an "operational CFO" with no "deals" to work on, Moore advised her on several occasions that the Company was actively involved in various transactions and that she soon would have plenty of deal work at iGPS. Management and board members also assured her repeatedly that she played a critical role as the CFO.

22.     When Yoss complained that she was not given enough responsibility with new customers, iGPS gave her the responsibility she wanted: Interacting with new customers and negotiating new deals.

23.     But Yoss then complained that she had too much responsibility and that she could not handle the increased workload.  In response, the Company hired additional staff to assist her in her duties.  The Company also made substantial investments in additional office space in order to accommodate her and her staff.

24.     On another occasion, when Yoss once again threatened to resign, iGPS granted her additional equity in the Company to convince her to stay.

### Yoss's Complaints and Threats Reach a Peak During a Critical Period for iGPS

25.     Although the Company bent over backwards to accommodate Yoss's complaints and demands throughout her nine-month employment, Yoss's dissatisfaction reached a peak during a critical period for the young Company.

26.     From September to December of 2007, iGPS was actively seeking an infusion of capital in order to, among other things, purchase pallets and build a pallet pool. However, the collapse of the credit markets around that period made it very difficult to find an investor and successfully negotiate a deal.

27.     Customarily, a CFO would play a vital role in such a fundraising effort. The CFO is often the "point-person" for interfacing with potential investors. The CFO typically helps these potential investors with their financial due diligence on the Company and actively participates in the negotiation of documents related to the investment transaction.

28.     Early in the process, iGPS looked to Yoss to fulfill this customary role of the CFO. Yoss was charged with participating in meetings with potential investors, explaining the financial condition of the Company and iGPS's business model, shepherding the due diligence process and overseeing the negotiation of the investment terms.

29.     However, from the beginning of this fundraising process, Yoss made it very clear that she was unhappy with her role and her continued threats to resign reached a peak. As it had done in the past, the iGPS management team attempted to address her complaints and retain her as CFO during this crucial period for the Company.

30.     One particular area of grievance for Yoss was her perceived role in finding potential investors in iGPS. Various officers and directors of the Company had preexisting relationships with potential investors, such as a number of private equity firms. These officers and directors parlayed their relationships to garner interest in an investment in the Company.

Naturally, these officers and directors played a central role in meetings with and presentations to potential investors.

31.    Yoss complained that she was not involved enough in these meetings and presentations.  If an iGPS executive or board member met with a potential investor with whom he or she had a preexisting relationship without Yoss, she would complain that she was being cut out of the process.

### Yoss Formally Resigns and Repeatedly Confirms Her Resignation

32.    Despite its countless efforts to accommodate Yoss's complaints and demands throughout her nine-month employment, the Company ultimately failed to prevent her resignation.  On or about October 22, 2007—a mere seven months after she joined iGPS—Yoss put her repeated threats into action and formally resigned.  She left the Company just over two months after her notice of resignation.

33.    Yoss resigned during a face-to-face meeting with Moore.  On October 22, 2007, Yoss asked Moore for a meeting in his office at the Company's headquarters in Orlando, Florida. At that meeting, Yoss informed Moore once again that the CFO position was not what she had envisioned, and that she had decided to resign.  Moore accepted Yoss's verbal notice of resignation and asked that she remain as CFO for a period of time to allow the Company to transition her duties to other employees.

34.    Yoss's resignation was unambiguous and unqualified.  At no point during her meeting with Moore did Yoss indicate that her resignation was conditional in any way or that the Company had somehow caused her to resign.

35.    Later that evening, Yoss had dinner with Lowe.  During dinner, Yoss asked Lowe if he had heard that she resigned.  Lowe confirmed that he had, and added that he hoped her

resignation was the right decision for her. Again, at no point during this conversation did Yoss indicate that her resignation was conditional in any way or that the Company had somehow caused her to resign.

36.     Several days later, Yoss confirmed her resignation again, this time by telephone to Richard Weinberg, a member of iGPS's board of directors. Yoss and Weinberg had worked together before joining iGPS, and Weinberg was instrumental in bringing Yoss onto the Company as its CFO. Once again, at no point during her telephone call to Weinberg did Yoss qualify her resignation in any way or suggest that iGPS had done anything to cause her to resign.

37.     Yoss stayed with the Company while the Company transitioned her duties to other employees and sought to find a new CFO. She maintained an office with the Company during this time and continued to perform certain limited duties.

### Yoss Did Not Believe iGPS Would Find an Investor When She Resigned

38.     It was eminently clear that when Yoss resigned, the Company's questionable financial future played a role in her decision. At the time Yoss gave notice of her resignation to Moore and Lowe on October 22, 2007, iGPS had failed to secure a third-party investor despite a lengthy and wide-ranging search. Whether the Company could successfully raise capital at all was very much in doubt at the time.

39.     Yoss did not play a meaningful role in the fundraising process after she had given notice of her resignation in October 2007. Even without its much-need CFO, the Company continued to seek potential investors in order to survive.

40.     On December 5, 2007—over a full month after Yoss's resignation—iGPS successfully secured the third-party investment it desperately needed.

### After iGPS Secures Outside Investment, Yoss Attempts to Rescind Her Resignation

41.     Not coincidentally, soon after the Company closed on the investment transaction, Yoss attempted to rescind her resignation.

42.     After securing the outside investment, iGPS held a meeting for all of its employees at the Company's headquarters in Orlando, Florida.  At the time, the Company had not yet completed the transition of Yoss's duties, so she was invited to attend and make a presentation of the Company's budget to iGPS's managers.

43.     While in Orlando, Yoss asked to meet with Moore.  During the meeting, Yoss advised Moore that she was having "second thoughts" and asked if she could rescind her resignation.  Moore advised Yoss that he had already accepted her resignation, that the Company had already moved forward without her and that the matter was closed.

44.     After failing to rescind her resignation, Yoss began to falsely claim that the Company had somehow terminated her without cause prior to closing its investment transaction.

45.     The purpose of these blatant falsehoods was clear: Under the Employment Contract, Yoss would have been entitled to a financial windfall if she were terminated by the Company without "Cause," in the form of an additional bonus, continuing salary payments and certain benefits.

46.     Thus, after refusing to fulfill the duties she had agreed to in her Employment Contract, threatening to resign from her position on countless occasions, leaving the Company in a lurch by formally resigning when the Company's future seemed bleak, confirming her resignation to numerous directors, officers and employees, Yoss—after failing to rescind her resignation as soon as the Company finally secured an outside investment—now attempts to twist the truth in order to squeeze a financial windfall from the Company for her nine months of dubious contribution as CFO.

47.     In light of Yoss's false claim that iGPS terminated her employment without Cause and her attempt to improperly seek compensation from the Company based on that false claim, iGPS has no alternative but to seek relief from this Court declaring that Yoss resigned from her employment without Good Reason, and, therefore, is not entitled to the additional compensation she seeks under the Employment Contract.

### Yoss Breaches the 90-day Notice Provision in Her Employment Contract

48.     In addition, Yoss failed to give 90 days' advance notice of her resignation without Good Reason pursuant to Section 8(e) of the Employment Contract.

49.     As set forth above, Yoss gave verbal notice of her resignation on October 22, 2007 to Moore and Lowe and subsequently confirmed her resignation to numerous directors, officers and employees of iGPS.  iGPS accepted her verbal notice of resignation, thereby waiving its right to a written notice.  However, at no point did iGPS waive its right to a 90-day advance notice.

### FIRST COUNTERCLAIM

#### (Declaratory Judgment)

50.     Counterclaim Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 67, inclusive, of its Answer and paragraphs 1 through 49, inclusive, of its Counterclaims.

51.     There is an actual controversy between the parties regarding their rights and obligations under the Employment Contract because Yoss, after voluntarily resigning without Good Reason and failing to rescind that resignation after the Company secured an outside investment, now asserts baseless claims in this action that she was terminated by the Company without Cause.

52.     Accordingly, iGPS is entitled to a declaratory judgment that Yoss voluntarily resigned from her position with iGPS without Good Reason and, in accordance with Section 8(e) of the Employment Contract, is not entitled to the compensation or benefits set forth for a termination by the Company without Cause.

## SECOND COUNTERCLAIM

### (Breach of Contract)

53.     Counterclaim Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 67, inclusive, of its Answer and paragraphs 1 through 52, inclusive, of its Counterclaims.

54.     Yoss's Employment Contract was a valid and enforceable contract.

55.     iGPS honored its obligations under the Employment Contract in all respects.

56.     Section 8(e) of the Employment Contract provides that Yoss is required to give at least 90 days' advance notice to iGPS of her resignation without Good Reason.

57.     iGPS accepted Yoss's verbal notice of resignation, thereby waiving its right to a written notice.  However, iGPS never waived its right to a 90-day advance notice.

58.     Yoss breached this provision of her Employment Contract by giving less than 90 days' advance notice to iGPS.

59.     iGPS has been damaged by Yoss's breach.

## PRAYER FOR RELIEF

Wherefore, Counterclaim Plaintiff prays for judgment as follows:

60.     For a declaration by Order of this Court, that Yoss voluntarily and unilaterally terminated her employment with iGPS without Good Reason, and, therefore, is entitled to only the compensation and benefits set forth in Section 8(e) of the Employment Contract;

61.     For damages in an amount to be determined at trial on Plaintiff's second cause of action including, but not limited to the forfeiture of any equity Yoss was granted in iGPS in connection with her employment;

62.     For costs and fees associated with this action; and

63.     For such other and further relief as the Court may deem proper.


Dated: New York, New York
      April 10, 2008

                    AKIN GUMP STRAUSS HAUER & FELD LLP


By:    /s/ Stephen M. Baldini
        Stephen M. Baldini (SB-2070)
        Austin K. So (AS-8348)
        590 Madison Avenue
        New York, New York 10022
        (212) 872-1000

        *Counsel for Defendant and Counterclaim Plaintiff iGPS Company, LLC*

## CERTIFICATE OF SERVICE

I, Austin K. So, hereby certify that I caused to be served via electronic notification in accordance with the electronic filing system and by first class mail the annexed Answer, Affirmative Defenses and Counterclaims by Defendant and Counterclaim Plaintiff iGPS Company, LLC on this 10th day of April 2008 upon the following:

Laurence S. Moy, Esq.
Outten & Golden LLP
3 Park Avenue, 29th Floor
New York, New York 10016

*Counsel for Plaintiff*

Dated: April 10, 2008
     New York, New York

/s/ Austin K. So
Austin K. So