**OUTTEN & GOLDEN LLP**
Laurence Moy (LM 3687)
ReNika Moore (RM 3484)
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  (212) 245-1000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

SUSAN YOSS,

                    Plaintiff,

    - against -

                                    **08-CV-02212 (MGC) (MHD)**

IGPS COMPANY LLC; PEGASUS CAPITAL
ADVISORS, LP; PEGASUS CAPITAL
ADVISORS G.P., LLC; PEGASUS CAPITAL
ADVISORS III, LP; PEGASUS INVESTORS III,
LP; PEGASUS INVESTORS III G.P., LLC,

                    Defendants.

### DECLARATION OF RENIKA C. MOORE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

I, ReNika C. Moore, an attorney under penalty of perjury, hereby declare as follows:

    1.  I am admitted to practice law in this Court and am an associate at Outten & Golden LLP, counsel for Plaintiff in the above-captioned matter.  I am fully familiar with the facts and circumstances herein and submit this declaration.

    2.  Attached as **Exhibit 1** is a copy of of *Darby Trading Inc. v. Shell Int'l Trading & Shipping, Co., Inc.,* No. 07 Civ. 0400, 2008 U.S. District LEXIS 25980 (S.D.N.Y. March 28, 2008).

3.    Attached as **Exhibit 2** is a copy of *Welch Allen, Inc., v. New Image Industries, Inc.,* No. 97 Civ. 240, 1998 U.S. District LEXIS 6564 (S.D.N.Y. May 5, 1998).

4.    Attached as **Exhibit 3** is a copy *Alter v. Bogoricin,* No. 97 Civ. 0662, 1997 U.S. District LEXIS 17369 (S.D.N.Y. Nov. 6, 1997).

5.    Attached as **Exhibit 4** is a copy of *City Nat'l Bank of Fla. v. Morgan Stanley DW, Inc.,* No. 05 Civ. 2739, 2007 U.S. District LEXIS 22187 (S.D.N.Y. March 29, 2007).

6.    Attached as **Exhibit 5** is a copy of *Dover Ltd. v. A.B. Watley*, No. 04 Civ. 7366, 2006 U.S. District LEXIS 81391 (S.D.N.Y. November 8, 2006).

Dated:  New York, New York

April 16, 2008

/s/ ReNika Moore
ReNika Moore (RM 3484)
Laurence Moy (LM 3687)
**Outten & Golden LLP**
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  212-245-1000
**Attorneys for Plaintiff**

# EXHIBIT

# 1

2008 U.S. Dist. LEXIS 25980, *

**DARBY TRADING INCORPORATED, Plaintiff, -v- SHELL INTERNATIONAL TRADING AND SHIPPING COMPANY LIMITED; MOTIVA ENTERPRISES LLC; and SHELL OIL COMPANY, Defendants.**

**Case No. 07-CV-0400 (KMK) (GAY)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2008 U.S. Dist. LEXIS 25980*

**March 28, 2008, Decided
March 31, 2008, Filed**

**COUNSEL:** [*1] Manuel Ralph Llorca, Esq., Llorca & Hahn LLP, Norwalk, Connecticut, Counsel for Plaintiff.

Jennifer Davidow, Esq., Phillip Bruce Dye, Jr., Esq., Ronald Leslie Oran, Jr., Esq., Vinson & Elkins New York, New York and Houston, Texas Counsel for Shell International Trading and Shipping Company Limited.

Michael Stephan Kraut, Esq., Morgan, Lewis and Bockius LLP, New York, New York, Counsel for Motiva Enterprises LLC.

Robert D. Owen, Esq., Felice Beth Galant, Esq., Sarah E. O'Connell, Esq., Fulbright & Jaworski LLP, New York, New York, Counsel for Shell Oil Company.

**JUDGES:** KENNETH M. KARAS, District Judge.

**OPINION BY:** KENNETH M. KARAS

**OPINION**

ORDER AND OPINION

KENNETH M. KARAS, District Judge:

On January 18, 2007, Plaintiff Darby Trading Inc. ("Darby") commenced this diversity action against Defendants Shell International Trading and Shipping Company ("STASCO"), Motiva Enterprises LLC ("Motiva"), and Shell Oil Company ("Shell Oil"). Plaintiff's Complaint alleges that Defendant Motiva breached an oral contract with Plaintiff, that STASCO and Shell Oil tortiously interfered with the contract between Plaintiff and Motiva, and that STASCO and Shell Oil tortiously interfered with the business relationship between Plaintiff and [*2] Motiva.

Motiva and Shell Oil each filed a Motion to Dismiss for failure to state a claim pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, and STASCO filed a Motion to Dismiss for lack of personal jurisdiction pursuant to *Rule 12(b)(2) of the Federal Rules of Civil Procedure*. All three motions were referred to Magistrate Judge George A. Yanthis for a report and recommendation. [1] On December 13, 2007, Magistrate Judge Yanthis issued a Report and Recommendation which concluded that this Court should grant Defendants' Motions to dismiss. Plaintiff subsequently filed timely objections to the Report and Recommendation.

> 1    On the same day that Plaintiff's Complaint was filed, this case was referred to Magistrate Judge Yanthis by Chief Judge Kimba Wood. This case was not assigned to this Court until August 6, 2007.

For the reasons stated below, the Court agrees with the Report and Recommendation and grants Defendants' Motions.

I. Factual Background

Although the Court will assume a general familiarity with the facts as discussed in Magistrate Judge Yanthis's Report and Recommendation, the Court will briefly summarize the facts most salient to these Motions. As the Motions before [*3] the Court are motions to dismiss, the facts taken from Plaintiff's Complaint are assumed to be true.

Plaintiff Darby is in the business of buying and selling petroleum products. (Compl. P 9.) In 1994, Plaintiff began supplying base oil products to Commercial Importadora S.A. ("CISA"), a Mexican company that supplies roughly 30% of the lubricating oil market in Mexico. (*Id.* PP 9-10.) The base oils that Plaintiff provided to CISA were of the "Group 1" variety, and were acquired from various points of origin. (*Id.* P 11.)

In 1998, Defendant Motiva converted its "Group 1" base oil refinery into a "Group 2" refinery. [2] (*Id.* P 11.) Starting in 1999, Motiva began aggressively marketing its "Group 2" base oils (hereinafter "STAR base oils"),

encouraging its customers to use the "Group 2" base oils on an exclusive basis. (*Id.* P 13.) As part of this aggressive marketing program, Motiva approached Darby and "requested Darby to convince Darby's customer CISA to modify its supply chain and to begin to use various grades of base oils manufactured by Motiva, and specifically the STAR Group 2 base oils." (*Id.* "In return, Motiva promised to continue to supply Plaintiff with STAR Group 2 base oils, which [*4] were not widely available, so that Plaintiff could continue to service the CISA account." (*Id.* This "arrangement" between Darby and Motiva continued through 2005. (*Id.*)

> 2    Plaintiff alleges that Motiva was initally a "joint-venture alliance between Texaco, Shell, and Saudi Aramco," but is now a "joint-venture alliance between Shell Oil and Saudi Aramco." (Compl. P 12.)

In 2006, however, Motiva informed Plaintiff that it would no longer sell its STAR base oils to Plaintiff, and instead would sell the STAR base oils to STASCO, which in turn would market the STAR base oils to CISA directly. (*Id.* P 14.) Motiva made this decision "at the urging of its affiliate STASCO and its 'parent' Shell Oil and/or other Shell Group companies." (*Id.*) This decision troubled Plaintiff, as Motiva continued to supply other companies with the STAR base oils, even companies that serviced Mexican companies like CISA. (*Id.* As a result of Motiva's decision, Plaintiff was compelled to use its limited supply of STAR base oils to service CISA, its largest customer, thereby preventing Plaintiff from providing the STAR base oils to other customers that it had developed in the preceding years, and thus allegedly causing [*5] Plaintiff to lose millions of dollars in sales. (*Id.* at P 15.)

According to Plaintiff, a similar dynamic emerged in regard to Plaintiff's sale of feedstock to Motiva. Toward the end of 2005, Plaintiff offered to sell Motiva hydrocracker bottoms to use as feedstock for Motiva's STAR base oil refinery. (*Id.* P 16.) This feedstock was offered at very competitive prices. (*Id.*) Motiva tested samples of the feedstock and reviewed technical information relating to the feedstock. (*Id.* PP 17-18.) Satisfied with the samples, Motiva requested a full shipment for a trial run. (*Id.* P 19.) The shipment was delivered in January 2006. (*Id.*) Motiva ran the feedstock through the system and informed Darby that the tests were successful and produced excellent results. (*Id.*)

Shortly after the first successful delivery, Plaintiff received reports from Motiva indicating that STASCO did not approve of Motiva's purchases from Plaintiff. (*Id.* P 20.) Motiva conveyed this information to Plaintiff, but did not discourage Plaintiff from offering the feedstock whenever it came available. (*Id.* P 21.) Thus, Plaintiff

again offered feedstock to Motiva in February 2006. (*Id.* P 22.) Although STASCO was offering the same [*6] feedstock to Motiva, Motiva chose to purchase from Plaintiff, responding to Plaintiff's lower prices and quality product. (*Id.* PP 22-23.)

Shortly after the second shipment was delivered, "STASCO and Shell Oil applied direct and indirect pressure on Motiva to stop the purchase of these hydrocracker bottoms from Darby and to purchase only from STASCO, regardless of how the feedstock was presented and approved within the Motiva system, and regardless of the higher STASCO price." (*Id.* P 24.) Motiva bowed to this pressure from "'higher up' in the STASCO/Shell Oil group structure," and declared that it could no longer purchase from Plaintiff in the future. (*Id.* P 25.)

## II. Discussion

### A. Standard of Review

#### 1. *Fed. R. Civ. P. 12(b)(2)*

"[R]esolution of a [12(b)(2)] motion to dismiss for lack of personal jurisdiction made in the Southern District of New York requires a two-step analysis." *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 124 (2d Cir. 2002).* "First, the court must determine if New York law would confer upon its courts the jurisdiction to reach the defendant," such as under the New York long-arm statute. *Id.* Second, if such a basis for jurisdiction exists, the [*7] court must then determine whether the extension of jurisdiction is permissible under the *Due Process Clause of the Fourteenth Amendment. See id.*

On a *Rule 12(b)(2)* motion, the plaintiff has the burden of establishing that the court maintains jurisdiction over the defendant. *See Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 240 (2d Cir. 1999).* However, "[p]rior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith legally sufficient allegations of jurisdiction, i.e., by making a *prima facie* showing of jurisdiction." *Jazini v. Nissan Motor Co., 148 F.3d 181, 184 (2d Cir. 1998)* (internal quotation marks and citations omitted) (alteration in original); *accord Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996).* "[A] prima facie showing of jurisdiction does not mean that plaintiff must show only some evidence that defendant is subject to jurisdiction; it means that plaintiff must plead facts which, if true, are sufficient in themselves to establish jurisdiction." *Bellepointe, Inc. v. Kohl's Dep't Stores, Inc., 975 F. Supp. 562, 564 (S.D.N.Y. 1997).* A plaintiff may "make this showing through [its] own [*8] affidavits and supporting materials[,] containing an averment of facts that, if credited . . ., would suffice to establish jurisdiction over the defendant." *Whitaker v. Am. Tele-*

*casting, Inc.,* 261 F.3d 196, 208 (2d Cir. 2001) (internal quotation marks and citations omitted) (alterations in original). While a court may consider materials beyond the pleadings, the court must credit a plaintiff's allegations in support of jurisdiction. *See A.I. Trade Fin., Inc. v. Petra Bank,* 989 F.2d 76, 79-80 (2d Cir. 1993) ("[W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party.").

2. *Fed. R. Civ. P. 12(b)(6)*

The Supreme Court has held that "[w]hile a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007) (citations omitted [*9] and second alteration in original). In *Twombly, id. at 1964-69,* the Supreme Court also abandoned reliance on the oft-cited line from *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957), that, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." As the Court explained, a literal application of *Conley's* "no set of facts" rationale is improper because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Twombly,* 127 S. Ct. at 1968 (alteration in original). Instead, the Court emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . [,]" *id. at 1965,* and "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint[,]" *id. at 1969.* Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id. at 1974.* If Plaintiff "ha[s] [*10] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.; see also Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir. 2007) ("After careful consideration of the Court's opinion and the conflicting signals from it that we have identified, we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" (emphasis in original)). [3]

[3] Plaintiff suggests that *Twombly* should be limited to antitrust cases. The Second Circuit, however, does not agree. *See Iqbal,* 490 F.3d at 157 ("We are reluctant to assume that all of the language of [*Twombly*] applies only to *section 1* allegations based on competitors' parallel conduct or, slightly more broadly, only to antitrust cases.").

A *Rule 12(b)(6)* motion to dismiss requires a court to "accept as true the factual allegations made in the complaint and draw all inferences in favor of the plaintiffs." *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir. 1998); *see* [*11] *also Blimpie Int'l, Inc. v. Blimpie of the Keys,* 371 F. Supp. 2d 469, 470-71 (S.D.N.Y. 2005). "'In adjudicating a *Rule 12(b)(6)* motion, a district court must confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'" *Glidepath Holding B.V. v. Spherion Corp., No. 04-CV-9758, 2007 U.S. Dist. LEXIS 54889, 2007 WL 2176072, at *10 (S.D.N.Y. July 26, 2007)* (quoting *Leonard F. v. Israel Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir. 1999)).

3. Review of the Magistrate Judge's Report and Recommendation

A district court reviewing a report and recommendation addressing a dispositive motion "'may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.'" *Donahue v. Global Home Loans & Fin., Inc., No. 05-CV-8362, 2007 U.S. Dist. LEXIS 18605, 2007 WL 831816, at *1 (S.D.N.Y. Mar. 15, 2007)* (quoting *28 U.S.C. § 636(b)(1)(C)*). Under *28 U.S.C. § 636(b)(1)* and *Federal Rule of Civil Procedure 72(b),* parties may submit objections to the magistrate judge's report and recommendation. The objections must be "specific" and "written," and must be made "within 10 [*12] days after being served with a copy of the recommended disposition." *Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1)(C).*

Where a party submits timely objections to a report and recommendation, as Plaintiff has here, the district court reviews the parts of the report and recommendation to which the party objected under a de novo standard of review. *See 28 U.S.C. § 636(b)(1)(C)* ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); *Fed. R. Civ. P. 72(b)(3)* ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition;

receive further evidence; or return the matter to the magistrate judge with instructions."); *see also Donahue, 2007 U.S. Dist. LEXIS 18605, 2007 WL 831816, at \*1.* The district court may adopt those portions of a report to which no objections have been made, as long as those portions are not clearly erroneous. *See Pizarro v. Bartlett, 776 F. Supp. 815, 817 (S.D.N.Y. 1991).*

B. Personal Jurisdiction Over STASCO

Before dealing with Plaintiff's  [\*13] objections, the Court must address Defendant STASCO's Motion to Dismiss for Lack of Personal Jurisdiction, which was not addressed in Magistrate Judge Yanthis's Report and Recommendation. *See Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963)* ("[L]ogic compel[s] initial consideration of the issue of jurisdiction over the defendant -- a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim . . . ."); *Mende v. Milestone Tech., Inc., 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003)* ("Before addressing Defendants' *Rule 12(b)(6)* motion to dismiss, the Court must first address the preliminary questions of service and personal jurisdiction."). Plaintiff contends that Defendant STASCO is subject to personal jurisdiction under New York's long-arm statute, *N.Y. C.P.L.R. 302(a)(3)(ii)* ("Section 302(a)(3)(ii)"). [4] For the reasons that follow, the Court holds that Plaintiff has failed to establish that the Court has jurisdiction over Defendant STASCO. However, the Court grants Plaintiff thirty days to amend its Complaint to satisfy the jurisdictional requirements as to Defendant STASCO.

4    Plaintiff has explicitly abandoned its initial contention that  [\*14] STASCO is subject to long-arm jurisdiction under *N.Y. C.P.L.R. § 302(a)(2).* (*See* Pl.'s Mem. of Law in Opp'n to STASCO's Mot. to Dismiss for Lack of Long-Arm Jurisdiction under *CPLR 302* ("Pl.'s STASCO Response") 3 n.1.) Furthermore, although Plaintiff never explicitly abandoned its early claim that STASCO is subject to long-arm jurisdiction under *N.Y. C.P.L.R. § 302(a)(3)(i)* ("Section 302(a)(3)(i)"), its briefing on the issue focused exclusively on jurisdiction under *Section 302(a)(3)(ii)*, and neglected to address the element unique to jurisdiction under *Section 302(a)(3)(i)*: the demonstration that Defendant "regularly does or solicits business [in New York], or engages in any other persistent course of conduct [in New York], or derives substantial revenue from goods used or consumed or services rendered [in New York] . . . ." *N.Y. C.P.L.R. 302(a)(3)(i).* Regardless of whether Plaintiff has abandoned its argument for jurisdiction under *Section 302(a)(3)(i)*, the Complaint does not allege that STASCO does *any* business in New York, engages in *any* course of conduct in New York, or derives *any* revenue from goods and services used or purchased in New York. *See Del Ponte v. Universal City Dev. Partners, Ltd., No. 07-CV-2360, 2008 U.S. Dist. LEXIS 3528, 2008 WL 169358, at \*7-11 (S.D.N.Y. Jan. 16, 2008)* [\*15] (noting the sort of conduct which can satisfy the "doing business" standard of *Section 302(a)(3)(i)*). Accordingly, Plaintiff cannot establish jurisdiction under *Section 302(a)(3)(i).*

*Section 302(a)(3)(ii)* authorizes a New York court to exercise personal jurisdiction when: (1) the defendant commits a tort outside of New York State that causes injury within New York State; and (2) the defendant expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce. *See Overseas Media Inc. v. Skvortsov, 407 F. Supp. 2d 563, 575 (S.D.N.Y. 2006)* (explicating *Section 302(a)(3)(ii)*). In its Motion to Dismiss, Defendant STASCO argues that Plaintiff fails to demonstrate that the tort alleged by Plaintiff caused injury within New York State. [5] "[C]ourts determining whether there is injury in New York sufficient to warrant § 302(a)(3) jurisdiction must generally apply a situs-of-injury test, which asks them to locate the 'original event which caused the injury.'" *Bank Brussels Lambert, 171 F.3d at 791* (quoting *Hermann v. Sharon Hosp., Inc., 135 A.D.2d 682, 522 N.Y.S.2d 581, 583 (App. Div. 1987)).* "This 'original event' is, however,  [\*16] generally distinguished not only from the initial tort but from the final economic injury and the felt consequences of the tort." *Id..*

5    Defendant STASCO also argues that Plaintiff has failed to allege an out-of-state tort. *See Overseas Media Inc., 407 F. Supp. 2d at 575* ("With respect to *302(a)(3)(ii)*, the defendant *must firstly commit 'a tortious act outside the State*; second, . . . the cause of action [must arise] from that act; third, . . . the act [must have caused] injury to a person or property within the State; fourth, [the defendant must have] expected or should reasonably have expected the act to have consequences in the State; and fifth, [the defendant must have] derived substantial revenue from interstate or international commerce.'" (citing *LaMarca v. Pak-Mor Mfg. Co., 95 N.Y.2d 210, 735 N.E.2d 883, 886, 713 N.Y.S.2d 304 (N.Y. 2000)* (emphasis added) (alterations in original))). For the purposes of this discussion of personal jurisdiction, the Court will assume that Plaintiff has properly alleged a tort by STASCO. The inadequacy of Plaintiff's tort allegations will be discussed later in this Opinion.

Plaintiff argues that the injury to its New York operations satisfies the situs-of-injury test. While Plaintiff [*17] is correct to note that lost sales or customers can satisfy the "injury within New York" requirement under *Section 302(a)(3)(ii)*, those lost sales must be in the New York market, and those lost customers must be New York customers. In *Citigroup Inc. v. City Holding Co.*, for example, a case cited favorably by Plaintiff, the court noted that "[i]njury within the state includes harm to a business in the New York market in the form of lost sales or customers. This rule is satisfied by Citigroup's claim that *its actual and potential customers in New York* are confused or deceived when they view and interact with the City National web sites." *97 F. Supp. 2d 549, 568 (S.D.N.Y. 2000)* (internal citation omitted) (emphasis added). Each of the cases cited favorably by Plaintiff echo this point: injury in the form of lost sales or lost customers may constitute injury for the purpose of *Section 302(a)(3)*, but only if those lost sales or lost customers are within the New York market. *See, e.g., 777388 Ontario Ltd. v. Lencore Acoustics Corp., 142 F. Supp. 2d 309, 324 (E.D.N.Y. 2001)* ("[B]ecause of the alleged actions of moving counterclaim defendants, Lencore *stood to lose not only its good will and* [*18] *customers in New York* but also the sales representatives that were vital to the sale and distribution of its New York-manufactured equipment." (emphasis added)); *Facit, Inc. v. Krueger, Inc., 732 F. Supp. 1267, 1273 (S.D.N.Y. 1990)* ("The harm alleged to have been inflicted within New York is the actual or potential loss of business, damage to customer relations, business reputation and goodwill. HFT completed substantial interstate sales, *as well as significant New York sales.* (internal citation omitted) (emphasis added)); *Fantis Foods, Inc. v. Standard Importing Co., 49 N.Y.2d 317, 402 N.E.2d 122, 126, 425 N.Y.S.2d 783 (N.Y. 1980)* (noting that personal jurisdiction depends upon a direct injury within the state and a "closer expectation of consequences within the State than the indirect financial loss resulting from the fact that the injured person resides or is domiciled there"); *Sybron Corp. v. Wetzel, 46 N.Y.2d 197, 385 N.E.2d 1055, 1059, 413 N.Y.S.2d 127 (N.Y. 1978)* ("It is, however, critical that it is New York where plaintiff manufactures and relines glass-lined equipment and the alleged trade secrets were acquired, and *the economic injury plaintiff seeks to avert stems from the threatened loss of important New York customers.*" (emphasis added)); [*19] *Polansky v. Gelrod, 20 A.D.3d 663, 798 N.Y.S.2d 762, 764 (App. Div. 2005)* ("[P]laintiff failed to show that he sustained any injury -- other than financial loss -- in New York. Assuming that defendants' conduct constituted a tort, the situs of such a nonphysical commercial injury is the place where 'the critical events associated with the dispute took place' and not where the resultant monetary loss occurred." (quoting *Am. Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp., 439 F.2d 428, 433-434 (2d Cir. 1971)))*.

Here, in its Complaint, Plaintiff has not alleged any injury in the form of decreased sales in the New York market or lost customers in the New York market. Rather, the only specific business injuries mentioned in Plaintiff's Complaint relate to Motiva, a Texas company incorporated in Delaware; CISA, a Mexican company; and an unnamed Brazilian company. (Compl. PP 3, 14, 25, 28.) Even if the Court were inclined to credit the Declaration submitted by Plaintiff with its response papers, Plaintiff still does not allege any loss of New York customers or sales. The Declaration of Spyro D. Dimitratos, Senior Vice President of Darby Trading Inc., notes that "the customers from which we have [*20] lost goodwill and business include Ipiranga (Brazil); Sarita Chemical Co. (India); and Roshfrans (Mexico)," but makes no mention of any New York-based companies. (Decl. of Spyro D. Dimitratos P 5.) Quite simply, Plaintiff alleges that it is selling products to consumers all over the globe -- everywhere, that is, but in New York.

The Declaration of Robert J. Fales, President and Owner of Darby Trading Inc., submitted in response to STASCO's Motion, generically states that "since Darby is located only in New York, all of the business it has lost has been in New York." (Decl. of Robert J. Fales P 4.) Yet, Mr. Fales provides not a single example of a New York customer Plaintiff allegedly lost due to STASCO's conduct. Instead, his affidavit only establishes that a New York company has suffered reduced profits. However, "'[t]he occurrence of financial consequences in New York due to the fortuitous location of plaintiffs in New York is not a sufficient basis for jurisdiction under *§ 302(a)(3)* where the underlying events took place outside New York.'" *Whitaker, 261 F.3d at 209* (quoting *United Bank of Kuwait v. James M. Bridges, Ltd., 766 F. Supp. 113, 116 (S.D.N.Y. 1991))*; *see Fantis Foods, 402 N.E.2d at 126* [*21] (noting that jurisdiction cannot be predicated solely on "indirect financial loss resulting from the fact that the injured person resides or is domiciled [in New York]"). Because Plaintiff has not adequately alleged an injury in the form of loss of New York sales or New York customers, this Court lacks jurisdiction over STASCO, and STASCO's Motion to Dismiss for Lack of Personal Jurisdiction is GRANTED. [6] However, the Court will grant Plaintiff thirty days to amend the jurisdictional basis of its claim against STASCO in a manner consistent with this Opinion.

6   Because the Court finds that Plaintiff has not satisfied the situs-of-injury test, the Court need not address the other elements of jurisdiction under *Section 302(a)(3)(ii)*.

C. Analysis of Plaintiff's Objections

Plaintiff's objections to Magistrate Judge Yanthis's Report and Recommendation state three specific concerns, which can be summarized as follows:

1. Magistrate Judge Yanthis erred in holding that Darby's oral contract with Motiva fell within the Statute of Frauds and that Darby's oral contract with Motiva could not be saved via the doctrine of promissory estoppel. Therefore, Magistrate Yanthis incorrectly dismissed Plaintiff's [*22] breach of contract claim against Motiva, and Plaintiff's tortious interference with contract claims against STASCO and Shell Oil.

2. Magistrate Judge Yanthis erred in dismissing Plaintiff's tortious interference with business relations claims against STASCO and Shell Oil for failure to adequately allege "dishonest, unfair, or improper means."

3. Magistrate Judge Yanthis erred in denying Plaintiff's request for leave to re-plead its Complaint on the grounds that any amendment would be futile.

The Court reviews de novo these objected-to portions of the Report and Recommendation. *See 28 U.S.C. § 636(b)(1)(C).*

1. Statute of Frauds

Magistrate Judge Yanthis held that Darby's breach of contract claim against Motiva was barred by the Statute of Frauds, as the plain meaning of the contract obligated Plaintiff to do nothing, but obligated Motiva to supply Darby with STAR base oils indefinitely. Therefore, the contract could not be completed within one year of the date of contract. The Court concurs with this assessment. "'[T]he Statute of Frauds forbids the imposition of a performance obligation on a defendant necessarily extending beyond one year, in the absence of a writing(s) which sets forth all [*23] of the essential terms of the agreement imposing that performance obligation.'" *Multi-Juice, S.A. v. Snapple Beverage Corp.,* No. 02-CV-4635, 2006 U.S. Dist. LEXIS 35928, 2006 WL 1519981, at *10 (S.D.N.Y. June 1, 2006) (quoting *City of Yonkers v. Otis Elevator Co.,* 649 F. Supp. 716, 727 (S.D.N.Y. 1986)). *New York General Obligations Law § 5-701(a)(1)* states in pertinent part:

Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking . . . [b]y its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime . . . .

Courts in New York have construed the Statute of Frauds "warily," fearing that strict application may "cause[] more fraud than it prevents." *Ohanian v. Avis Rent A Car Sys., Inc.,* 779 F.2d 101, 106 (2d Cir. 1985); *see also Klagsbrun v. Ross,* No. 93-CV-7709, 1995 U.S. Dist. LEXIS 1191, 1995 WL 43664, at *4 (S.D.N.Y. Feb. 3, 1995) ("Courts have long realized that strict application of the statute of frauds causes more fraud tha[n] it prevents." (internal quotation marks omitted)). [*24] Thus, the "one year" provision of the Statute of Frauds has been interpreted to encompass "'only those contracts which, by their terms, have absolutely no possibility in fact and law of full performance within one year.'" *Guilbert v. Gardner,* 480 F.3d 140, 151 (2d Cir. 2007) (quoting *Cron v. Hargro Fabrics, Inc.,* 91 N.Y.2d 362, 694 N.E.2d 56, 58, 670 N.Y.S.2d 973 (N.Y. 1998)). "If an agreement may be fairly and reasonably interpreted to permit performance within a year, the Statute of Frauds will not bar a breach of contract action no matter how improbable it may be that performance will actually occur within that time frame." *Id. at 151* (citing *Cron.,* 694 N.E.2d at 58).

The key question is thus whether the agreement between Plaintiff and Motiva, "fairly and reasonably interpreted," permitted the possibility, however slight, that full performance could be completed within one year. *Id.* Here, the Court has little difficulty determining that full performance on the contract could not have been completed within one year. The agreement, as described by Plaintiff, consisted of the following arrangement: Darby promised to persuade CISA to switch to Motiva's STAR base oils, and Motiva, in turn, promised to supply Darby with [*25] the STAR base oils that Darby would sell to CISA for an undetermined number of years. Plaintiff clearly understood that this agreement would span longer than one year, and, in fact, it lasted from 1999 to the beginning of 2006. This is quite logical: it is difficult to imagine why Plaintiff would have persuaded a significant customer to use "Group 2" base oils (of which Motiva is the largest provider) without an understanding that Motiva would continue to provide Plaintiff with that product well into the future. In determining "whether a

contract is capable of performance within a year for Statute of Frauds purposes, [t]he endurance of defendant's liability is the deciding factor." *Levine v. Zadro Prods., Inc.,* No. 02-CV-2838, 2003 U.S. Dist. LEXIS 9637, 2003 WL 21344550, at *4 (S.D.N.Y. June 9, 2003) (internal quotation marks omitted) (alteration in original); *City of Yonkers, 649 F. Supp. at 727* ("The crucial question is the endurance of the defendant's liability." (quotation marks omitted)). Here, the "arrangement," as Plaintiff describes it in its Complaint, did not provide any means for Motiva to discharge its performance obligations within one year. As such, the supposed contract presents a classic example [*26] of the Statute of Frauds. *See Borsack v. Chalk & Vermilion Fine Arts, Ltd., 974 F. Supp. 293, 298 n.3 (S.D.N.Y. 1997)* ("Where an alleged contract, as here, is indefinite as to duration and does not, by its terms, permit the defendant to discharge its performance obligations in less than one year, the statute requires a writing setting forth the essential terms of the agreement.") ; *City of Yonkers, 649 F. Supp. at 727* ("[W]here no provision of the agreement alleged permits the defendants to discharge that performance obligation in less than a year, the Statute of Frauds applies.").

In its objections to the Report and Recommendation, Plaintiff posits three ways in which the "arrangement" described above might have been deemed fully performed within one year. First, Plaintiff argues that it could have been unsuccessful in convincing CISA to switch its specifications to the STAR base oil standard, thereby completing the contract within one year. Contrary to Plaintiff's assertions, if Plaintiff had been unsuccessful in persuading CISA to alter its business procedures, there would have been no contract to perform. According to Plaintiff's own pleadings, Motiva offered to "continue to supply" [*27] Darby with STAR base oils if Darby was able "to *convince* " CISA to use the STAR base oils. (Compl. P 13.) Had Darby been unable to convince CISA to alter its business processes, no obligation would have been imposed on Motiva, and the issue of performance within one year would have been rendered moot.

Second, Plaintiff argues that it might have decided not to do business with CISA on its own volition within one year of the agreement. Again, Plaintiff's example is unavailing. As noted by Magistrate Judge Yanthis, "where only the party seeking to enforce the oral agreement has an option to terminate the contract within a year, the statute of frauds does bar an action based on the contract." *Miller v. Quik Park Columbia Garage Corp.,* No. 93-CV-4730, 1995 U.S. Dist. LEXIS 5388, 1995 WL 238951, at *4 (S.D.N.Y. Apr. 25, 1995); *see also Burke v. Bevona, 866 F.2d 532, 537 (2d Cir. 1989)* (noting that there is "substantial New York authority for the proposition that an oral contract for an otherwise unlimited term

cannot be brought within the one-year permissible period of *section 5-701(a)(1)* by a termination contingency that is exercisable only by the plaintiff") (citing cases). Here, unlike the two cases cited by Plaintiff, [*28] *North Shore Bottling Co. v. C. Schmidt and Sons, Inc., 22 N.Y.2d 171, 239 N.E.2d 189, 292 N.Y.S.2d 86 (N.Y. 1968)* and *Coinmach Industries Corp., v. Domnitch, 37 N.Y.2d 889, 340 N.E.2d 735, 378 N.Y.S.2d 370 (N.Y. 1975),* Defendant had no express option to terminate the contract, and thus could not have fully performed within the year through such a termination. Indeed, Plaintiff's theory of breach is that Defendant unlawfully terminated the "arrangement" seven years after it was formed. As noted, because "[t]he endurance of defendant's liability is the deciding factor[,]" *Levine, 2003 U.S. Dist. LEXIS 9637, 2003 WL 21344550, at *4* (internal quotation marks omitted) (alteration in original), Plaintiff cannot bring the agreement outside the Statute of Frauds solely on its own power to terminate the contract within a year.

Third, Plaintiff argues that the manufacturing plants of CISA or Motiva might have been destroyed by natural disaster within one year of contract, satisfying performance of the contract. Here, Plaintiff confuses actions which would fulfill the terms of the contract with actions that would defeat the purpose of the contract:

> There are a number of events, however, which could happen within a year and terminate performance but which would not constitute performance [*29] in fulfillment of the terms of the contract but would effect the destruction of the contract. Thus insolvency, bankruptcy, dissolution of defendant's business, retirement from business, impossibility of performance and breach of contract are examples of events which would terminate performance by means of the destruction of the contract rather than by fulfillment of its express terms.

*Dundee Wine & Spirits, Ltd. v. Glenmore Distilleries Co., 238 F. Supp. 283, 286 (S.D.N.Y. 1965); see Zupan v. Blumberg, 2 N.Y.2d 547, 141 N.E.2d 819, 820-21, 161 N.Y.S.2d 428 (N.Y. 1957)* (noting that dissolution of contracting party's business does not render contract performed, but rather destroyed); *Cohen v. Bartgis Bros. Co., 264 A.D. 260, 35 N.Y.S.2d 206, 208 (App. Div. 1942)* (citing 2 Williston on Contracts, Rev. 2d, Section 499); *see also Ebker v. Tan Jay Int'l, Ltd., 739 F.2d 812, 815 n.3 (2d Cir. 1984)* (Friendly, J.) (clarifying the distinction between performance and discharge of a contract). As noted by Motiva, the rule advocated by Plaintiff -- that the potential destruction of some essential

element to a contract should render that contract outside the Statute of Frauds -- would potentially apply to every contract, and render the Statute [*30] of Frauds meaningless.

Accordingly, the Court fully agrees with the recommendation of Magistrate Judge Yanthis and holds that the oral agreement between Darby and Motiva falls within the Statute of Frauds, and thus is unenforceable. This cause of action is therefore dismissed with prejudice as Plaintiff's counsel acknowledged at oral argument that Plaintiff could add nothing more by way of allegations regarding the supposed contract.

2. Promissory Estoppel

Alternatively, Plaintiff argues that even if its contract with Motiva falls within the Statute of Frauds, the oral contract could be upheld under the doctrine of promissory estoppel. Magistrate Judge Yanthis rejected this argument, concluding that Plaintiff had failed to assert an unconscionable injury, as required by New York law. The Court fully concurs with Magistrate Judge Yanthis's judgment.

"In New York, promissory estoppel has three elements: 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made[;] and an injury sustained by the party asserting the estoppel by reason of the reliance.'" *Cyberchron Corp. v. Calldata Sys. Dev., Inc.,* 47 F.3d 39, 44 (2d Cir. 1995) (quoting [*31] *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 73 (2d Cir. 1989)). However, to invoke the doctrine of promissory estoppel to circumvent the Statute of Frauds, Plaintiff must demonstrate "'unconscionable' injury, i.e., injury beyond that which flows naturally (expectation damages) from the non-performance of the unenforceable agreement." *Merex A.G. v. Fairchild Weston Sys., Inc.,* 29 F.3d 821, 826 (2d Cir. 1994). Thus, the question is whether the injury sustained by Plaintiff, as pled, can be described as "unconscionable."

To satisfy the "unconscionable injury" threshold, Plaintiff "must demonstrate injuries beyond those that flow naturally from the defendant's non-performance or from the plaintiff's continuing performance of the unenforceable agreement." *Mobile Data Shred, Inc. v. United Bank of Switz.,* No. 99-CV-10315, 2000 U.S. Dist. LEXIS 4252, 2000 WL 351516, at *4 (S.D.N.Y. Apr. 5, 2000) (citing *Merex,* 29 F.3d at 826). "Thus, in the absence of 'egregious' circumstances, courts have consistently rejected promissory estoppel claims when the alleged injuries consisted of lost profits, lost fees, forgone business opportunities or damage to business reputation." *Id.* (citing *Weissman v. Seiyu, Ltd.,* No. 98-CV-6976, 2000 U.S. Dist. LEXIS 509, 2000 WL 42205, at *10 (S.D.N.Y. Jan. 18, 2000)). [*32] [7]

[7] At oral argument, Plaintiff suggested that in this passage, the *Mobile Data Shred* court added a new layer to the "unconscionable injury" requirement -- that is, a case involving "egregious circumstances" also could qualify as an exception to the Statute of Frauds. The Court is unpersuaded, as it is apparent that "unconscionable injury" was viewed as synonymous with "egregious circumstances." Thus, this Court follows both *Merex* and *Mobile Data Shred* in determining whether Plaintiff's promissory estoppel claim involves an "unconscionable injury."

Plaintiff claims that Motiva's failure to provide STAR base oils "had the effect of cutting off Darby from [the CISA] account." (Compl. P 14.) In addition, by forcing Plaintiff to divert all its remaining supplies of the STAR base oils to satisfy CISA, Plaintiff "thereby lost the sales it would have made to its other customers, as well as the goodwill of said customers, causing substantial damage to Darby's business." (Id. P 15.) These injuries, consisting of lost clients and lost opportunities, while perhaps significant to Plaintiff, are most aptly described as the expectation damages of Motiva's non-performance of the unenforceable oral [*33] agreement. *See N. Am. Knitting Mills, Inc. v. Int'l Women's Apparel,* No. 99-CV-4643, 2000 U.S. Dist. LEXIS 13139, 2000 WL 1290608, at *3 (S.D.N.Y. Sept. 12, 2000) (holding that loss of substantial clients does not amount to an unconscionable injury); *Mobile Data Shred,* 2000 U.S. Dist. LEXIS 4252, 2000 WL 351516, at *4 (holding that lost business opportunities does not amount to an unconscionable injury). Because the demonstration of such typical expectation damages, without more, does not demonstrate an unconscionable injury, *see Merex,* 29 F.3d at 826, the Court concurs with the judgment of Magistrate Judge Yanthis and holds that the oral contract between Plaintiff and Motiva cannot be saved by promissory estoppel. Thus, Plaintiff's breach of contract claim against Motiva is dismissed for failure to state a claim. [8]

[8] Plaintiff also alleges that Defendants STASCO and Shell Oil tortiously interfered with the alleged contract between Plaintiff and Motiva. Because the analysis of the tortious interference with contract claim depends upon the analysis of Plaintiff's tortious interference with business relations claim, it will be addressed later in the Opinion. See *infra.*

3. Tortious Interference with Business Relations

Magistrate Judge Yanthis [*34] recommended that Plaintiff's claim for tortious interference with business relations against both STASCO and Shell Oil be dismissed for failure to allege that either defendant "acted

with the sole purpose of hurting Darby," or, in the alternative, "used dishonest, unfair, or improper means." (Report and Recommendation at 8-9.) The Court also concurs with this recommendation.

"To prevail on a claim for 'tortious interference with business relations' under New York law, a party 'must prove that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship.'" *State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 171 (2d Cir. 2004)* (quoting *Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003)* (hereinafter *Carvel I*)). Unlike the claim for tortious interference with contract, the lack of a valid contract is not a barrier to a claim for tortious interference with business relations. *See Scutti Enter., LLC. v. Park Place Entm't Corp., 322 F.3d 211, 215 (2d Cir. 2003)* [*35] (hereinafter " *Scutti I*"). Indeed, Plaintiff can recover if it can prove that the Defendants tortiously interfered with "'a continuing business or other customary relationship not amounting to a formal contract.'" *Id.* (quoting *Hannex Corp. v. GMI, Inc., 140 F.3d 194, 205 (2d Cir. 1998)*).

Plaintiff has adequately alleged the first, second, and fourth elements of this tort -- namely, that a business relationship existed between Plaintiff and Motiva, that STASCO and Shell Oil knew about this relationship, and that the relationship was injured. The pivotal element, however, is the third -- the requirement that Plaintiff demonstrate that Defendants STASCO and Shell Oil "acted solely out of malice, or used dishonest, unfair, or improper means[.]" *State Street Bank, 374 F.3d at 171*.

In *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 406 N.E.2d 445, 448-49, 428 N.Y.S.2d 628 (N.Y. 1980)*, the New York Court of Appeals elaborated on the level of culpability required to uphold a claim of tortious interference with business relations. The *Guard-Life* court commented that a defendant may be excused from the consequences of such interference "where the interference is intended at least in part to advance the competing [*36] interest of the interferer, no unlawful restraint of trade is effected, and the means employed are not wrongful." *Id. at 449*. The court further elaborated on the meaning of "wrongful means," quoting approvingly from the Restatement of Torts, and commented that the definition of "wrongful means" should include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and *some degrees of economic pressure* [,]" but not "persuasion alone." *Id.* (quoting *Restatement (Second) of Torts §§ 768* cmt. E; *767* cmt. C (1979)) (emphasis added). As noted by the court, the "wrongful means" standard was

meant to require "proof of more culpable conduct on the part of the interferer" in cases where no binding contract had been violated. *Id.*

In 2003, in *Carvel I*, the Second Circuit took up a case which hinged on the meaning of "wrongful means." Understandably perplexed by the vague contours of this concept, the Second Circuit certified a pair of questions to the New York Court of Appeals for clarification of what sort of conduct might amount to "wrongful means." *See Carvel I, 350 F.3d at 23* ("[A]lthough it is clear that 'wrongful means' . . . can ground liability for a competitor's [*37] interference with prospective economic relations, it is unclear just what sort of conduct constitutes those means."). In *Carvel Corp. v. Noonan, 3 N.Y.3d 182, 818 N.E.2d 1100, 785 N.Y.S.2d 359 (N.Y. 2004)* (hereinafter *Carvel II*), the New York Court of Appeals addressed the certified questions and attempted to clarify the language of *Guard-Life* and subsequent cases. The *Carvel II* court stated that, as a general rule, in a suit based on tortious interference with a non-binding relationship, the plaintiff must show that the defendant's conduct amounted to a crime or an independent tort. *Id. at 1103* ("Conduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations."); *see also Hassan v. Deutche Bank A.G., 515 F. Supp. 2d 426, 430 (S.D.N.Y. 2007)* (explaining holding of *Carvel II*); *Treppel v. Biovail Corp., No. 03-CV-3002, 2005 U.S. Dist. LEXIS 2737, 2005 WL 427538, at *4 (S.D.N.Y. Feb. 22, 2005)* (same). However, the *Carvel II* court recognized one exception to this standard: if it could be demonstrated that defendant acted "'for the sole purpose of inflicting intentional harm on plaintiff[],'" a plaintiff need [*38] not show a crime or independent tort. *818 N.E.2d at 1103* (quoting *NBT Bancorp, Inc., v. Fleet/Norstar Fin Group, Inc., 215 A.D.2d 990, 628 N.Y.S.2d 408, 408 n.1 (App. Div. 1995), aff'd, 87 N.Y.2d 614, 664 N.E.2d 492, 641 N.Y.S.2d 581 (1996))*. Although the court declined to elaborate on any other exceptions -- that is, behavior which, though not a crime or a tort, might be considered sufficiently culpable to form the basis for a claim -- it "left open the possibility that 'extreme and unfair economic pressure' may also constitute 'wrongful means.'" *Hassan, 515 F. Supp. 2d at 431* (quoting *Carvel II, 818 N.E.2d at 1105*). The New York Court of Appeals did not, however, delineate the boundaries of what kind of economic pressure might be considered "extreme or unfair economic pressure," but rather left that question "for another day." *Carvel II, 818 N.E.2d at 1104-05* (internal quotation marks omitted); *see also Treppel, 2005 U.S. Dist. LEXIS 2737, 2005 WL 427538, at *5* (noting that the *Carvel II* decision "did not offer further guidance on the meaning of 'extreme and unfair'"); *Catskill Dev., L.L.C. v. Park Place Entm't Corp., 345 F. Supp. 2d 360,*

363-64 (S.D.N.Y. 2004) (noting that the court in *Carvel II* "did not set limits on what kind of conduct might someday be [*39] deemed extreme and unfair or egregious"), *rev'd on other grounds*, 169 Fed. App'x 658 (2d Cir. 2006).

In an effort to flesh out the meaning of "extreme and unfair" economic conduct, Plaintiff invites the Court to follow the reasoning of *Scutti I*, in which the Second Circuit proposed a test for assessing wrongful economic conduct. In *Scutti I*, the Second Circuit noted that while the phrase "some degree of economic pressure" had not been defined by the New York courts, the Restatement (Second) of Torts -- which the New York Court of Appeals relied upon in formulating the original "wrongful means" test, *see Guard-Life, 406 N.E.2d at 449* -- did provide some guidance. *Scutti I, 322 F.3d at 216.* In particular, the court in *Scutti I* observed that

> [t]he Restatement recognizes that if one competitor "succeeds in diverting business from his competitor by virtue of superiority in matters relating to their competition, he serves the purposes for which competition is encouraged," while "economic pressure on the third person in matters unrelated to the business in which actor and the other compete is treated as an improper interference."

*Id.* (quoting *Restatement (Second) of Torts § 768* cmt. E). From [*40] this language, the court in *Scutti I* developed a two-part inquiry to determine whether economic pressure is wrongful. *Id.* First, the court asks whether the actions by the defendants rise to the level of economic pressure (and not mere persuasion). [9] Second, if the actions of the defendants rise to the level of economic pressure, the court then inquires whether the pressure is related or unrelated to the business in which the defendants and the plaintiff engage. Only if the pressure is unrelated to the parties' common business will the court entertain a finding of wrongful means. *See id.*

9   Quoting the Restatement, the court in *Scutti I* observed that the propriety of economic pressure must be measured

> in the light of the circumstances in which it is exerted, the object sought to be accomplished by the actor, the degree of coercion involved, the extent of the harm that it threatens, the effect upon the neutral parties drawn into the situation, the effects upon competition, and the general reasonableness and appropriateness of this pressure as a means of accomplishing the actor's objective.

*322 F.3d at 216* (quoting *Restatement (Second) of Torts § 767* cmt. C).

Plaintiff's allegations of tortious [*41] interference with business relations focus on "STASCO and/or Shell Oil's direction to Motiva to cease purchasing [hydrocracker] bottoms from Darby and instead to purchase [hydrocracker] bottoms from STASCO at a higher price and/or at less advantageous terms." (Compl. P 40.) These actions surely relate to the common business pursued by Plaintiff and Defendants Motiva, STASCO, and Shell Oil, thus failing the second part of the *Scutti I* inquiry. *See Scutti I, 322 F.3d at 217.* The two-part inquiry of *Scutti I*, therefore, is unavailing to Plaintiff. [10]

10   It is unclear whether the two-part inquiry proposed in *Scutti I* still has vitality. *Scutti I* was decided prior to the New York Court of Appeals' decision in *Carvel II*. *Scutti I* was subsequently remanded, and upon appeal of the case, the Second Circuit (in an unpublished opinion) hewed very closely to the legal standard later laid out in *Carvel II*. *See Advanced Global Tech. LLC v. Sirius Satellite Radio, Inc., 15 Misc. 3d 776, 836 N.Y.S.2d 807, 811 (Sup. Ct. 2007)* (noting that "the United States Court of Appeals recognized, in an appeal, after remand, in the *Scutti* case [*Scutti Enters., LLC v. Park Place Entm't Corp., 173 Fed. App'x 75 (2d Cir. 2006)* (hereinafter [*42] " *Scutti II*")], that the *Carvel* decision limited its 2003 decision"). However, *Scutti II*, an order with no precedential value, could be interpreted as upholding the viability of the two-part inquiry of *Scutti I*. In *Scutti II*, the Court concluded that "[n]o reasonable fact-finder . . . could conclude that [the defendant's actions] were unrelated to [the defendant's] legitimate interests . . . or were motivated by anything other than legitimate business reasons." *Id.* at 2 (quoting *Scutti II, 173 Fed. App'x at 77*). This statement could be construed as an application of the second part of the two-part *Scutti I* test -- whether the actions of the defendant relate to the business of the plaintiff, *see Scutti I, 322 F.3d at 216* -- or as an application of the lone exception discussed by the *Carvel II* court -- whether the behavior in question was "for the sole purpose of inflicting intentional harm on plaintiff[]," *see Carvel II, 818 N.E.2d at 1103*. However, under either construction -- regardless of whether *Scutti II* indicates an

abandonment or affirmation the *Scutti I* test -- the disposition for Plaintiff here will be the same, as Plaintiff has failed to allege that the conduct at issue was [*43] done either for the primary purpose of inflicting harm on Plaintiff, or was unrelated to Plaintiff's business.

Placing *Scutti I* aside, there remains a dearth of concrete guidance regarding what kind of economic pressure -- other than those actions which amount to a crime, an independent tort, or which are committed "for the sole purpose of inflicting intentional harm on plaintiff" -- constitutes "wrongful means." The New York Court of Appeals has only hinted that the "wrongful" conduct must be "egregious." *Carvel II, 818 N.E.2d at 1104.* Thus, the question before this Court is whether the conduct allegedly committed by STASCO and Shell Oil -- the pressuring of an affiliate to purchase supplies from a higher-priced sister company rather than from Plaintiff -- amounts to a crime or an independent tort; was done for the sole purpose of injuring Plaintiff; or constitutes the sort of "extreme," "unfair," and "egregious" behavior which might warrant an additional exception to the general rule of *Carvel II.*

The first and second parts of this question are easily answered. Plaintiff has not at all alleged that Defendants' alleged conduct amounts to a crime or an independent tort. In addition, Plaintiff [*44] has not adequately alleged that STASCO and Shell Oil pressured Motiva for the *sole* purpose of harming Plaintiff. The Complaint states that STASCO and Shell Oil pressured Motiva to make its purchases of hydrocracker bottoms from within the corporate family rather than from outside companies like Darby. Such behavior demonstrates a desire to funnel profits to jointly-owned corporations rather than to non-affiliated companies. While such behavior may not maximize the earning potential of Motiva, it hardly evinces a deliberate effort engineered "for the sole purpose of inflicting intentional harm on plaintiff[]." *Carvel II, 818 N.E.2d at 1103.*

The third part of this question is less clear. Plaintiff argues that STASCO and Shell Oil's pressuring of Motiva to eschew the better-priced goods offered by Plaintiff and instead to purchase from STASCO constitutes wrongful means. As support for this position, Plaintiff cites language from the Restatement (Second) of Torts, which emphasizes that economic behavior that offends competition and efficiency can potentially amount to "wrongful means:"

The rule stated in this Section rests on the belief that competition is a necessary or desirable incident [*45] of free enterprise. Superiority of power in the matters relating to competition is believed to flow from superiority in efficiency and service. If the actor succeeds in diverting business from his competitor by virtue of superiority in matters relating to their competition, he serves the purposes for which competition is encouraged. If, however, he diverts the competitor's business by exerting a superior power in affairs unrelated to their competition there is no reason to suppose that his success is either due to or will result in superior efficiency or service and thus promote the interest that is the reason for encouraging competition. For this reason economic pressure on the third person in matters unrelated to the business in which the actor and the other compete is treated as an improper interference.

*Restatement (Second) of Torts § 768* cmt. E. [11] This language, however, is unavailing, as the economic pressure brought to bear by STASCO and Shell Oil against Motiva *was* related to the business in which Plaintiff and Defendants engage. Moreover, even if the business had not been related, Plaintiff has not alleged conduct which is sufficiently "extreme," "unfair," and "egregious" [*46] to warrant a new exception to the general rule of *Carvel II.* This is probative because in the years since *Carvel II* was decided, courts have been stingy in their interpretation of this tort, and have resisted invitations to go beyond the language of the Court of Appeals. *See, e.g., Milton Abeles, Inc. v. Farmers Pride, Inc., No. 03-CV-6111, 2007 U.S. Dist. LEXIS 50071, 2007 WL 2028069, at *4 (E.D.N.Y. July 11, 2007)* (noting that the demonstration of "some degree of economic pressure" is insufficient to uphold the tort claim if plaintiff does not demonstrate purposeful infliction of intentional harm); *Masefield AG v. Colonial Oil Indus., No. 05-CV-2231, 2006 U.S. Dist. LEXIS 5792, 2006 WL 346178, at *9 (S.D.N.Y. Feb. 15, 2006)* ("It is not clear what 'extreme and unfair' means, and whether economic pressure can be 'extreme and unfair' without being tortious and criminal."); *Treppel, 2005 U.S. Dist. LEXIS 2737, 2005 WL 427538, at *7* ("[P]laintiff has not directed the Court to any conduct that is sufficiently egregious to justify a second exception to the rule and therefore, the allegations against the Three Defendants must fall within the purview of the general rule or the malice exception."); *Shared Commc'ns Servs. of ESR, Inc. v. Goldman Sachs & Co., 23 A.D.3d 162, 803 N.Y.S.2d 512, 513 (App. Div. 2005)* [*47] ("The claim for tortious interference with prospective business relations failed to include the necessary allegation that defendant's conduct was motivated solely by malice or to inflict injury by unlawful means, beyond mere self-interest or other economic considerations.");

*Martian Entm't, LLC v. Harris, 12 Misc. 3d 1190A, 824 N.Y.S.2d 769, 769 (Sup. Ct. 2006)* (noting that allegations that defendant sought to persuade a third party not to do business with plaintiff does not meet the standard of wrongful means); *Cerberus Capital Mgmt., L.P. v. Snelling & Snelling, Inc., 12 Misc. 3d 1187A, 2005 WL 4441899, at *7 (N.Y. Sup. Ct. 2005)* ("[T]he complaint contains nothing indicating the . . . defendants acted beyond mere self-interest or other economic considerations. This is insufficient to support a claim for tortious interference with prospective business relations."). Plaintiff's Complaint, which merely alleges that the various interlocked companies in the Shell family preferred to purchase from each other rather than from outside companies, does not offer an example of "egregious" conduct "so 'culpable' . . . that it could be the basis for a claim of tortious interference with economic relations." *Carvel II, 818 N.E.2d at 1103-04*; [*48] *see also Masefield AG, 2006 U.S. Dist. LEXIS 5792, 2006 WL 346178, at *9* (holding that "conclusory allegation[s]" that defendant used coercive business practices to intentionally interfere with business relations was insufficient to state a claim); *Advanced Global Tech., 836 N.Y.S.2d at 811* (holding that plaintiff's allegations that defendant engaged in coercive business practices "without justification, entirely out of malice" and without "normal economic self-interest" were conclusory and thus insufficient to state a claim). Accordingly, the Court concurs with the recommendation of Magistrate Judge Yanthis and dismisses Plaintiff's claims of tortious interference with business relations for failure to state a claim.

11    This comment elaborates on *subsection (1)(b) of the Restatement (Second) of Torts § 768*. The text of that section is as follows:

§ 768. Competition As Proper Or Improper Interference

(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if . . .

(b) the actor does not employ wrongful means . . .

3. Tortious [*49] Interference with Contract

Plaintiff also alleges that Defendants STASCO and Shell Oil tortiously interfered with the alleged contract between Plaintiff and Motiva. This claim focuses on the alleged pressure exerted by STASCO and Shell Oil on Motiva, which resulted in Motiva refusing to sell STAR base oils to Plaintiff, thereby undermining a seven-year business arrangement between Plaintiff and Motiva.

Defendants STASCO and Shell Oil argue that because Plaintiff's contract with Motiva fails to satisfy the Statute of Frauds, Plaintiff cannot make a claim for tortious interference with contract, as it cannot allege the existence of a valid contract. Plaintiff, on the other hand, argues that Defendants STASCO and Shell Oil cannot interpose Motiva's Statute of Frauds defense, as STASCO and Shell Oil were not parties to the original contract.

Plaintiff is correct in asserting that STASCO and Shell Oil cannot utilize Motiva's Statute of Frauds defense. "[A] contract not drawn in accordance with the Statute of Frauds is not ipso facto void but only voidable, subject to being declared void if and when the statute is interposed as a defense 'at the proper time and in the proper way.'" *Felicie, Inc. v. Leibovitz, 67 A.D.2d 656, 412 N.Y.S.2d 625, 626-27 (App. Div. 1979)*. [*50] Here, however, Defendants STASCO and Shell Oil have not interposed the defense in the proper way, as "[t]he Statute of Frauds is a personal defense and cannot be availed of by a third party." *Id. at 627* (quoting *Stitt v Ward, 142 A.D. 626, 127 N.Y.S. 351, 351 (App. Div. 1911)*); *see also Vincent v. Seaman, 152 A.D.2d 841, 544 N.Y.S.2d 225, 227 (App. Div. 1989)* ("A Statute of Frauds defense, however, is a defense personal to the assignor and cannot be raised by defendant, a stranger to the assignment agreement, to defeat the enforceability of the contract of sale."); *Dante v. 310 Assocs., 121 A.D.2d 332, 503 N.Y.S.2d 786, 788 (App. Div. 1986)* ("[T]he Statute of Frauds is a personal defense which cannot be interposed by a third party"); *Raoul v. Olde Vill. Hall, Inc., 76 A.D.2d 319, 430 N.Y.S.2d 214, 220 (App. Div. 1980)* ("[A]n oral contract within the statute is not absolutely invalid but is only voidable and unenforceable at the election of the party to be charged or his successors in interest . . . .").

Although Defendants STASCO and Shell Oil cannot interpose the Statute of Frauds as a defense to Plaintiff's

tortious interference with contract claim, the fact that the contract in question is unenforceable -- and thus voidable -- against Motiva [*51] nonetheless changes the analysis of Plaintiff's claim against STASCO and Shell Oil. As noted by the New York Court of Appeals in *Guard-Life*, a claim of tortious interference with a voidable contract -- as opposed to an enforceable contract -- should be treated the same as a tortious interference with business relations claim. *See 406 N.E.2d at 449* ("[W]e are persuaded that interference with performance of voidable contracts should be treated the same as interference with contracts terminable at will for purposes of imposing liability in tort, and that both fall in the same category with interference with prospective contractual relations."); *see also Cent. Sports Army Club v. Arena Assocs., Inc., 952 F. Supp. 181, 190 (S.D.N.Y. 1997)* (noting that because the agreement at issue was voidable, "there is no liability for interference with such an agreement absent employment of wrongful means, unlawful restraint of trade, or lack of competitive motive" (citing *Guard-Life*)); *Taub v. Amana Imports, Inc., 140 A.D.2d 687, 528 N.Y.S.2d 884, 885 (App. Div. 1988)* ("[T]he existence of a valid, enforceable contract is a necessary predicate for a cause of action sounding in intentional interference with performance [*52] of a contract. However, recovery may nonetheless be had where, although the contract on which the plaintiff relies is voidable, the defendant has induced a party not to abide by its terms by means of fraud or other misconduct (citing *Guard-Life* (internal citations omitted)); *see also* John Danforth, Note, *Tortious Interference with Contract: A Reassertion of Society's Interest in Commercial Stability and Contractual Integrity*, 81 COLUM. L. REV. 1491, 1504 (1981) ("Similarly, the *Guard-Life* majority reasoned, unenforceable contracts contain no legal guarantee of future performance, and so should only be allowed limited tort protection. The *Guard-Life* decision clearly indicates that, for New York, an analysis of tort liability for interference with contract begins (and perhaps ends) with an assessment of the legally enforceable rights enjoyed by the plaintiff in his contract." (internal footnotes omitted)). Because Plaintiff's contract with Motiva is unenforceable and thus voidable, Plaintiff's tortious interference with contract claim against STASCO and Shell Oil must satisfy the more demanding standard required of claims of tortious interference with business relations. Thus, Plaintiff's [*53] claim regarding STASCO's and Shell Oil's allegedly tortious interference with Plaintiff's STAR base oil contract with Motiva will be analyzed in the same manner that the Court analyzed Plaintiff's claim for tortious interference with business relations over the hydrocracker bottoms feedstock transactions.

Here, as with Plaintiff's previous tortious interference claim, Plaintiff has failed to properly allege "wrongful means," a necessary element of the claim. "Wrongful means" can be satisfied if Plaintiff alleges that Defendants engaged in conduct that: (1) amounts to a crime or independent tort; (2) was done for the sole purpose of injuring Plaintiff; or (3) constitutes "extreme," "unfair," and "egregious" behavior which might warrant an additional exception to the general rule of *Carvel II*. Because Plaintiff fails to claim that Defendants committed a crime, independent tort, or acted solely for the purpose of harming Plaintiff, Plaintiff's claim again depends upon the Court finding that Plaintiff's allegations constitute the sort of "extreme," "unfair," and "egregious" behavior which might warrant an additional exception to *Carvel II*. And, while the allegations made by Plaintiff in [*54] regard to the STAR base oil episode are perhaps more unsavory than the allegations made regarding the hydrocracker episode, the facts are not sufficiently "extreme," "unfair," or "egregious" such that the Court might craft a new exception in the law. However, because Plaintiff indicated at oral argument that it could produce more facts to buttress its claim, the Court grants Plaintiff thirty days to amend its tortious interference with contract claim against STASCO and Shell Oil in a manner consistent with this Opinion.

III. Conclusion

For the reasons stated herein, Defendant STASCO's Motion to Dismiss for Lack of Personal Jurisdiction is GRANTED without prejudice, but Plaintiff shall be given thirty days to amend its Complaint in a manner consistent with this Opinion. Defendant Motiva's Motion to Dismiss for Failure to State a Claim is GRANTED with prejudice. Defendants STASCO and Shell Oil's Motions to Dismiss for Failure to State a Claim are GRANTED without prejudice, but Plaintiff shall be given thirty days to amend its tortious interference with contract claim in a manner consistent with this Opinion. The Clerk of Court is respectfully directed to terminate the pending motions (Dkt. [*55] Nos. 12, 16, 21) and enter judgment for Motiva.

SO ORDERED.

Dated: March 28, 2008

White Plains, New York

/s/ Kenneth M. Karas

KENNETH M. KARAS

UNITED STATES DISTRICT JUDGE

# EXHIBIT

# 2

2007 U.S. Dist. LEXIS 22187, *

**CITY NATIONAL BANK OF FLORIDA, Plaintiff, -against- MORGAN STANLEY DW, INC., Defendant/Third Party Plaintiff, -against- CASE INVESTMENTS, LLC and DAVID S. SOLOMON, Third Party Defendants.**

**05 Civ. 2739 (DLC) (JCF)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 22187*

**March 29, 2007, Decided**

**SUBSEQUENT HISTORY:** Adopted by, Costs and fees proceeding at, Judgment entered by, Dismissed by *City Nat'l Bank of Fla. v. Morgan Stanley DW, Inc., 2007 U.S. Dist. LEXIS 34932 (S.D.N.Y., May 14, 2007)*

**PRIOR HISTORY:** *City Nat'l Bank of Fla. v. Morgan Stanley DW, Inc., 2006 U.S. Dist. LEXIS 43408 (S.D.N.Y., June 27, 2006)*

**COUNSEL:** [*1] For City National Bank of Florida, a national banking corporation, Plaintiff: Mark M. Rottenberg, LEAD ATTORNEY, David Robert Quesnel, Rottenberg Lipman Rich, P.C., New York, NY.

For Morgan Stanley DW, Inc., Defendant: Matthew C Plant, LEAD ATTORNEY, Bressler, Amery & Ross, PC (NYC), New York, NY.

For Morgan Stanley DW, Inc., ThirdParty Plaintiff: Matthew C Plant, LEAD ATTORNEY, Bressler, Amery & Ross, PC (NYC), New York, NY.

**JUDGES:** DENISE L. COTE, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** DENISE L. COTE

**OPINION**

*REPORT AND RECOMMENDATION*

TO THE HONORABLE DENISE L. COTE, U.S.D.J.:

This is a third-party action commenced by Morgan Stanley DW, Inc. ("MSDW") seeking indemnification and contribution from third-party defendants, Case Investments, LLC ("Case") and David Solomon ("Mr. Solomon"). The principal claim, on which this third-party claim is based, was brought by City National Bank of Florida ("CNB") against MSDW asserting breach of contract. CNB claimed that MSDW allowed third-party defendant Case to make unauthorized withdrawals from MSDW accounts it had pledged as security on a loan made by CNB, in violation of a contract between MSDW and CNB. These withdrawals by Case resulted [*2] in a short-fall in the repayment of the loan. CNB sought to obtain the amount of this short-fall from MSDW. Ultimately, CNB and MSDW settled the principle action, and CNB agreed to dismiss its claims against MSDW.

In this action, the plaintiff MSDW seeks damages from the third-party defendant Case arising from the settlement payment it made to CNB. MSDW also seeks to hold Mr. Solomon individually liable. After Case and Mr. Solomon failed to file an answer to the third-party complaint, a default judgment was entered against them. The third-party action was referred to me for an inquest on damages, which was held on January 16, 2007. Despite being afforded notice of the hearing, the third-party defendants did not appear. The following findings are therefore based on the evidence presented at the hearing and on the information submitted by the third-party plaintiff.

*Background*

Case is a Delaware Limited Liability Company and is located in New York. (Third-Party Complaint ("Compl."), PP 3-4). According to the complaint, David S. Solomon is the managing member of Case and its alter ego. (Compl., P 5). MSDW is a Delaware corporation with its principal place of business in New [*3] York, and CNB is a national banking corporation with its principal place of business in Florida. (Compl., PP 1-2).

In April 2003, CNB made a loan to Case for $ 925,000.00. (Affidavit of Allen Merkur dated November 14, 2005 ("Merkur Aff."), attached as Exh. 1 to Declaration of Matthew C. Plant dated November 14, 2006 ("Plant Decl."), P 2). Around this same time, Case executed a Commercial Pledge and Security Agreement that pledged MSDW Account No. 614-018389 ("the pledged account") to CNB as collateral for the loan. (Plant Decl., P 4). Prior to the maturity date of the loan, CNB and

2007 U.S. Dist. LEXIS 22187, *

Case agreed to renew the loan, and, as additional security, Case pledged other MSDW accounts to CNB and continued the pledge on the pledged account. (Plant Decl., PP 5-7). Subsequently, Case, CNB, and MSDW collectively executed Morgan Stanley Pledged Account Control Agreements ("MSDW control agreements") for all the pledged accounts, which provided that Case would "not have authority to trade in the Pledged Account" unless CNB gave its authorization. (Plant Decl., P 8; MSDW control agreements, attached as part of Exh. 1 to Plant Decl., § 2(a)).

Between December 2003 and September 2005, Case made approximately [*4] 43 wire transfers from the pledged accounts without CNB authorization. (Plant Decl., P 9). Once CNB discovered the transfers, it demanded that MSDW replace the funds that Case had withdrawn. (Plant Decl., P 12). Pursuant to CNB's request, MSDW liquidated the remaining collateral in the pledged accounts and wired the proceeds to CNB. These proceeds were insufficient to repay the loan and a balance of $98,204.21 remained due from Case. (Plant Decl., P 13).

CNB originally filed a complaint directly against the third-party defendants in Florida, but because it was unable to effect service on either defendant, CNB filed an action for breach of contract against MSDW in this Court on March 10, 2005. (Plant Decl., PP 13-15). CNB sought damages for the outstanding loan balance of $98,204.21, plus interest and attorneys' fees. (Plant Decl., P 15). On April 28, 2005, MSDW filed the present third-party complaint and served it on the third-party defendants, along with a copy of the plaintiff's complaint. (Plant Decl., P 16). On July 18, 2006, when the third-party defendants failed to answer, the Honorable Denise L. Cote, U.S.D.J., entered a default judgment and referred the case to me for [*5] inquest on damages. CNB and MSDW then entered into a settlement by which CNB agreed to dismiss its claims against MSDW in consideration of $ 87,500.00, and assigned to MSDW $ 87,500.00 of the debt that Case owed to CNB. (Plant Decl., P 21).

*Discussion*

A. *Jurisdiction*

This Court had diversity jurisdiction over the main action pursuant to *28 U.S.C. § 1332*, and supplemental jurisdiction over the third-party complaint pursuant to *28 U.S.C. § 1337*. The Court continues to have discretionary authority to exercise supplemental jurisdiction over the remaining third-party complaint pursuant to *28 U.S.C. § 1367(a)*. In general, "district courts [should] deal with cases involving pendent claims in the manner that best serves the principles of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine." *See City of Chicago v. International College of Surgeons, 522 U.S. 156, 172-73, 118 S. Ct. 523, 139 L. Ed. 2d 525 (1997)* (alterations in the original)(internal quotations and citations omitted). In this case, these interests are best served by continuing to exercise jurisdiction [*6] over MSDW's third-party claim.

B. *Choice of Law*

The MSDW control agreements signed by Case and CNB each contain a provision that calls for the application of New York law. (MSDW control agreements, § 10); *see LaSalle Bank National Association v. Nomura Asset Capital Corp., 424 F.3d 195, 205 n.7 (2d Cir. 2005)*("'New York law gives full effect to parties' choice-of-law provisions'")(quoting *Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996)*. Thus, New York law applies to the indemnification clause.

C. *Liability*

1. *Case Investments*

Under New York law, "[w]hen one of two or more joint tortfeasors obtains a release (i.e., settles with the plaintiff), he may neither be held liable for contribution to nor may he seek contribution from the other joint tortfeasors." *Matter of Poling Transportation Corp., 784 F. Supp. 1045, 1047 (S.D.N.Y. 1992)*(citing New York General Obligations Law ("GOL") *§ 15-108*). However, *GOL § 15-108* does not bar indemnification claims brought by settling tortfeasors. *Id.; see also Rosado v. Proctor & Schwartz, Inc., 66 N.Y.2d 21, 24, 484 N.E.2d 1354, 494 N.Y.S.2d 851, 853 (1985)*. In indemnification, [*7] "the party held legally liable shifts the entire loss to another 'to prevent a result which is regarded as unjust or unsatisfactory.'" *Id.* (quoting *Mas v. Two Bridges Associates, 75 N.Y.2d 680, 689-90, 554 N.E.2d 1257, 555 N.Y.S.2d 669, 674 (1990))*. A written contract that provides for indemnification will be enforced as long as the intent to assume such a role is "sufficiently clear and unambiguous." *Rodrigues v. N & S Bldg. Contrs., Inc., 5 N.Y.3d 427, 433, 839 N.E.2d 357, 805 N.Y.S.2d 299, 302 (2005)*.

MSDW may no longer seek contribution from Case because it has settled the primary claim with CNB. With regard to indemnification, every MSDW control agreement signed by Case and CNB contained the following "Liability and Indemnification" clause:

(b) Borrower and Creditor hereby agree to indemnify and hold harmless Morgan Stanley, its officers, directors, employees and agents, and any Investment Manager or Agent named in accordance with the procedures in section 2, against all claims, causes of action, liabilities, lawsuits, de-

mands, expenses, and or damages including, without limitation, any and all court costs and reasonable attorney's fees, in any way related to [*8] or arising out of or in connection with this Agreement, and instructions received from Creditor with respect to the Pledged Account except if such claims, liabilities or expenses are caused solely by Morgan Stanley's or such Investment Manager's or Agent's gross negligence or willful misconduct.

(MSDW control agreements, § 7). Here, Case, as "Borrower," clearly agreed to indemnify MSDW against "all claims . . . in connection with this Agreement." Since the control agreements are elements of the collateral on the initial loan between CNB and Case, the language of the indemnification agreement applies. Consequently, Case is liable to MSDW for indemnification.

### 2. David S. Solomon

By contrast, as Mr. Solomon was not a party to the agreements made between Case, CNB, and MSDW, he may only be held individually liable for breach if the facts alleged in the complaint support piercing the corporate veil. *See Dow Chemical Pacific Ltd. v. Rascator Maritime S.A., 782 F.2d 329, 342-43 (2d Cir. 1986)* (affirming district court's decision to enter a default judgement and pierce the corporate veil simultaneously). Under New York Law, courts will disregard the corporate [*9] structure in order "to prevent fraud or to achieve equity." *Walkovszky v. Carlton, 18 N.Y.2d 414, 416, 223 N.E.2d 6, 276 N.Y.S.2d 585, 587 (1966)* (quoting *International Aircraft Trading Co. v. Manufacturers Trust Co., 297 N.Y. 285, 292, 79 N.E.2d 249 (1948)).* Evidence of "complete domination of the corporation is the key to piercing the corporate veil, . . . [but] such domination standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required." *Morris v. New York State Department of Taxation & Finance, 82 N.Y.2d 135, 141-42, 623 N.E.2d 1157, 603 N.Y.S.2d 807, 811 (1993)*; *American Fuel Corp. v. Utah Energy Development Co., 122 F.3d 130, 134 (2d Cir. 1997).*

Because New York courts disregard corporate form reluctantly, they do so only when the form has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation . . ., and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego.

*Gartner v. Snyder, 607 F.2d 582, 586 (2d Cir. 1979)*(alterations in [*10] the original)(citations omitted).

In order to properly plead an alter ego theory, a plaintiff must demonstrate "(1) that the parent exercised such complete domination in respect to the transaction attacked that the subsidiary had at that time no separate will of its own, and (2) that this domination was used to commit fraud or wrong against plaintiff." *Rolls-Royce Motor Cars, Inc. v. Schudroff, 929 F. Supp. 117, 122 (S.D.N.Y. 1996)* (quoting *Zinaman v. USTS New York, Inc., 798 F. Supp. 128, 132 (S.D.N.Y. 1992).* The trier of fact must look at the totality of the evidence to decide if the presumption of corporate independence is outweighed by the policy to protect those who conduct business with the corporation. *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 139 (2d Cir. 1991).* To this end, the trier of fact is entitled to examine factors such as:

(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.,* issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds [*11] are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, [and] (6) the amount of business discretion displayed by the allegedly dominated corporation[.]

*Id.* "[P]urely conclusory allegations cannot suffice to state a claim based on veil-piercing or alter-ego liability, even under the liberal notice pleading standard." *In re Currency Conversion Fee Antitrust Litig., 265 F. Supp. 2d 385, 426 (S.D.N.Y. 2003).*

Following a default, all factual allegations of the complaint, except those relating to damages, must be accepted as true. *See Cotton v. Slone, 4 F.3d 176, 181 (2d Cir. 1993)*; *Time Warner Cable of New York City v. Barnes, 13 F. Supp. 2d 543, 547 (S.D.N.Y. 1998).* In its complaint, MSDW makes a general assertion, "on information and belief," that Mr. Solomon is the "alter ego" of Case. (Compl., P 5). MSDW also states that Mr. Solomon was the exclusive signatory for Case, and that all MSDW correspondence relating to Case's accounts was

[*12] sent in care of Mr. Solomon, as they shared common addresses. (Compl., PP 10-12). Given the numerous factors that must be taken into account when conducting the alter ego analysis, MSDW's general assertion, together with the evidence of a few shared characteristics between Mr. Solomon and Chase, is not enough to establish that Mr. Solomon is an alter ego of the company. MSDW has not presented adequate allegations to pierce the corporate veil and find Mr. Solomon individually liable.

E. *Damages*

When determining the damages to be awarded, the court must have a "sufficient basis from which to evaluate the fairness of the proposed sum." *Fustok v. Conti-Commodity Services, Inc., 873 F.2d 38, 40 (2d Cir. 1989).* Here, MSDW seeks the default amount of $ 87,500.00 plus attorney's fees and costs. It has presented proof that it paid $ 87,500.00 to CNB to settle the initial claim. (Exh. E (General Release and Settlement Agreement between CNB and MSDW); Exh. F (copy of MSDW check made payable to CNB in the amount of $ 87,500.00), submitted into evidence at the inquest). The default amount sought is $ 10,204.00 less than the $ 98,204.21 sought by CNB in its initial claim, which [*13] was the amount owed by Case on the loan. (Merkur Aff., PP 1, 19-20).

Based on the evidence, the proposed default amount is fair and reasonable, and MSDW is entitled to a damage award of $ 87,500.00.

F. *Attorneys' Fees*

Because Case and CNB explicitly contracted to indemnify MSDW against "reasonable attorney's fees . . . arising out of or in connection with this Agreement" (MSDW Control agreements P 7(b)), attorneys' fees are recoverable in this case. *See Kaleidoscope Media Group, Inc. v. Entm't Solutions, Inc., 97 Civ. 9369, 2001 U.S. Dist. LEXIS 10801, 2001 WL 849532, at \*4 (S.D.N.Y. July 19, 2001)*(holding attorneys' fees recoverable on default judgment because the parties had previously contracted that these fees would be recoverable in the event of a breach of contract). Upon finding that attorneys' fees are recoverable, an appropriate award is "based upon the number of hours reasonably expended by counsel on the litigation multiplied by a reasonable hourly rate." *Reiter v. MTA New York City Transit Authority, 457 F.3d 224, 232 (2d Cir. 2006).*

Here, MSDW seeks a total of $ 11,523.85 in attorneys' fees. (Exh. F (Declaration of David G. Smitham dated January 19, 2007 ("Smitham [*14] Decl."), P 12; Exh. G (attorney time records and invoices), submitted into evidence at the inquest)); *see also New York State*

*Association for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1147-48 (2d Cir. 1983)*(contemporaneous time records required in application for statutory attorneys' fees). MSDW's counsel have submitted time records indicating that they conducted the following amount of work attributable to settlement discussions with Mr. Solomon: 14.5 hours by an attorney at the rate of $ 190.00 per hour, and 9.6 hours by another attorney at $ 178.00 per hour, for a total of $ 4,017.40. (Smitham Decl., P 10). MSDW's counsel submitted additional time records indicating that they conducted the following amount of work attributable to the preparation of the motion for default judgment, the proposed findings, and the documentation for and attendance at the inquest hearing: 7.3 hours by an attorney at the rate of $ 190.00 per hour, 5.8 hours by another attorney at the rate of $ 295.00 per hour, and 23.3 hours by another attorney at the rate of $ 225.00 per hour, for a total of $ 7,506.45. (Smitham Decl., P 10).

Here, all requests were fully documented with [*15] contemporaneous time records. The time expended was reasonable, and the rates requested are commensurate with those generally charged for similar work in this district. Therefore, the request for fees should be granted in the amount of $ 11,523.85.

G. *Interest*

Pursuant to *28 U.S.C. § 1961(a)*, interest will be allowed "on any money judgement in a civil case recovered in a district court." Such interest is calculated from the date of judgement "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment"; furthermore, the interest will be compounded annually. *28 U.S.C. § 1961(a)* and *(b).* Accordingly, MSDW should be awarded post-judgement interest at the statutorily-mandated rate.

*Conclusion*

For the reasons set forth above, I recommend that judgment be entered in favor of MSDW and against Case in the amount of $ 87,500.00 in damages and $ 11,523.85 in attorneys' fees, for a total of $ 99,023.85, plus post-judgement interest. Pursuant to *28 U.S.C. § 636(b)(1) [*16]* and *Rules 72, 6(a)*, and *6(e) of the Federal Rules of Civil Procedure*, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Denise L. Cote, Room 1040, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York

10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York

March 29, 2007

# EXHIBIT

# 3

1997 U.S. Dist. LEXIS 17369, *

**HAL ALTER, Plaintiff, -against- JULIO BOGORICIN, RITA BOGORICIN, CLAUDIO BOGORICIN, JULIO BOGORICIN REAL ESTATE CORP., JULIO BOGORICIN REAL ESTATE GROUP, and JULIO BOGORICIN REAL ESTATE CO., Defendants.**

**97 Civ. 0662 (MBM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1997 U.S. Dist. LEXIS 17369*

**November 4, 1997, Decided**
**November 6, 1997, Filed**

**DISPOSITION:** [*1] Defendants' motion to dismiss granted as to following claims: breach of covenant of good faith and fair dealing, fraud, violation of *§ 198 of New York's Labor Law*, and violation of *§ 4305 of New York's Insurance Law*. Defendants' motion for partial dismissal of breach of contract claim granted. Defendants' motion to dismiss plaintiff's claims for quantum meruit and tortious interference with contract granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, a corporation, a company, a group of companies, the majority owner of the corporate defendants, and two individuals with ownership interests in the corporate defendants, moved to dismiss in part plaintiff terminated employee's (employee) claim for breach of contract, to dismiss in their entirety the employee's remaining seven claims, and to strike the employee's request for an accounting or the imposition of a constructive trust.

**OVERVIEW:** The employee's suit arose out of the termination of his employment from the corporation. Plaintiff asserted claims for breach of contract, breach of an implied covenant of good faith and fair dealing, fraud, quantum meruit and unjust enrichment, tortious interference with contract, violation *N.Y. Lab. Law § 198 (§ 198)*, violation of *N.Y. Ins. Law § 4305 (§ 4305)*, and conversion. The employee also sought an accounting and the imposition of a constructive trust. On motions to dismiss, filed pursuant to *Fed. R. Civ. P. 12(b)(6)*, the court dismissed the employee's breach of contract claim as to all defendants except the corporation, dismissed the employee's tortious interference with contract claim as to all defendants except the president of the three corporate defendants, partially dismissed the employee's quantum

meruit claim, and dismissed in their entirety the employee's claims for breach of covenant of good faith and fair dealing, fraud, violation of *§ 198*, and violation of *§ 4305*. Finally, the court held that the employee was not entitled to an accounting or the imposition of a constructive trust because he failed to allege a breach of fiduciary duty.

**OUTCOME:** The court granted the motion for partial dismissal of the breach of contract claim, granted dismissal of the employee's claims for breach of covenant of good faith and fair dealing, fraud, and several statutory violations, granted partial dismissal of the claims for quantum meruit and tortious interference with contract, and struck the requests for an accounting and a constructive trust.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Diversity Jurisdiction > Amount in Controversy > Challenges*
*Civil Procedure > Jurisdiction > Diversity Jurisdiction > Amount in Controversy > Determinations*
*Civil Procedure > Summary Judgment > Partial Summary Judgments*
[HN1] In a diversity case, the court determines the amount in controversy based on plaintiff's allegations at the time the action is commenced, and generally not after a subsequent change such as partial dismissal or summary judgment. Even when a plaintiff's allegations leave grave doubt about the likelihood of recovery of the requisite amount, dismissal is not warranted unless it appears to a legal certainty that the claim is really for less than the jurisdictional amount. Thus, a party invoking federal jurisdiction bears the burden of proving to a rea-

sonable probability that the amount in controversy exceeds the jurisdictional minimum.

**Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview**
[HN2] Implied consent to use a forum's law is sufficient to establish choice of law.

**Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims**
[HN3] A motion to dismiss under *Fed. R. Civ. P. 12(b)(6)* may be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. The court must take the facts alleged in the complaint as true and draw all reasonable inferences in the favor of the plaintiff.

**Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss**
[HN4] On a motion to dismiss, a court generally may not consider the contents of documents that are extraneous to the complaint. However, when a plaintiff fails to attach or to incorporate by reference a document that is integral to the complaint and upon which the plaintiff heavily relies, the court may take that document into account in deciding a motion to dismiss.

**Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Alter Ego > Fraud**
**Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements**
[HN5] New York courts are generally reluctant to rely on a claim that a corporation is the alter ego of its principals as a basis for piercing the corporate veil. A party seeking to pierce the veil must make a two-part showing: (i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil. Because it is not necessary to allege fraud in order to pierce the corporate veil, a plaintiff's alter-ego allegations are judged by the liberal notice pleading standards of *Fed. R. Civ. P. 8(a)* rather than the more stringent pleading standards of *Fed. R. Civ. P. 9(b).*

**Business & Corporate Law > Corporations > Formation > Corporate Existence, Powers & Purpose > General Overview**

**Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview**
[HN6] Under the second prong of New York's test for piercing the corporate veil, a plaintiff must allege facts sufficient to establish that defendants misused the corporate form for their personal ends so as to commit a wrong or injustice against him. In other words, a plaintiff must establish a relationship between the alleged wrong against him and defendants' alleged abuse of the corporate form.

**Contracts Law > Contract Interpretation > General Overview**
[HN7] Under the definiteness doctrine, New York courts will not enforce a material contract term if it is impossible to determine what in fact the parties have agreed to. Thus, a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable.

**Contracts Law > Contract Interpretation > General Overview**
[HN8] New York courts refuse to apply the definiteness doctrine rigidly. Thus, where it is clear from the language of an agreement that the parties intended to be bound and there exists an objective method for supplying a missing term, the court should endeavor to hold the parties to their bargain. There are two situations in which a court can attach a definite meaning to an otherwise indefinite term: (1) if the agreement contains a methodology for determining the missing term within the four corners of the agreement, or (2) if the agreement invites recourse to an objective extrinsic event, condition or standard on which the amount was made to depend.

**Contracts Law > Breach > General Overview**
**Contracts Law > Contract Interpretation > Good Faith & Fair Dealing**
**Contracts Law > Types of Contracts > Covenants**
[HN9] New York courts recognize an implied covenant of good faith and fair dealing in every contract. This covenant ensures that neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract. However, the covenant of good faith and fair dealing is not distinct from the underlying contract, and therefore, as a general rule, the cause of action alleging breach of good faith is duplicative of a cause of action alleging breach of contract.

**Contracts Law > Breach > General Overview**

1997 U.S. Dist. LEXIS 17369, *

*Contracts Law > Defenses > Fraud & Misrepresentation > General Overview*
*Labor & Employment Law > Employment Relationships > General Overview*
[HN10] As a general rule, no cause of action for fraud is stated or exists where the only fraud charged relates to a breach of an employment contract. However, New York courts allow a litigant simultaneously to maintain a fraud and a breach of employment contract claim provided he either: (i) demonstrates a legal duty separate from the duty to perform under the contract, or (ii) demonstrates a fraudulent misrepresentation collateral or extraneous to the contract.

*Contracts Law > Remedies > Equitable Relief > General Overview*
*Contracts Law > Types of Contracts > General Overview*
[HN11] The equitable doctrines of quantum meruit and unjust enrichment are related. Quantum meruit, which means as much as he deserves, is based on the concept that no one who benefits by the labor and materials of another should be unjustly enriched thereby. Thus, a claim of quantum meruit is the means by which an unjust enrichment is remedied. Both doctrines are quasi-contractual in nature and apply only in the absence of an express agreement. Thus, the existence of a valid and enforceable written contract governing a particular subject matter generally precludes recovery on a theory of quantum meruit or unjust enrichment for events arising out of the same subject matter.

*Contracts Law > Breach > General Overview*
*Contracts Law > Types of Contracts > General Overview*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Breach*
[HN12] New York courts suggest that a wrongfully terminated employee may pursue a quasi-contract claim for unpaid profit sharing at the same time that he seeks salary benefits under a breach of contract theory.

*Contracts Law > Third Parties > General Overview*
*Torts > Business Torts > Commercial Interference > Contracts > Elements*
[HN13] Under New York law, a plaintiff must allege four elements to state a claim for tortious interference with contract: (1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach; and (4) damages. In order to state a claim for tortious interference, a plaintiff must allege facts sufficient to establish that the defendant actually interfered with the contract.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN14] Although a district court is required to accept as true all well-pleaded allegations in deciding a motion to dismiss, it is not required to accept as true conclusory allegations for which there are no factual underpinnings.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > General Overview*
*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
*Torts > Business Torts > Commercial Interference > Employment Relationships > General Overview*
[HN15] New York courts permit an employee to sue the equity owner of his corporate employer for tortious interference provided that the interference was motivated by malice toward the employee.

*Labor & Employment Law > Wage & Hour Laws > Wage Payments*
[HN16] See *N.Y. Lab. Law § 198(1)(a).*

*Labor & Employment Law > Wage & Hour Laws > Remedies > General Overview*
*Labor & Employment Law > Wage & Hour Laws > Wage Payments*
[HN17] *N.Y. Lab. Law § 198* does not stand alone. It sets forth the remedies available in actions for wage claims founded on the substantive provisions of N.Y. Lab. Law art. 6.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > General Overview*
*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > General Overview*
[HN18] N.Y. Lab. Law does not apply to employees serving in an executive, managerial or administrative capacity.

*Insurance Law > Claims & Contracts > Cancellation & Nonrenewal > Notice Requirements*
*Insurance Law > Group Policies > Employment Termination*
*Insurance Law > Group Policies > Notice Requirements*

[HN19] See *N.Y. Ins. Law § 4305(e)(2)(A)*.

#### Insurance Law > Group Policies > Employment Termination

[HN20] *N.Y. Ins. Law § 4305(e)(2)(A) (§ 4305(e)(2)(A))* is directed to employees, not employers. It does not mandate the contents of a continuation notice; it merely provides that an employee has a two-month window to respond once he receives such notice. Second, nothing in *§ 4305(e)(2)(A)* suggests that an inaccurate continuation letter may serve to reduce the time in which an employee may request continuation. The 60-day period is statutorily mandated and does not depend on the accuracy of a continuation letter.

#### Civil Procedure > Remedies > Equitable Accountings > General Overview
#### Governments > Fiduciary Responsibilities
#### Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview

[HN21] The right to an accounting is premised upon the existence of confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest. An accounting is unavailable when the parties have only an employee-employer relationship.

#### Business & Corporate Law > Joint Ventures > Management Duties & Liabilities
#### Governments > Fiduciary Responsibilities
#### Labor & Employment Law > Employment Relationships > Fiduciary Responsibilities

[HN22] New York courts hold that an employee may not compel an accounting if the employment relationship entails only a sharing of profits, not a sharing of losses. In such a case, the employer is not considered a fiduciary of or joint venturer with the employee.

#### Estate, Gift & Trust Law > Trusts > Constructive Trusts
#### Governments > Fiduciary Responsibilities
#### Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview

[HN23] A constructive trust may not be imposed unless four elements have been established: a confidential or fiduciary relationship, a promise, a transfer made in reliance on that promise, and unjust enrichment. Thus, a constructive trust is generally not available in the absence of a breach of fiduciary duty.

#### Contracts Law > Remedies > Equitable Relief > Quantum Meruit
#### Estate, Gift & Trust Law > Trusts > Constructive Trusts

[HN24] The constructive trust is an equitable doctrine that applies only when equity so demands.

**COUNSEL:** For Plaintiff: ANDREW P. KARAMOUZIS, ESQ., King, Pagano & Harrison, New York, NY.

For Defendants: RICHARD M. RESNIK, ESQ., Mandel & Resnik, P.C., New York, NY.

**JUDGES:** Michael B. Mukasey, U.S. District Judge.

**OPINION BY:** Michael B. Mukasey

**OPINION**

OPINION AND ORDER

MICHAEL B. MUKASEY, U.S.D.J.

Hal Alter sues Julio Bogoricin, Rita Bogoricin, Claudio Bogoricin, Julio Bogoricin Real Estate Corp. ("JBRE Corp."), Julio Bogoricin Real Estate Group ("JBRE Group"), and Julio Bogoricin Real Estate Co. ("JBRE Co.") for breach of contract, and various contrived tort and statutory claims, arising out the termination of his employment at JBRE Corp. Defendants move to dismiss most of the complaint under *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim upon which [*2] relief can be granted. For the reasons that follow, defendants' motion is granted in substantial part and denied in small part.

I.

The facts alleged in the complaint are accepted as true for the purposes of this motion. *Doe v. City of New York, 15 F.3d 264, 266 (2d Cir. 1994)*. Julio Bogoricin, a resident of New York (Compl. P 3), is the president and majority owner of three entities: JBRE Corp., a New York real estate corporation; JBRE Group, a group of real estate companies based in Brazil and doing business in New York and other foreign cities; and JBRE Co., a real estate company based in Brazil and doing business in New York. (*Id.* PP 6-8) Rita Bogoricin and Claudio Bogoricin have ownership interests in these three entities and assist Julio Bogoricin in their management. (*Id.*) Julio Bogoricin, with the assistance of Rita Bogoricin and Claudio Bogoricin, thoroughly dominates each of these entities, ignores corporate formalities, and commingles corporate funds with personal funds. (*Id.*)

In April 1992, Julio Bogoricin offered plaintiff the executive vice presidency of JBRE Corp.'s New York office. (*Id.* P 15) Thereafter, in early July 1992, Julio

Bogoricin and [*3] Claudio Bogoricin told plaintiff that he would receive a "sizeable compensation package" if he accepted the position, including: a base monthly salary; an annual bonus; a share of commissions; and at least a 10 percent share of any increase in the value of JBRE Corp.'s real estate portfolio. (*Id.*) Julio and Claudio Bogoricin also assured plaintiff that JBRE Corp. "liked to share" profits with employees and that profit sharing would be a fundamental part of his compensation. (*Id.*)

On July 13, 1992, plaintiff drafted a letter (the "Employment Agreement") summarizing the terms of his employment and compensation. (*Id.* P 17; Resnik Aff., Ex. A) The Employment Agreement provided that in exchange for "overseeing activities of [JBRE Corp.] and other interests of [JBRE Group]" plaintiff would receive: (1) a base salary of $ 7,500 per month, adjustable for inflation; (2) an annual bonus equal to one month's salary; (3) 10 percent of any commissions received by JBRE Group or JBRE Co. as a result of any business generated by JBRE Corp.; and (4) profit sharing "in the range of 10% but according to a formula yet to be determined." (Compl. P 17; Resnik Aff., Ex. A) The Employment [*4] Agreement provided also that plaintiff would receive paid vacation leave and that, unless his employment was terminated for cause, he was entitled to six months notice before termination. (*Id.*) Both plaintiff and Claudio Bogoricin, on behalf of JBRE Corp., signed the Employment Agreement.

From July 1992 through January 1996, JBRE Corp. made substantial financial gains that, plaintiff alleges, were due largely to his efforts. (Compl. P 18) These gains generated commissions for both JBRE Group and JBRE Co., and resulted in an increase in the value of JBRE Corp.'s real estate holdings. (*Id.* PP 18-19) However, during the course of plaintiff's employment, Julio Bogoricin and JBRE Corp. consistently failed to make either incentive compensation or profit sharing payments to plaintiff. (*Id.* P 20) They failed also to provide plaintiff with documentation proving that plaintiff was not entitled to these payments, but simply told him that such payments were not due or owing. (*Id.*)

In December 1996, Julio Bogoricin instructed the payroll administrator at JBRE Corp. to withhold plaintiff's December salary and his yearly bonus. (*Id.* P 21) When plaintiff arrived at work on January [*5] 22, 1997, an attorney for Julio Bogoricin barred him from entering his office and informed him that his employment with JBRE Corp. was suspended immediately. (*Id.* P 22) Plaintiff was not allowed to return to his office to retrieve his personal property. (*Id.*) Julio Bogoricin officially fired plaintiff on January 31, 1997, shortly after plaintiff filed the present action. (*Id.* P 23; Resnik Aff. Ex. B) On February 6, 1997, Julio Bogoricin and JBRE Corp. remitted three payrolls checks to plaintiff totalling

$ 8,273.91. (Compl. P 24) Additional facts will appear below, as necessary.

Plaintiff filed the initial complaint in this action on January 31, 1997 and an amended complaint on April 11, 1997. [1] He alleges eight claims arising out of the termination of his employment: (1) breach of contract; (2) breach of an implied covenant of good faith and fair dealing; (3) fraud; (4) quantum meruit and unjust enrichment; (5) tortious interference with contract; (6) violation of *§ 198 of the New York Labor Law*; (7) violation of *§ 4305 of the New York Insurance Law*; and (8) conversion. (*Id.* PP 27-74, 81-84) In addition, plaintiff asks the court to order an accounting of "all monies [*6] due and owing to him" (*id.* P 78) and to impose a constructive trust on defendants' funds in a corresponding amount. (*Id.* PP 75-80) Defendants move to dismiss the first cause of action in part and the second through seventh causes of action in their entirety. (Def. Mem.) In addition, defendants contend that plaintiff is not entitled to an accounting or to the imposition of a constructive trust. (*Id.* at 31-34)

> 1   Hereinafter, all references to the "complaint" are to the amended complaint.

II.

Before addressing the merits of defendants' motion, it is necessary to consider two threshold issues. First, defendants contend that this court does not have subject matter jurisdiction over plaintiff's claims. (Def. Mem. at 7 n.4; Def. Reply Mem. at 2-3) Plaintiff brings this action in federal court pursuant to *28 U.S.C. § 1332(a)(1)* alleging diversity of citizenship among the parties and an amount in controversy in excess of $ 75,000. (Compl. P 11) Defendants do not dispute the diversity of the parties. Rather, [*7] defendants argue that once I have properly ruled on their motion to dismiss, plaintiff's remaining claims will amount to at most $ 52,500, a sum below the jurisdictional threshold. (Def. Mem. at 7 n.4)

Defendants' misread the law of diversity jurisdiction. [HN1] In a diversity case, the court determines the amount in controversy based on plaintiff's allegations "at the time the action is commenced," *Tongkook America, Inc. v. Shipton Sportswear Co., 14 F.3d 781, 784 (2d Cir. 1994)*, and generally not after a subsequent change such as partial dismissal or summary judgment. *Id.; see also* 15 James Wm. Moore et al., *Moore's Federal Practice* P 102.104(3) (3rd ed. 1997) (if diversity jurisdiction existed at time case was filed, it is not affected by dismissal of one or more claims, even though amount recoverable on remaining claims falls below jurisdictional requirement). Even when a plaintiff's allegations leave "grave doubt about the likelihood of recovery of the requisite amount," *Zacharia v. Harbor Island Spa, Inc., 684 F.2d*

199, 202 (2d Cir. 1982), dismissal is not warranted unless it appears "'to a legal certainty that the claim is really for less than the jurisdictional amount [*8] . . . .'" *Tongkook,* 14 F.3d at 784 (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 289, 82 L. Ed. 845, 58 S. Ct. 586 (1938)); *see also Pariente v. Scott Meredith Literary Agency, Inc.,* 771 F. Supp. 609, 614 (S.D.N.Y. 1991). Thus, a party invoking federal jurisdiction bears the burden of proving to a "reasonable probability" that the amount in controversy exceeds the jurisdictional minimum. *Tongkook,* 14 F.3d at 784.

Based on the claims for relief alleged in the complaint, I cannot say to a legal certainty that the amount in controversy is really less than $ 75,000. Plaintiff contends that defendants owe him at least seven months salary -- at a rate of $ 7,500 per month -- plus a percentage of commissions and profits. (Compl. P 30-33) Plaintiff contends further that this unpaid compensation amounts to over $ 1 million. (Compl. P 34) However doubtful plaintiff's chances of recovering that sum may be, defendants cannot divest this court of jurisdiction it otherwise has through a motion to dismiss under *Rule 12(b)(6)*. *St. Paul Mercury,* 303 U.S. at 289-90 (events subsequent to filing of action do not oust federal courts of jurisdiction); *see also* [*9] *Tongkook,* 14 F.3d at 785 (if damages are uncertain, "doubt should be resolved in favor of plaintiff's pleadings"). Accordingly, because I find to a reasonable probability that plaintiff's claims exceed the jurisdictional minimum, this court has subject matter jurisdiction.

The second threshold issue is choice of law. The Employment Agreement does not specify the law that is to govern disputes between the parties, and it is unclear where the parties entered into that agreement. However, the parties rely exclusively on New York law, and neither suggests that another jurisdiction may have a more significant interest in this dispute. *See Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1030 (2d Cir. 1996), *cert. denied,* U.S. , 117 S. Ct. 959 (1997) (under New York choice of law analysis, "law of the jurisdiction with the most significant interest" in dispute controls). Thus, "under the principle that [HN2] implied consent to use a forum's law is sufficient to establish choice of law," *Tehran-Berkeley Civil & Envtl. Engs. v. Tippetts-Abbett-McCarthy-Stratton,* 888 F.2d 239, 242 (2d Cir. 1989), I will apply New York law here.

III.

Defendants move to dismiss [*10] seven of plaintiff's eight causes of action on the ground that they fail to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6)*. [HN3] A motion to dismiss under *Rule 12(b)(6)* may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of

his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). The court must take the facts alleged in the complaint as true and draw all reasonable inferences in the favor of the plaintiff. *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 699-700 (2d Cir. 1994).

[HN4] On a motion to dismiss, a court generally may not consider the contents of documents that are extraneous to the complaint. *See, e.g., North American Dev., Inc. v. Shahbazi,* 1996 U.S. Dist. LEXIS 7784, No. 95-4803, 1996 WL 306538, at *5 (S.D.N.Y. June 6, 1996). However, when a plaintiff fails to attach or to incorporate by reference a document that is integral to the complaint and upon which the plaintiff heavily relies, the court may take that document into account in deciding a motion to dismiss. *International Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, [*11] 72 (2d Cir. 1995); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir. 1991), *cert. denied,* 503 U.S. 960 (1992) (if plaintiff had actual notice of document at issue and relied upon it, no need to convert motion to dismiss into motion for summary judgment); *see also Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3rd Cir. 1993), *cert. denied,* 510 U.S. 1042, 126 L. Ed. 2d 655, 114 S. Ct. 687 (1994) (if court does not consider dispositive document, "a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach [the] document"). Here, plaintiff has failed to attach to his complaint a copy of the Employment Agreement. However, because plaintiff relies heavily on its terms -- which he drafted himself -- and because those terms are integral to this dispute, I will consider the Employment Agreement in ruling on the present motion.

A. *Breach of Contract*

Plaintiff's first claim is that defendants are in breach of the Employment Agreement because they: withheld incentive, profit sharing, and salary payments; withheld vacation benefits; failed to give him six months notice prior to [*12] termination; and terminated him without cause. (Compl. P 30-33) Defendants seek partial dismissal of this claim on two grounds.

1. *Sufficiency of Plaintiff's Alter Ego Allegations*

Defendants assert that plaintiff had a contractual relationship *only* with JBRE Corp., and that therefore this claim must be dismissed as to all other defendants. (Def. Mem. at 9-11) Although plaintiff acknowledges that he entered into the Employment Agreement with JBRE Corp. (Compl. P 17), he argues that all other defendants are parties to that agreement because JBRE Corp. is

merely the "alter ego" of the other defendants. (Pl. Mem. at 11-12)

[HN5] New York courts are generally reluctant to rely on a claim that a corporation is the alter ego of its principals as a basis for piercing the corporate veil. *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd., 909 F.2d 698, 703 (2d Cir. 1990)* (citing *Gartner v. Snyder, 607 F.2d 582, 586 (2d Cir. 1979)*. A party seeking to pierce the veil must "make a two-part showing: (i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong [*13] that injured the party seeking to pierce the veil." *American Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 1997 WL 491621, at *3 (2d Cir. 1997)*; *see also Morris v. New York State Dept. of Taxation and Finance, 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 810-11, 623 N.E.2d 1157 (1993)*. Because it is not necessary to allege fraud in order to pierce the corporate veil, plaintiff's alter-ego allegations are judged by the liberal notice pleading standards of *Fed. R. Civ. P. 8(a)* rather than the more stringent pleading standards of *Fed. R. Civ. P. 9(b)*. *See Citicorp Int'l Trading Co. v. Western Oil & Refining Co., 771 F. Supp. 600, 608 (S.D.N.Y. 1991)*.

Defendants contend that plaintiff has failed to satisfy either prong of this test. However, it is unnecessary to determine whether plaintiff has met the first prong because, even under the liberal pleading standards of *Rule 8(e)*, plaintiff has failed to meet the second prong. *See Morris, 82 N.Y.2d at 142-43, 603 N.Y.S.2d at 811* (unnecessary to reach first prong when second prong not satisfied). [HN6] Under the second prong, plaintiff must allege facts sufficient to establish that defendants "misused the corporate form for [*14] [their] personal ends so as to commit a wrong or injustice against" him. *Id., 82 N.Y.2d at 143, 603 N.Y.S.2d at 811*. In other words, plaintiff must establish a relationship between the alleged wrong against him and defendants' alleged abuse of the corporate form. *See American Fuel Corp., 1997 WL 491621, at *6* (plaintiff "failed as a matter of law to show the use of the corporate form for a wrongful or fraudulent purpose"). Plaintiff has failed to assert facts that would establish such a relationship in this case.

Read liberally, the complaint demonstrates only that plaintiff entered into a contract with a closely held corporation which is controlled by one or more equity owners who make employment decisions for the corporation. Although plaintiff contends that Julio Bogoricin "ignored corporate formalities, diverted corporate resources and commingled [personal] funds" in his dealings with JBRE Corp., he does not allege that any of these abuses of the corporate form led to a violation of the Employment Agreement. For example, plaintiff does not allege that any of the defendants: furthered their personal interests,

rather than those of JBRE Corp., by hiring and then terminating [*15] him; misled him into believing that he was entering into an employment agreement with them in their personal capacities; or failed to invest JBRE Corp. with funds sufficient to pay him.

In short, plaintiff has not established that the wrong allegedly committed against him -- the breach of contract -- is related to any misuse of the corporate form. *See Mass v. McClenahan, 893 F. Supp. 225, 234 (S.D.N.Y. 1995)* (in employment termination case, no reason to pierce corporate veil when defendant did not act in furtherance of his personal interest or mislead employee). In essence, plaintiff seeks to convert a breach of contract claim against his former employer, JBRE Corp., into multi-party litigation based solely on the unexceptional fact that in closely held corporations the owners typically make the employment decisions. Accordingly, the breach of contract claim is dismissed as to all defendants except JBRE Corp.

## 2. *The Profit-Sharing Provision*

Defendants contend also that the breach of contract claim should be dismissed against JBRE Corp. to the extent that it alleges a violation of the profit sharing provision of the Employment Agreement. The Employment Agreement provides [*16] that "profit sharing shall be in the range of 10% but according to a formula yet to be developed, including the determination of accrued value in the event of termination." (Resnik Aff., Ex. A) Defendants argue that this provision is only an "agreement to agree" and therefore unenforceable. (Def. Mem. at 12-13)

[HN7] Under the "definiteness doctrine," New York courts will not enforce a material contract term if it is impossible to determine "what in fact the parties have agreed to . . . ." *166 Mamaroneck Ave. Corp. v. 151 East Pond Road Corp., 78 N.Y.2d 88, 91, 571 N.Y.S.2d 686, 687, 575 N.E.2d 104 (1991)* (citation omitted); *see also Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 249, 417 N.E.2d 541 (1981)* ("definiteness as to material matters is of the very essence in contract law"). Thus, "'a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable.'" *166 Mamaroneck, 78 N.Y.2d at 91, 571 N.Y.S.2d at 687* (quoting *Martin, 52 N.Y.2d at 109, 430 N.Y.S.2d at 249*). A compensation clause is sufficient and enforceable only if the amount of compensation can be determined "in accordance with [*17] the terms of the agreement without any further expression by the parties." *Benevento v. RJR Nabisco, Inc., 1993 U.S. Dist. LEXIS 6226, No. 89-6266, 1993 WL 126424, at *5 (S.D.N.Y. Apr. 1, 1993)*.

[HN8] New York courts refuse to apply the definiteness doctrine rigidly, however. *166 Mamaroneck*, 78 N.Y.2d at 91, *571 N.Y.S.2d at 687*. "Thus, where it is clear from the language of an agreement that the parties intended to be bound and there exists an objective method for supplying a missing term, the court should endeavor to hold the parties to their bargain." *Id.* 78 N.Y.2d at 91, 571 N.Y.S.2d at 688 (citation omitted). In *Martin*, the Court of Appeals recognized two situations in which a court could attach a definite meaning to an otherwise indefinite term: (1) if the agreement contained "a methodology for determining [the missing term] . . . within the four corners of the [agreement]," or (2) if the agreement "invited recourse to an objective extrinsic event, condition or standard on which the amount was made to depend." *52 N.Y.2d at 110, 436 N.Y.S.2d at 250-51*; *see also 166 Mamaroneck*, 78 N.Y.2d at 92-93, *571 N.Y.S.2d at 688* (concluding that lease provision providing for arbitration to determine [*18] rental price was enforceable because it established a method for calculation).

In this case, the Employment Agreement -- which plaintiff drafted himself -- does not specify the share of profit plaintiff is to receive. It provides only that such share "shall be in the range of 10% . . . ." More important, it leaves the precise determination of this share to a future "formula yet to be developed. . . ." This statement strongly suggests that the parties left the profit sharing provision to future negotiations, particularly when one considers the precision with which the Employment Agreement addresses other terms of plaintiff's compensation. Moreover, the Employment Agreement neither contains a methodology for developing a profit sharing formula nor refers to an extrinsic standard, event or condition from which such a formula could be calculated. *See Martin, 52 N.Y.2d at 110, 436 N.Y.S.2d at 251*. Accordingly, even drawing all reasonable inferences in favor of plaintiff, I find that, by its very design, the profit sharing provision is an agreement to agree and therefore unenforceable under a breach of contract theory.

B. *Breach of an Implied Covenant of Good Faith and Fair Dealing*

[*19] Plaintiff's second claim alleges a breach of an implied covenant of good faith and fair dealing. Plaintiff bases this claim on allegations that defendants failed to provide him with financial records that would have allowed him to calculate his incentive compensation and profit sharing payments, and barred him from entering his office after his termination. (Compl. P 39, 41-42) Defendants move to dismiss this claim on the ground that it duplicates the breach of contract claim. (Def. Mem. at 14-16; Reply at 7-8)

[HN9] New York courts recognize an implied covenant of good faith and fair dealing in every contract. *Apfel v. Prudential-Bache Securities, Inc., 183 A.D.2d 439, 439, 583 N.Y.S.2d 386, 387* (1st Dep't 1992), *modified on other grounds and affirmed, 81 N.Y.2d 470, 600 N.Y.S.2d 433, 616 N.E.2d 1095 (1993)*. This covenant ensures that "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . ." *M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990)* (per curiam). However, the covenant of good faith and fair dealing is not distinct from the underlying contract, [*20] *see Geler v. National Westminster Bank USA, 770 F. Supp. 210, 215 (S.D.N.Y. 1991)*, and therefore, "as, a general rule, 'the cause of action alleging breach of good faith is duplicative of a cause of action alleging breach of contract . . . .'" *OHM Remediation Servs. Corp. v. Hughes Environmental Systems, Inc., 952 F. Supp. 120, 124 (S.D.N.Y. 1997)* (quoting *Apfel, 183 A.D.2d at 439, 583 N.Y.S.2d at 387*); *see also Canstar v. J.A. Jones Constr. Co., 212 A.D.2d 452, 453, 622 N.Y.S.2d 730, 731* (1st Dep't 1995) ("[A] breach of an implied covenant of good faith and fair dealing is intrinsically tied to the damages allegedly resulting from a breach of the contract."). In fact, one court in this district recently has observed that every court faced with a complaint brought under New York law and alleging both breach of contract and breach of a covenant of good faith and fair dealing has dismissed the latter claim as duplicative. *See W.S.A., Inc. v. ACA Corp., 1996 U.S. Dist. LEXIS 14198*, Nos. 94-1868, 94-1493, 1996 WL 551599, at *9 (S.D.N.Y. Sept. 27, 1996), *modified on other grounds on reconsideration*, 1996 U.S. Dist. LEXIS 18885, 1996 WL 735508 (Dec. 20, 1996) (Haight, J.).

Plaintiff acknowledges the general rule against [*21] duplicative claims. (Pl. Mem. at 12) He seeks to avoid its application on the ground that defendants committed "separate and distinct wrongful acts" by: (1) refusing to provide financial documents pertaining to his compensation; (2) concealing of financial information and documents; and (3) barring him from entering his office to retrieve his personal belongings. (*Id.* at 13-14) Plaintiff contends that these three acts support a separate claim for breach of an implied covenant of good faith and fair dealing.

This contention is unpersuasive. With respect to the first two of these acts, the relief sought by plaintiff "is intrinsically tied to the damages allegedly resulting from [the] breach of contract." *Canstar, 212 A.D.2d at 453, 622 N.Y.S.2d at 731*. That is, the damages plaintiff seeks as a result of defendants' alleged failure to turn over financial information is identical to the damages he seeks for the alleged breach of contract -- in both instances, unpaid compensation. That plaintiff did not allege with-

holding or concealment of financial information in the breach of contract portion of his complaint does not mean that those acts support a separate claim for breach [*22] of an implied covenant of good faith. *See W.S.A., Inc.*, 1996 WL 551599, at *9 (bifurcating breach of contract allegations does not create two separate causes of action).

The third alleged "act" -- barring plaintiff from entering his office -- also fails to state a claim for breach of an implied covenant of good faith and fair dealing. To the extent this "act" is intended to show that defendants violated the Employment Agreement by refusing to allow plaintiff to come to work, it duplicates the breach of contract claim. To the extent that this "act" is intended to show that defendants wrongfully refused to allow plaintiff to retrieve his property *after* firing him, it treats events outside the employment contract and essentially restates plaintiff's claim for conversion. In either case, the act of barring plaintiff from entering his office does not give rise to a separate, cognizable claim for breach of the implied covenant of good faith and fair dealing. Accordingly, plaintiff's claim that defendants violated an implied covenant of good faith and fair dealing is dismissed.

## C. Fraud

Plaintiff's third claim is for fraud and deceit. He alleges that defendants fraudulently [*23] induced him to enter into the Employment Agreement, and fraudulently concealed financial information from [him] in order to avoid paying his compensation and to "induce him to continue to expend his best efforts" at JBRE Corp. (*Id. P 45-50*) Defendants move to dismiss this claim on the grounds that it fails to satisfy the special pleading requirements of *Fed. R. Civ. P. 9(b)* and duplicates the breach of contract claim. (Def. Mem. at 17-23) Although it is arguable whether plaintiff's allegations satisfy *Rule 9(b)*, there is no need to address this issue. Even if fraud has been pleaded with sufficient particularity, plaintiff has failed to establish that the alleged fraud gives rise to a separate cause of action.

[HN10] As a general rule, "no cause of action for fraud is stated or exists where the only fraud charged relates to a breach of the employment contract." *Dalton v. Union Bank of Switzerland, 134 A.D.2d 174, 176, 520 N.Y.S.2d 764, 766* (1st Dep't 1987). (Pl. Mem. at 16) However, as plaintiff points out (Pl. Mem. at 16), New York courts allow a litigant simultaneously to maintain a fraud and a breach of employment contract claim provided he either: "(i) demonstrate[s] a legal [*24] duty separate from the duty to perform under the contract . . . or (ii) demonstrate[s] a fraudulent misrepresentation collateral or extraneous to the contract." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98*

*F.3d 13, 20 (2d Cir. 1996)*. Plaintiff does not contend that defendants owed him a separate duty outside the contract. Rather, he contends that, because the profit-sharing provision of the Employment Agreement is not enforceable, defendants' promises regarding profit sharing constitute a "collateral oral agreement" that fraudulently induced him to enter into the Employment Agreement. (Pl. Mem. at 17) *See OHM Remediation Servs. v. Hughes Envtl., 952 F. Supp. 120, 123 (N.D.N.Y. 1997)* (fraud claim permissible if based on "an agreement not integrated into the contract at issue, such as a collateral oral agreement").

This argument has two fundamental flaws. First, it collapses the issues of collateralness and enforceability. A "collateral agreement" is one that is extraneous to the terms of the contract. *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d at 20*. However, the subject of profit sharing was explicitly incorporated into the [*25] terms of the Employment Agreement. Simply because it was incorporated in such a way as to render it unenforceable does not make profit sharing, or the negotiation leading up to the Employment Agreement, the subject of a "collateral agreement." The second flaw in plaintiff's argument is that he drafted the Employment Agreement himself. His claim that he was fraudulently induced by pre-contractual promises is defeated by the stark fact that it was within his power to incorporate those promises -- in enforceable terms -- into the Employment Agreement. His failure to do so reflects either his own inconvenient candor or his lack of foresight, but not fraud.

For similar reasons, plaintiff's contention that defendants withheld financial documentation while he was employed at JBRE Corp. also fails to state a separate claim for fraud. To the extent that plaintiff alleges that defendants fraudulently avoided their payment obligations, this claim is redundant to the breach of contract claim. To the extent that plaintiff alleges that defendants fraudulently induced him "to continue to expend his best efforts" at JBRE Corp., he has not alleged that he sustained any separate damages not recoverable [*26] under his breach of contract claim. *See R.H. Damon & Co. v. Softkey Software Prods. Inc., 811 F. Supp. 986, 992 (S.D.N.Y. 1993)* (fraud claim not separately maintainable where plaintiff does not "allege that [he] sustained damages in addition to those [he] could have anticipated in the event of a breach"). Accordingly, plaintiff's third cause of action alleging fraud and deceit is dismissed.

## D. Quantum Meruit and Unjust-Enrichment

In his fourth claim for relief, plaintiff alleges that defendants have been unjustly enriched because they have "reaped the economic benefits of [his] substantial work and efforts" without adequately compensating him with a

yearly bonus, vacation benefits, incentive compensation payments, or profit sharing payments. (Compl. P 57) Defendants move to dismiss this claim on the ground that the doctrines of quantum meruit and unjust enrichment are not available when the parties have executed an express contract. (Def. Mem. at 23-24)

[HN11] The equitable doctrines of quantum meruit and unjust enrichment are related. Quantum meruit, which means "as much as he deserves," is based on the concept that "'no one who benefits by the labor and materials of [*27] another should be unjustly enriched thereby . . . .'" *Allstate Ins. Co. v. Administratia Asigurarilor De Stat, 948 F. Supp. 285, 312 (S.D.N.Y. 1996)* (quoting *Black's Law Dictionary* 1119 (5th Ed. 1979)). Thus, a claim of quantum meruit is the means by which an unjust enrichment is remedied. *See Allstate, 948 F. Supp. at 312.* Both doctrines are quasi-contractual in nature and apply only in the absence of an express agreement. *See, e.g., Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190 (1987).* Thus, "the existence of a valid and enforceable written contract governing a particular subject matter" generally precludes recovery on a theory of quantum meruit or unjust enrichment for events arising out of the same subject matter. *Randall v. Guido, 655 N.Y.S.2d 527, 528* (App. Div. 1st Dep't 1997).

With respect to his right to compensation other than profit sharing, plaintiff's attempt to avoid this general rule is unavailing. He points out that *Fed. R. Civ. P. 8(e)(2)* permits a litigant to assert inconsistent theories of recovery and that therefore a party may "sue on a contract and at the same time alternatively [*28] repudiate the agreement and seek recovery on a quantum meruit claim . . . ." 5 Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1283, at 535-37 (1990). The defect in the plaintiff's argument is that nowhere in his complaint does he repudiate the Employment Agreement. Indeed, with the exception of plaintiff's right to a share of the profits, there is no dispute that the terms of plaintiff's compensation are governed by the express provisions of the Employment Agreement. *Compare* Compl. P 61 ("the Employment Agreement has been and continues to be a valid, binding contract in full force and effect") *with* Def. Mem. at 24 (defendants "do not dispute that there is an Employment Agreement governing . . . the present action"). Plaintiff cannot circumvent those otherwise valid provisions by invoking the quantum meruit doctrine as an alternative theory of recovery.

With respect to his right to profit sharing, plaintiff's quantum meruit claim stands on a different footing. As discussed above, the profit sharing provision of the Employment Agreement is too indefinite to be enforced under a breach of contract theory. In similar circumstances,

[HN12] New York courts [*29] have suggested that a wrongfully terminated employee may pursue a quasi-contract claim for unpaid profit sharing at the same time that he seeks salary benefits under a breach of contract theory. *See Varney v. Ditmars, 217 N.Y. 223, 232, 111 N.E. 822 (1916)* (dictum); *Hardy v. Erickson, 36 N.Y.S.2d 823, 825 (N.Y. Sup. 1942)*; *see also Benevento*, 1993 WL 126424, at *8 (citing *Varney*); 1 E. Allen Farnsworth, *Farnsworth on Contracts*, § 3.30, at 371 (1990).

In *Varney*, for example, the plaintiff, an architect employed at a weekly wage of $ 40, had been promised by his employer that he would "receive a fair share of [the company's] profits." *217 N.Y. at 225*. After being discharged, the plaintiff sought to recover unpaid salary benefits and a "fair and reasonable share" of the profits. Although the Court of Appeals concluded that a promise to share a "fair" amount of the profits was too "indefinite and uncertain" to enforce, *id. at 228*, it stated that "if the work actually performed [by the plaintiff] was worth more than $ 40 per week, he . . . could, on a proper complaint [alleging quantum meruit], recover its value less [*30] the amount received." *Id. at 232*.

Similarly, in *Hardy*, the plaintiff entered into an employment contract at a minimum salary of $ 500 per month for the first six months of employment and, thereafter, at "an amount as should be agreed upon between the parties." *36 N.Y.S.2d at 824*. After being dismissed, plaintiff brought suit alleging that he was entitled, not only to a base salary of $ 500 per month, but also to the value of his services above that amount. The court upheld his claim against a motion to dismiss, stating:

> The complaint sets up an existing, valid and enforceable contract for personal services. It is complete as to all terms except the additional compensation over the tentative minimum rate, and contains a provision for the fixing of that additional compensation at a later day. Assuming that it had never been fixed the plaintiff may still be permitted to recover upon quantum meruit.

*Id. at 825*.

To be sure, *Varney* and *Hardy* are not recent decisions. Yet they exemplify a court's equitable power to prevent unjust enrichment, even where the parties have a valid contract as to most of the relevant terms of compensation. Thus, if plaintiff [*31] can establish that his services at JBRE Corp. were worth more than the damages, if any, he may be able to collect under the Em-

ployment Agreement, he is entitled to prevent unjust enrichment by recovering a share of JBRE Corp.'s profits. *See* 1 Farnsworth, § 3.30, at 371 (if promise to share profits is unenforceable for lack of definiteness, employee may have restitution of reasonable value of services in excess of contract wages).

Thus, defendants' motion to dismiss plaintiff's quantum meruit claim is denied with respect to plaintiff's claim to a share of the profits in excess of any contractual damages. The motion is granted with respect to all other contract issues expressly covered by the Employment Agreement. Further, because plaintiff had an employment relationship only with JBRE Corp. and because he has not alleged that the other defendants received unjust enrichment that was separate or distinct from that obtained by JBRE Corp., he may pursue this quantum meruit claim only against JBRE Corp.

### E. *Tortious Interference with Employment Contract*

Defendants move next to dismiss plaintiff's claim of tortious interference with his employment contract. Plaintiff alleges [*32] that, Julio Bogoricin, Rita Bogoricin, Claudio Bogoricin, JBRE Group and JBRE Co. "intentional[ly], malicious[ly] and willful[ly]" caused JBRE Corp. to violate the Employment Agreement by terminating plaintiff's employment. (Compl. P 63-64)

[HN13] Under New York law, a plaintiff must allege four elements to state a claim for tortious interference with contract: "(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach; and (4) damages." *Foster v. Churchill*, 87 N.Y.2d 744, 749-50, 642 N.Y.S.2d 583, 586, 665 N.E.2d 153 (1996). In order to state a claim for tortious interference, a plaintiff must allege facts sufficient to establish that the defendant actually interfered with the contract. See Graal Enters. Ltd. v. Desourdy Int'l 1949 Inc., No. 95-0752, 1996 WL 353003, at *7 (S.D.N.Y. June 26, 1997); *EDP Hosp. Computer Sys., Inc. v. Bronx-Lebanon Hosp. Ctr.*, 212 A.D.2d 570, 571, 622 N.Y.S.2d 557, 558 (2d Dep't 1995).

In this case, plaintiff has failed entirely to allege facts sufficient to establish that Rita Bogoricin, Claudio Bogoricin, JBRE Co. or JBRE [*33] Group interfered with his contractual relations with JBRE Corp. Indeed, in his memorandum of law, the only "facts" plaintiff could point to in support of this claim are those asserted in paragraphs 20-25 of the complaint, all of which relate to Julio Bogoricin's actions. (Pl. Mem. at 20) [HN14] Although a district court is required to accept as true all well-pleaded allegations in deciding a motion to dismiss, it is not required to accept as true conclusory allegations for which there are no factual underpinnings. *See De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d

Cir.), *cert. denied*, 117 S. Ct. 509 (1996) ("conclusory allegations unsupported by factual assertions [fail] even the liberal standard of *Rule 12(b)(6)*") (quotations omitted). Plaintiff's tortious interference claim against Rita Bogoricin, Claudio Bogoricin, JBRE Co. and JBRE Group is devoid of such underpinnings.

Plaintiff's only possible claim for tortious interference is against Julio Bogoricin. Although defendants contend that Julio Bogoricin cannot be considered a "third party" to the employment contract, [HN15] New York courts have permitted an employee to sue the equity owner of his corporate employer for [*34] tortious interference provided that the interference was motivated by malice toward the employee. *See Foster*, 87 N.Y.2d at 750, 642 N.Y.S.2d at 587; *Felsen v. Sol Cafe Mfg. Corp.*, 24 N.Y.2d 682, 687, 301 N.Y.S.2d 610, 614, 249 N.E.2d 459 (1969); *see also American Protein Corp. v. AB Volvo*, 844 F.2d 56, 63 (2d Cir.), *cert. denied*, 488 U.S. 852, 102 L. Ed. 2d 109, 109 S. Ct. 136 (1988). The rationale behind this rule is that the immunity from suit that equity owners generally enjoy should not extend to decisions that are not made for economic reasons. *Foster*, 87 N.Y.2d at 750, 642 N.Y.S.2d at 587. In this case, plaintiff has alleged that the Julio Bogoricin acted with malice in causing JBRE Corp. to fire him. (Compl. P 64) Although defendants may choose to attack this bare allegation at a later evidentiary stage, the allegation -- as it relates to state of mind -- appears to be sufficient to withstand a motion to dismiss. *See Preferred Health Care Ltd. v. Empire Blue Cross & Blue Shield*, 1997 U.S. Dist. LEXIS 4298, No. 94-9326, 1997 WL 160489, at *3, (S.D.N.Y. Apr. 7, 1997); *In the Matter of Sunrise Sec. Lit.*, 793 F. Supp. 1306, 1325 (E.D. Pa. 1992) (malice may pleaded generally in tortious [*35] interference claim); *cf. Fed. R. Civ. P. 9(b)* ("malice . . . may be averred generally"). Accordingly, defendants' motion to dismiss plaintiff's claim for tortious interference is granted with respect to Rita Bogoricin, Claudio Bogoricin, JBRE Co. and JBRE Group and denied with respect to Julio Bogoricin.

### F. *Section 198 of New York's Labor Law*

Defendants move to dismiss plaintiff's fifth claim alleging a violation of *§ 198 of New York's Labor Law*. [HN16] Subsection 1-a of *§ 198*, upon which plaintiff's claim is based, provides that

> in any action instituted upon a wage claim by an employee . . . the court shall allow such employee reasonable attorney's fees and, upon finding that the employer's failure to pay the wage required by this article was willful, an addition amount as liquidated damages equal to

twenty-five percent of the total amount of the wages found to be due.

Plaintiff contends that, by withholding compensation and other benefits properly owing under the Employment Agreement, defendants are liable for attorney's fees and liquidated damages under this section. (Compl. PP 66-71; Pl. Mem. at 22-23)

There are two flaws in this argument. First, [HN17] § 198 [*36] does not stand alone. It sets forth the remedies available in "actions for wage claims founded on the substantive provisions of Labor Law article 6." *Gottlieb v. Kenneth D. Laub & Co.,* 82 N.Y.2d 457, 464, 605 N.Y.S.2d 213, 217, 626 N.E.2d 29 (1993). In *Gottlieb* for example, the plaintiff alleged "only a common-law contract cause of action and a second cause of action for a 'violation of Labor Law *section 198*'. . . ." *Id.* 82 N.Y.2d at 460, 605 N.Y.S.2d at 215. He did not allege a violation of the provisions of article 6. The Court of Appeals dismissed his § 198 claim, reasoning that the New York legislature intended that section to apply only when a plaintiff has brought a "wage claim" under a separate statutory provision in article 6. *Id.* 82 N.Y.2d at 463-64, 605 N.Y.S.2d at 217. In this case, as in *Gottlieb,* plaintiff has not brought a wage claim under the provisions of article 6. Accordingly, he cannot pursue the statutory remedies available for such a claim.

*Gottlieb* suggests a second fundamental flaw in plaintiff's § 198 claim. In *Gottlieb,* the Court of Appeals recognized that [HN18] the Labor Law does not apply to "employees serving in an executive, managerial [*37] or administrative capacity." *Id.* 82 N.Y.2d at 461, 605 N.Y.S.2d at 216; *see N.Y. Labor Law § 190(4-7)* (McKinney 1986 & Supp. 1997); *see also Cohen v. Fox-Knapp, Inc.,* 226 A.D.2d 207, 208, 640 N.Y.S.2d 554, 555 (1st Dep't 1996) ("the salary claim of an executive is not within the purview of Labor Law § 198"). In this case, the complaint states explicitly that plaintiff served as the "vice-president" of JBRE Corp.'s New York office (Compl. P 15), a position that gave him "full authority to act and bind [JBRE Corp.] and its subsidiaries." *(Id. P 77)* It is impossible to imagine how plaintiff could not be considered an executive.

Plaintiff unsuccessfully attempts to avoid this classification by arguing that, at the time of his termination, he was suspended and therefore no longer serving in an executive capacity. (Pl. Mem. at 23) It is true, as plaintiff points out, that the Appellate Division in *Cohen* held that a former executive could recover under § 198 because he was working as a salaried salesman, rather than an executive, at time of his termination. *226 A.D.2d at 208, 640 N.Y.S.2d at 555.* However, nothing in the holding of that case suggests that an executive [*38] who is sus-

pended prior to termination ought to be considered a non-executive employee for purposes of § 198. Such a reading would make the availability of § 198 contingent, not on the position held by the employee, but on the procedure used by the employer to fire him. This result "would afford a windfall remedy to litigants whom the [New York] Legislature consciously chose *not* to afford the protections and benefits of the wage payment regulatory provisions of the Labor Law." *Gottlieb, at 465, 605 N.Y.S.2d at 218.* Accordingly, plaintiff's claim for attorney's fees and liquidated damages under *§ 198 of New York's Labor Law* is dismissed.

*G. Section 4305(e)(2)(A) of New York's Insurance Law*

Plaintiff claims that defendants violated *§ 4305(e)(2)(A) of New York's Insurance Law.* The following additional facts, taken from the complaint, are relevant to this claim: On March 1, 1997, one month after plaintiff's termination on January 31, 1997, JBRE Corp. sent plaintiff a letter informing him that he had the right to continue his group health insurance policy. (Compl. P 26) The letter provided that plaintiff had to send a written notice to JBRE Corp. of his intent to [*39] continue health insurance "within sixty days of [his] termination date [January 31, 1997], or complete the attached COBRA election form and return the same directly to [JBRE Corp.] prior to April 1, 1997." *(Id. P 26)*

Plaintiff contends that the continuation notice sent by JBRE Corp. violated *§ 4305(e)(2)(A)* of the Insurance Law. [HN19] That section provides:

> An employee . . . who wishes continuation [of the group health coverage] must request such continuation in writing within the sixty day period following the later of: (i) the date of [his] termination; or (ii) the date the employee is sent notice by first class mail of the right of continuation by the group policyholder.

Plaintiff argues that, because he did not receive the continuation notice until March 1, 1997, and because that date was later than the date of his termination, he should have had sixty days from that date -- or until April 30, 1997 -- to request continuation. However, the letter sent by JBRE Corp. stated that plaintiff had to request continuation either within 60 days from the date of his termination -- that is, by March 31, 1997 -- or by April 1, 1997. Either way, plaintiff contends, [*40] the notice sent by JBRE Corp. was defective because it gave him only about 30 days to elect continuation of group health insurance, rather than the 60 days guaranteed by *§ 4305(e)(2)(A).* (Pl. Mem. at 24)

Plaintiff's argument misconstrues the obligations and rights created by [HN20] *§ 4305(e)(2)(A)*. First, that section is directed to employees, not employers. *See N.Y. Insurance Law § 4305(e)(2)(A)* (McKinney 1997) ("an employee who wishes continuation of coverage must request . . .") It does not mandate the contents of a continuation notice; it merely provides that an employee has a two-month window to respond once he receives such notice. Second, contrary to the import of plaintiff's argument, nothing in *§ 4305(e)(2)(A)* suggests that an inaccurate continuation letter may serve to reduce the time in which an employee may request continuation. The 60-day period is statutorily mandated and does not depend on the accuracy of a continuation letter.

Notably, plaintiff does not allege that the defective continuation letter misled him into believing that the statutory notice period was less than 60 days or that he had lost his right to request continuation. Indeed, plaintiff's actions belie [*41] any such allegation. Plaintiff filed his amended complaint on April 11, 1997 -- alleging a violation of *§ 4305(e)(2)(A)* -- *19* days before the expiration of the 60 day period. Thus, I must assume that, as of the date of the amended complaint, plaintiff was aware of *§ 4305(e)(2)(A)* and the rights conferred under that statute. His failure to request either a continuation of health coverage or an extension of time in which to request such a continuation -- if there was such a failure -- moots the defective notice. Accordingly, plaintiff's sixth claim alleging a violation of *§ 4305(e)(2)(A)* of New York's Insurance law is dismissed.

IV.

Defendants move also to dismiss plaintiff's claim for equitable relief in the form of an accounting and a constructive trust. Plaintiff alleges that he is entitled to a "full accounting [of] all monies due and owing" under the Employment Agreement and to the imposition of a constructive trust over such monies. (*Id.* PP 78-80) Defendants object to these remedies, principally on the ground that plaintiff was only an employee of JBRE Corp. and therefore not entitled to such equitable relief. (Def. Mem. at 31-34) For the reasons stated below, plaintiff's [*42] requests for these forms of relief are stricken.

A. *Accounting*

[HN21] "'The right to an accounting is premised upon the existence of confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest.'" *Adam v. Cutner & Rathkopf, 656 N.Y.S.2d 753, 759* (App. Div. 1st Dep't 1997) (quoting *Palazzo v. Palazzo, 121 A.D.2d 261, 265, 503 N.Y.S.2d 381, 384* (1st Dep't 1986)). An accounting is

unavailable when the parties have only an employee-employer relationship. *See Michnick v. Parkell Products, Inc., 215 A.D.2d 462, 462-63, 626 N.Y.S.2d 265, 266* (2nd Dep't 1995); *Reichert v. MacFarland Builders, Inc., 85 A.D.2d 767, 767, 445 N.Y.S.2d 264, 264* (3rd Dep't 1981); *see also* 1 N.Y. Jur. 2d § 30, at 183 (1979).

Plaintiff's claim for an accounting founders on these principles. Although plaintiff, as a corporate officer of JBRE Corp., may have owed some fiduciary duty to the corporation, defendants did not owe plaintiff a similar duty not to fire him or to withhold his compensation. To the extent that these actions were wrongful, they were wrongful because they violated [*43] the Employment Agreement, not because defendants were "in breach of [a] duty imposed" by a fiduciary obligation owed to the plaintiff. *Adam, 656 N.Y.S.2d at 759*; *cf. Waldman v. Englishtown Sportswear, Ltd., 92 A.D.2d 833, 835-36, 460 N.Y.S.2d 552, 556* (1st Dep't 1983) (mere fact that employer owes money to employee does not make employer a fiduciary). That plaintiff may have expected to share some profits in the corporation does not change this conclusion. [HN22] New York courts have held that an employee may not compel an accounting if, as here, the employment relationship entails only a sharing of profits, not a sharing of losses. *Reichert, 85 A.D.2d at 767, 445 N.Y.S.2d at 265*. In such a case, the employer is not considered a fiduciary of or joint venturer with the employee. *See Michnick, 215 A.D.2d at 462-63, 626 N.Y.S.2d at 266*.

The "other special circumstances" that plaintiff alleges -- defendants' withholding of compensation and concealment of financial information (Compl. P 20, 35; Pl. Mem. at 26) -- do not justify an accounting. These circumstances establish only that defendants may have breached the Employment Agreement.

B. *Constructive Trust*

Plaintiff's [*44] request for a constructive trust fails for similar reasons. [HN23] A constructive trust may not be imposed unless four elements have been established: a confidential or fiduciary relationship, a promise, a transfer made in reliance on that promise, and unjust enrichment. *In Re Koreag, Controle Et Revision, S.A., 961 F.2d 341, 352* (2d Cir.), *cert. denied, 113 S. Ct. 188 (1992)*. Thus, a constructive trust is generally not available in the absence of a breach of fiduciary duty. *See Smallwood Estates, Inc. v. Nikola, 163 A.D.2d 763, 764, 558 N.Y.S.2d 725, 726* (3d Dep't 1990); *see also* 106 N.Y. Jur. 2d § 163, at 207 (constructive trust imposed where "by virtue of a fiduciary relationship, one has obtained property in derogation of his duties as" fiduciary). As noted, plaintiff has failed to allege a breach of fiduciary duty.

Plaintiff contends that New York courts have not applied the fiduciary requirement rigidly. *See In Re Ko-reag, 961 F.2d at 353*. Perhaps. But, it is equally true that [HN24] the constructive trust is an equitable doctrine that applies only when equity so demands. *Id. at 352*. Under the circumstances of this case, in which plaintiff is protected from any unjust [*45] enrichment under a theory of quantum meruit and in which the gravamen his claim is a simple common-law breach of contract, there is no reason to impose a constructive trust on assets of defendants.

* * *

For the above reasons, defendants' motion to dismiss is granted as to the following claims: breach of covenant of good faith and fair dealing, fraud, violation of *§ 198 of New York's Labor Law*, and violation of *§ 4305 of New York's Insurance Law*. Defendants' motion for partial dismissal of the breach of contract claim is also granted. Defendants' motion to dismiss plaintiff's claims for quantum meruit and tortious interference with contract is granted in part and denied in part. Finally, plaintiff's requests for equitable relief in the form of an accounting and a constructive trust are stricken.

SO ORDERED:

Dated: New York, New York

November 4, 1997

Michael B. Mukasey,

U.S. District Judge

# EXHIBIT

# 4

2006 U.S. Dist. LEXIS 81391, *

**DOVER LIMITED and WENDY SUI CHENG YAP, Plaintiffs, -against- A.B. WATLEY, INC., et al., Defendants.**

**04 Civ. 7366 (FM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 81391*

**November 8, 2006, Decided**

**SUBSEQUENT HISTORY:** Motion denied by *Dover Ltd. v. A.B. Watley, Inc., 2007 U.S. Dist. LEXIS 91443 (S.D.N.Y., Dec. 11, 2007)*

**PRIOR HISTORY:** *Dover Ltd. v. A.B. Watley, Inc., 2006 U.S. Dist. LEXIS 76004 (S.D.N.Y., Oct. 18, 2006)*

**COUNSEL:** [*1] For Dover Limited, Wendy Sui Cheng Yap, Plaintiffs: Thomas J. Mullaney, LEAD ATTORNEY, Law Offices of Thomas J. Mullaney, New York, NY US.

For A.B. Watley, Inc., Defendant: Nancy J. Kim. Ellenoff Grossman & Schole LLP, New York, NY; Sameer Rastogi, Sichenzia Ross Friedman Ference, LLP, New York, NY.

For Robert Malin, Defendant: Donald Glenn Davis, LEAD ATTORNEY, Butler, Fitzgerald & Potter, A Professional Corporation, New York, NY; Nancy J. Kim. Ellenoff Grossman & Schole LLP, New York, NY; Sameer Rastogi, Sichenzia Ross Friedman Ference, LLP, New York, NY.

For Keith Sorrentino, Defendant: Sameer Rastogi, Sichenzia Ross Friedman Ference, LLP, New York, NY.

For John Coakley, Defendant: Sameer Rastogi, Sichenzia Ross Friedman Ference, LLP, New York, NY.

Alain Assemi, Defendant, Pro se, Morgan Hill, CA.

For A.B. Watley Direct, Inc., A.B. Watley Group, Inc., Defendants: Donald Glenn Davis, LEAD ATTORNEY, Butler, Fitzgerald & Potter, [*2] A Professional Corporation, New York, NY; Nancy J. Kim. Ellenoff Grossman & Schole LLP, New York, NY; Sameer Rastogi, Sichenzia Ross Friedman Ference, LLP, New York, NY.

**JUDGES:** FRANK MAAS, United States Magistrate Judge.

**OPINION BY:** FRANK MAAS

**OPINION**

***MEMORANDUM DECISION***

**FRANK MAAS**, United States Magistrate Judge.

*I. Introduction*

On March 27, 2006, I dismissed all but two of the claims asserted by plaintiffs Dover Limited ("Dover") and Wendy Sui Cheng Yap ("Yap") (together, "Plaintiffs") in their Amended Complaint in this securities fraud action, but I granted them leave to replead within thirty days to the extent that the defects noted in my Memorandum Decision could be cured. Thereafter, the Plaintiffs filed a Second Amended Complaint and, later, a Third Amended Complaint ("TAC").

Defendants A.B. Watley, Inc. ("ABW"), A.B. Watley Group, Inc. ("Group"), and A.B. Watley Direct, Inc. ("Direct") (collectively, the "ABW Companies") have now moved to stay this action pending an arbitration, or, in the alternative, to dismiss the alter ego claims asserted against Direct and Group in the TAC pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*. The only other defendant, Alain Assemi ("Assemi"), also has moved to dismiss the TAC pursuant to *Rule 12(b)(6)*. (The ABW Companies and Assemi are hereinafter referred to, collectively, as the "Defendants"). [*3] For the reasons set forth below, these motions are denied.

*II. Background*

A. *Relevant Facts*

The facts giving rise to this suit were described in considerable detail in my prior Memorandum Decision, familiarity with which is presumed. *See Dover Ltd. v. A.B. Watley, Inc.("Dover I"), 423 F. Supp. 2d 303 (S.D.N.Y. 2006)*. Accordingly, the facts are set forth here only to the extent that they differ from those alleged in

the Plaintiffs' earlier pleadings or are necessary to resolve the Defendants' motions.

Plaintiff Yap is a resident of Singapore and a director of plaintiff Dover, which is a foreign corporation located in Singapore. (TAC PP 4-5). In mid-2003, Yap discussed with Assemi the prospect of Dover investing $ 10 million in a "Non-Depletion of Capital Growth Program" ("Non-Depletion Account") allegedly offered by ABW, which, at that time, was a member of the NASD. (Id. PP 15, 25, 63). Assemi told Yap that Dover's investment was guaranteed by ABW not to deplete or depreciate, and that Dover would realize a profit of no less than $ 5 million by September 15, 2003, four months after the funds were received. (Id. P 26). These representations [*4] were false because ABW did not offer a Non-Depletion Account to its customers, nor did it have an investment program that guaranteed the security of its customers' funds while also affording them a high rate of return. (Id. P 29).

Over the following weeks, Yap opened a brokerage account for Dover at ABW ("Account"), into which she transferred $ 10 million. (Id. PP 15, 26). The customer paperwork that she signed contained an agreement ("Agreement") that all disputes arising out the relationship between the Plaintiffs and ABW would be resolved by arbitration and that any such arbitration

shall be conducted by any arbitration facility provided by any exchange or self-regulatory agency of which ABW is a member, pursuant to the procedures of such body.

(Id. Ex. C P 13(A) (block capitalization omitted)). The Agreement further stated that all persons subject to the Agreement who were not residing in the United States

agree that the rules of the organization administering the arbitration, namely the NASD, specifically provides for the designation of the place where the arbitration is to take place . . . .

(Id. P 13(C)(1) (block capitalization [*5] omitted)).

On or about June 17, 2003, Yap received an ABW statement indicating that the Dover account had sustained a loss of $ 3,011,141 over a seven-day period. (Id. P 30). Similarly, when Yap received an ABW month-end statement for the Account for June 2003, it reflected an opening value of only $ 6,988,859.84, more than $ 3 million less than Dover had remitted to ABW. (Id. P 43).

Following Yap's receipt of this paperwork, Assemi made various lulling statements to her, claiming that the losses shown on the statements were due to a computer error" which would be corrected by the end of the week, that the Account actually had an "'equity' value of approximately $ 15 million[,] and that [ABW] was going to 'piggy back' Dover's 'equity' to 'other's equity' to obtain a total of $ 50 million and then enter Dover into a 'bigger payout program.'" (Id. P 31). Despite these assurances, the Plaintiffs received a letter from ABW, dated July 3, 2003, which stated that the Account had "declined in value from $ 10,000,000 to $ 7,005,173.90." (Id. P 32). On July 14, Assemi sent Yap a facsimile which explained that ABW "is responsible and accountable for your funds" and that [*6] "Mr. Robert Malin, the president of [ABW], assured me this morning that they will be depositing profits into your account." (Id. P 33 & Ex. A). Assemi also wrote that Yap's " $ 6.75 [million] ha[d] been transferred to a non-deplet[ion] account" and that "[she would] be more than pleased after [her] great patience." (Id. P 34 & Ex. A). Despite these further assurances, the Account eventually sustained a net loss of $ 2,994,597.84, excluding interest. (Id. P 50).

B. Subsequent Events

In mid-2004, the Plaintiffs commenced an arbitration against ABW by filing a statement of claim with the NASD. (Decl. of Thomas M. Mullaney, Esq., dated Aug. 29, 2006 ("Mullaney Decl."), Ex. A). Subsequently, the NASD terminated ABW's membership on July 2, 2004, and advised the Plaintiffs, by letter dated August 18, 2004, that they no longer were required to arbitrate their claims against ABW before the NASD. (See TAC P 63; Mullaney Decl. Ex. A). As the letter explained:

Rule 10301(a) of the NASD Code of Arbitration

Procedure prohibits any NASD member whose membership is terminated, suspended, canceled, or revoked; or that has been expelled from the NASD; or that [*7] is otherwise defunct from enforcing predispute arbitration agreements with its customers to arbitrate at the NASD, unless the customers agree in writing to do so after the claim has arisen. If the claimant chooses not to proceed with the claim in this forum, and has not agreed to arbitrate the claim in another forum, he or she may be able to bring this claim in court.

(Mullaney Decl. Ex. A). Thus, unless the Plaintiffs agreed to continue the arbitration that they had initiated,

the provisions of the Agreement entitling ABW to compel the arbitration of any disputes regarding the Account were null and void. The NASD letter advised the Plaintiffs the NASD would assume that they wished to proceed with the arbitration unless it was given written notice to the contrary by September 22, 2004. (*Id.*).

On September 8, 2004, the Plaintiffs sent the NASD a letter indicating that they did not wish to proceed with their claim against ABW before the NASD. (*See* Letter dated Oct. 3, 2006, from Mr. Mullaney to the Court (Attach.) ("Mullaney Letter Attach.")). [1] They commenced this action the following week. (*See* Docket No. 1).

> 1 Although the letter to the NASD withdrawing the Plaintiffs' request for arbitration has been submitted to the Court by Plaintiffs' counsel unaccompanied by an affidavit or affirmation establishing its authenticity, there does not appear to be any real issue in that regard.

[*8] On March 27, 2006, I granted in part and denied in part the Defendants' motions to dismiss the Amended Complaint. *See Dover I, 423 F. Supp. 2d at 331.* As a consequence, the Plaintiffs were permitted to proceed against Assemi on Count I of their Amended Complaint, which charged him with a violation of *Section 10(b)* of the Securities Exchange Act of 1934, as amended ("Exchange Act"), and *Rule 10b-5* thereunder, and Count II, which charged him with common law fraud. [2] *Id. at 326-27.* In addition, the Plaintiffs were permitted to proceed against ABW on Count V of the Amended Complaint, which charged that the Plaintiffs' funds had been converted. *Id. at 328.* The Plaintiffs also were granted leave to replead their dismissed claims "to the extent the defects identified [by the Court could] be corrected through repleading." *Id. at 331.*

> 2 In the TAC, the Plaintiffs have dropped their common law fraud claim against Assemi for reasons which are unexplained.

[*9] The Plaintiffs served and filed their Second Amended Complaint on April 11, 2006. (*See* Docket No. 51). By Order dated June 6, 2006, I then granted the Plaintiffs' request to withdraw that pleading and to serve and file the TAC. (*See* Docket No. 66). The TAC subsequently was filed on June 20, 2006. (*See* Docket No. 68).

Count I of the TAC alleges a violation of the Exchange Act. Specifically, the Plaintiffs claim that Assemi violated *Section 10(b)* of the Act, and *Rule 10b-5* thereunder, by engaging in a scheme to induce the Plaintiffs to invest $ 10 million in a fictitious Non-Depletion Account. (*See* TAC PP 78-90).

Counts II through VIII of the TAC assert various common law claims against ABW. Count II alleges that

ABW converted and misappropriated the Plaintiffs' investment funds. (*Id.* PP 91-97). Count III alleges that ABW breached its Agreement with the Plaintiffs to invest all of Dover's $ 10 million in an ABW-managed account. (*Id.* PP 98-102). Count IV alleges that ABW breached its implied covenant of good faith and fair dealing by converting or permitting others to convert Dover's funds and not attempting to recover as much of those misappropriated funds [*10] as possible. (*Id.* PP 103-07 ). Count V alleges that ABW breached its fiduciary duty to invest the Plaintiffs' funds and maintain them safely. (*Id.* PP 108-17). Another count, which is erroneously also labeled Count V, alleges that ABW negligently failed to safeguard the Plaintiffs' funds. (*Id.* PP 118-24). Count VI alleges that ABW negligently supervised John J. (Jay) Amore, a consultant to ABW who served as its "de facto" employee despite its knowledge that he had a propensity to misappropriate client funds. (*Id.* PP 125-31). Finally, Count VII alleges that ABW was unjustly enriched in the amount of $ 2,994,597.84. (*Id.* PP 132-37).

In a separate portion of the TAC, which is incorporated by reference into, but does not correspond to any of these claims for relief, the Plaintiffs seek to hold Group and Direct vicariously liable for ABW's conduct under an alter ego theory. (*Id.* PP 2, 9, 56-77). More specifically, the Plaintiffs contend that Group and Direct participated in the fraud and mishandling of the Account. (*Id.* PP 16, 56-77). [3]

> 3 On June 6, 2006, I issued an Order that the TAC "may name Group and Direct in the conversion claim only if the [P]laintiffs are able to allege facts indicating that these entities were complicit in the conversion of their funds, or alter egos of ABW, rather than simply successor entities." (*See* Docket No. 66). Notwithstanding their contention that Group and Direct were alter egos of ABW, the Plaintiffs have not named these entities in Count II of the TAC, which charges ABW with the conversion of their funds.

[*11] Three motions are presently pending. First, Assemi has moved to dismiss the TAC, pursuant to *Rule 12(b)(6)*, for failure to state a claim. Second, the ABW Companies have moved to stay this action, pursuant to the Federal Arbitration Act ("FAA"). Finally, Group and Direct have moved, pursuant to *Rule 12(b)(6)*, to dismiss the TAC insofar as it seeks to impose vicarious liability on them. Before turning to the dismissal motions, I will consider the motion to stay this action.

III. *Discussion*

A. *ABW Companies' Motion to Stay Pending Arbitration*

2006 U.S. Dist. LEXIS 81391, *

The ABW Companies contend that the Plaintiffs' claims against them must be stayed until an arbitration has been held because the Agreement provides for the arbitration of any disputes between ABW and its customers. (ABW Defs.' Mem. at 6). Under *Section 3 of the FAA*, upon the request of a party, a federal court generally must stay any action that involves issues which are the subject of an arbitration agreement. *See McMahan Sec. Co. L.P. v. Forum Capital Mkts. L.P.*, 35 F.3d 82, 85 (2d Cir. 1994). More specifically, the statute provides that,

> [i]f any suit or proceeding be brought in any of the courts [*12] of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, *shall on application of one of the parties stay the trial of the action* until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

*9 U.S.C. § 3* (emphasis added). The use of the word "shall" indicates that there is "no place for the exercise of discretion by a district court." *Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985).* Thus, the parties must be directed "to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Id.*

Here, it apparently is undisputed that the NASD terminated ABW's membership on or about July 2, 2004. (TAC P 63). Subsequently, the NASD notified the Plaintiffs of ABW's termination on August 18, 2004. (Mullaney Decl. Ex. A). In its letter, the NASD explained that [*13] the Plaintiffs could continue with the arbitration or could withdraw their request for arbitration if they chose to do so. (*Id.*). Under NASD Rule 10301(a), unless the Plaintiffs agreed in writing to proceed with the arbitration, their claim against ABW was "ineligible for submission to arbitration under the [NASD] Code." NASD Rule 10301(a). Thereafter, in their September 8, 2004, letter to the NASD, the Plaintiffs *did not* consent; instead, as Rule 10301(a) permitted, they expressly rescinded their agreement to arbitrate their claims against ABW before the NASD. (Mullaney Letter Attach.).

The ABW companies contend that even if the Plaintiffs cannot be compelled to arbitrate *before the NASD*, the Agreement nevertheless requires them to arbitrate their claims before *some* alternative arbitral forum, such as the American Arbitration Association. (*See* ABW Defs.' Reply Mem. at 5). In advancing this argument, the ABW Companies rely on *Section 5 of the FAA* ("*Section 5*"), which permits a court to appoint an arbitrator to resolve a dispute in certain specified circumstances. (*Id.* at 6). Insofar as relevant, *Section 5* states:

> If in the agreement provision be made [*14] for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein . . . .

*9 U.S.C. § 5.*

By its terms, *Section 5* addresses situations in which an agreed forum is available but there has been a lapse in the naming of an arbitrator or a party fails to avail itself of the agreed method of selecting an arbitrator. In such circumstances, the statute permits - indeed requires - a federal court to intervene to ensure that the contracting parties' intent to arbitrate can be effectuated. *Section 5* nevertheless is inapplicable when the parties have specified an exclusive arbitral [*15] forum, but that forum is no longer available. *See In re Salomon Inc. S'holders' Derivative Litig., 68 F.3d 554, 558 (2d Cir. 1995).*

The Court consequently must examine the parties' Agreement to determine whether they agreed to arbitrate the dispute that gives rise to this case in a forum other than the NASD. In that regard, as noted earlier, the Agreement states generically that any disputes among the parties shall be settled by means of an arbitration conducted before an arbitration facility provided by any exchange or self-regulatory agency of which ABW is a member, pursuant to the procedures of such body." (TAC Ex. C P 13(A)). The ABW Companies, however, have failed to show that ABW ever was a member of any such entity other than the NASD. Moreover, even if ABW held other memberships, the Agreement further provides

that for customers, such as the Plaintiffs, who were not residing in the United States when a dispute arose, "the rules of the organization administering the arbitration, namely the NASD," will control "the designation of the place where the arbitration is to take place." (*Id.* P 13(C)).

In several cases, the Second Circuit has held that [*16] such language should be construed as an agreement to arbitrate only in the specified forum. For example, in *Paine Webber, Inc. v. Rutherford, 903 F.2d 106, 107-09 (2d Cir. 1990)*, the parties' agreement called for the arbitration to be conducted in accordance with the rules of one of a handful of specifically-named self-regulatory organizations. The Second Circuit concluded that this language required that any arbitration be held before one of the named entities, rather than another arbitral forum, such as the American Arbitration Association. *Id.* at 108.

Similarly, in *In re Salomon*, several ex-officials of Salomon Brothers had signed agreements which stated that any disagreements between them and their employer would be decided in accordance with the Constitution and rules of the New York Stock Exchange. *68 F.3d at 558*. Pursuant to the terms of its Constitution, however, the Exchange exercised its discretion not to entertain the controversy. *Id.* at 556. Although the defendants then sought to compel the plaintiffs to proceed in a different forum pursuant to *Section 5*, the Second Circuit found that the language of the [*17] agreements, which invoked the rules of a particular self-regulatory organization, established that the parties had not agreed to proceed elsewhere in the event that the named organization's facilities were unavailable. *Id.* at 561. In arriving at this determination, the court noted that two other circuits also had reached the same conclusion in cases in which the arbitral agreements declared that the arbitrations would be conducted pursuant to the rules of specifically-identified self-regulatory organizations. *See id.* at 558-59 (citing *Luckie v. Smith Barney, Harris Upham & Co., 999 F.2d 509 (11th Cir. 1993)* (per curiam), and *Roney & Co. v. Goren, 875 F.2d 1218 (6th Cir. 1989)*).

In their papers, the ABW Companies cite three cases which they contend mandate a different result. (*See* ABW Defs.' Reply Mem. at 7-8). However, the Second Circuit's decision in *In re Salomon*, which the ABW Companies have failed to cite, establishes that their reliance on at least two of these cases is unavailing. Thus, the Second Circuit specifically stated that, to the extent that *Zechman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 742 F. Supp. 1359, 1364 (N.D. Ill. 1990)*, [*18] disagreed with the decisions in *Luckie* and *Goren*, "we agree with our sister [c]ircuits rather than the district court." *In re Salomon, 68 F.3d at 559*. The Second Circuit also distinguished the second of the ABW Compa-

nies' cases, *Astra Footwear Industry v. Harwyn International, Inc., 442 F. Supp. 907, 909 (S.D.N.Y. 1978)*, on the ground that the contractual language at issue there did not establish a "dominant intent" to arbitrate before particular arbitrators. Although the factual basis for that conclusion is not readily apparent, the parties in *Astra* had agreed to arbitrate before an organization which no longer conducted arbitrations and had, in fact, been merged out of existence. Here, by comparison, the NASD remains a viable self-regulatory organization, and it continues to conduct arbitrations. (*See* NASD - Arbitration & Mediation - What is Dispute Resolution, http://www.nasd.com/ArbitrationMediation/NASDDisputeResolution/ WhatisDisputeResolution/index.htm) (last visited Oct. 18, 2006). Accordingly, even if *Astra* was correctly decided, it is factually inapposite. Moreover, the rules of the NASD specifically provide that a dispute [*19] between a customer and an entity that has lost its NASD membership is "ineligible" for arbitration under the NASD Code, unless the customer consents in writing to proceed before the NASD. Thus, the very language that the ABW Companies point to as the basis for their application under *Section 5* - namely, an agreement that the arbitral forum would be decided pursuant to the NASD rules - expressly deprives them of the forum to which they previously had agreed.

The third case cited by the ABW Companies, *Chattanooga Mailers' Union, Local No. 92 v. Chattanooga News-Free Press Co., 524 F.2d 1305 (6th Cir. 1975)*, is also inapposite. In that case, the parties' collective bargaining agreement called for the formation of a special "Board of Arbitration," comprised of two labor representatives and two management representatives who, in turn, were to select a neutral fifth member to act as chair. *Id.* at 1308. Although the terms of the collective bargaining agreement expired before the parties' dispute arose, the district court entered an order compelling arbitration "because it effectuated the obvious intent of the parties." *Id.* at 1311. On [*20] appeal, the Sixth Circuit reversed and remanded because it found that there was a factual issue as to whether the agreement remained in force beyond its formal expiration date. *Id.* at 1315-16. The court nevertheless held that if the district judge determined on remand that the parties intended that their prior contract would apply while new terms were being negotiated, they should be compelled to arbitrate their dispute concerning those new terms. *Id.* at 1315. The court further opined that if the dispute was arbitrable, the district court could craft procedures to enable the arbitration to go forward even if a Board of Arbitration could not, as a practical matter, be convened because the formal contract term had expired. *Id.*

Here, by comparison, the parties agreed to be bound by the NASD's arbitral rules. Those rules expressly state,

however, that ABW could not compel an arbitration to go forward once its membership was terminated, and that a previously-filed arbitration would proceed only if the customer furnished its written consent. Since no such consent was forthcoming, this is not a case in which the parties may have evidenced their joint [*21] desire to proceed with an arbitration notwithstanding the unavailability of the intended forum. *Chattanooga Mailers'* is therefore inapplicable.

In sum, as the Second Circuit's decisions in *Paine Webber* and *In re Salomon* establish, the NASD was the exclusive arbitral forum in which the parties' dispute could be heard. When ABW's membership in the NASD was terminated, the NASD ceased to be a viable forum, unless the Plaintiffs agreed to continue the proceeding there, which they did not. For these reasons, the ABW Companies cannot invoke *Section 5* to override the parties' contractual intent and require the Plaintiffs to arbitrate elsewhere.

The motion to stay this action pending arbitration is therefore denied.

### B. *Assemi's Motion to Dismiss*

The Plaintiffs allege in Count I of the TAC that Assemi violated *Section 10(b)* of the Exchange Act, and *Rule 10b-5* thereunder, by knowingly and intentionally making a series of false and misleading statements of material fact and withholding material information, in order to induce them to place their funds with ABW for the purpose of investing in a Non-Depletion Account which, in fact, was not offered by ABW, thereby resulting [*22] in substantial monetary losses to them. (TAC PP 78-85, 89). The Plaintiffs further allege that they would not have made this investment had it not been for Assemi's material misrepresentations and omissions. (*Id.* PP 86-88). This is precisely the claim against Assemi that I previously determined was legally sufficient. [4] *See Dover I, 423 F. Supp. 2d at 326.*

> 4    In *Dover I*, I noted that the Plaintiffs had not adequately pleaded "transaction causation," *i.e.*, that, but for Assemi's representations about ABW and the Non-Depletion Account, they would not have invested their funds. *Dover I, 423 F. Supp. 2d at 325*. Nevertheless, because this was a technical "glitch," I deemed the Amended Complaint to be so amended. *Id.* In the TAC, the Plaintiffs have cured this defect. (*See* TAC P 88).

In his motion papers, Assemi essentially ignores *Dover I* and seeks to reargue issues which have previously been resolved against him. However, my prior rulings in that regard [*23] constitute the "law of the case" and thus are not subject to further review at this stage. *See In re PCH Assoc., 949 F.2d 585, 592 (2d Cir. 1991)* ("Under the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation.").

Assemi also contends that the six additional counts of the TAC fail to state a claim for relief. (Assemi Mem. at 7-9). What he fails to note is that he has not been named as a defendant in any claim for relief other than Count I. Accordingly, he lacks standing to attack the legal sufficiency of those other counts. *See Standard Chlorine of Del., Inc. v. Sinibaldi, 1994 U.S. Dist. LEXIS 20538, No. 91-188-SLR, 1994 WL 796603, at *7 n.5 (D. Del. Dec. 8, 1994)* (defendant lacks standing to move for dismissal or summary judgment with respect to count in which he is not named); *see also Ford v. Wilson, 1995 U.S. Dist. LEXIS 8430, No. 93 C 20342, 1995 WL 360458, at *5 n.2 (N.D. Ill. June 6, 1995)* (city has standing to bring motion to strike because it has been named by virtue of police officer being named in his official capacity).

Finally, in his motion papers, which [*24] are unsworn, Assemi takes issue with a host of the Plaintiffs' allegations. For example, Assemi asserts that he never told Yap that ABW offered a non-depletion account, that he declined her request for a guaranteed rate of return, and that she acted deceptively during the course of their business dealings. (*See* Assemi Mem. at 2). In advancing such arguments, Assemi fails to recognize that on a *Rule 12(b)(6)* motion a court must accept as true all factual allegations in the complaint. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)*; *Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995)*. Furthermore, even if the Court were to treat Assemi's papers as a motion for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure*, he would not be entitled to the dismissal of the Plaintiffs' claims against him because his papers are unsworn and because the Plaintiffs have not had any opportunity for discovery. *See Fed. R. Civ. P. 56(c), (e), (f)*.

Accordingly, because the Plaintiffs [*25] have adequately pleaded their securities fraud claim against Assemi, his motion to dismiss the TAC must be denied.

### C. *Alter Ego Claims Against Group and Direct*

Although the ABW Companies principally urge that this case should be stayed while the Plaintiffs' claims against ABW are arbitrated, they also contend, in the alternative, that the alter ego claims against Group and Direct in the TAC should be dismissed because they "fall far short of the stringent test set forth in *American Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir. 1988)*." (ABW Defs.' Mem. at 16). In that case, the Second Circuit held that a parent company may be held liable for

the acts of its subsidiary when the parent has "exercise[d] complete domination in respect to the transaction attacked" and used that domination "to commit [a] fraud or wrong . . . which proximately caused plaintiff's injury." *Am. Protein, 844 F.2d at 60* (internal quotation marks omitted).

Each of the claims for which the Plaintiffs seek to hold Direct and Group liable is a common law claim arising under this Court's diversity jurisdiction. Accordingly, to determine the applicable law, the Court [*26] must apply the choice of law rules of New York, which is its forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941)*. Under New York's choice-of-law rules, the controlling law with respect to the Plaintiffs' claims against Group and Direct - the entities whose veil is sought to be pierced - is therefore the law of the state where they were incorporated. *Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)*. According to the TAC, both Direct and Group were incorporated in Delaware. (*See* TAC PP 7-8). Therefore, Delaware law must be applied in this case.

"Under Delaware law, the corporate veil may be pierced 'in the interest of justice, when such matters as fraud, contravention of law or contract, [or] public wrong . . . are involved.'" *S.J. Berwin & Co. v. Evergreen Ent-m't Group, 1995 U.S. Dist. LEXIS 15155, No. 92 Civ. 6209 (WK), 1995 WL 606094, at *2 (S.D.N.Y. Oct. 12, 1995)* (quoting *Pauley Petroleum, Inc. v. Cont'l Oil Co., 43 Del. Ch. 516, 239 A.2d 629, 633 (Del. Ch. 1968)*). A court also may pierce the corporate veil of an entity "where a subsidiary is in fact a mere instrumentality [*27] or alter ego of its owner." *Id.* (quoting *Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784, 793 (Del. Ch. 1992)*).

Although Delaware law appears to be controlling, the parties' papers only cite cases concerning New York law. In such circumstances, notwithstanding *Fletcher*, some courts have applied New York law, observing that there is, in any event, relatively little difference between the applicable standards under both states' laws. *See Wausau Bus. Ins. Co. v. Turner Constr. Co., 141 F. Supp. 2d 412, 417 (S.D.N.Y. 2001)*; *S.J. Berwin, 1995 U.S. Dist. LEXIS 15155, 1995 WL 606094, at *2*.

New York courts disregard a party's corporate veil "reluctantly." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 17 (2d Cir. 1996)*. Nevertheless, as in Delaware, a corporation may be held liable on an alter ego theory when it has exercised complete domination over another corporation and used that domination to commit a fraud or wrong that injured the plaintiff. *Morris v. N.Y. State Dep't of Taxation & Fin., 82 N.Y.2d 135, 141, 623 N.E.2d 1157, 603 N.Y.S.2d 807 (1993)*. "[C]ontrol is the key;" that control, in turn, "must

be used to commit [*28] a fraud or wrong that causes [the] plaintiff's loss." *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 138 (2d Cir. 1991)* (quoting *Am. Protein, 844 F.2d at 60*).

Among the factors that may be considered in determining whether to pierce the corporate veil are:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question [*29] had property that was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders, 933 F.2d at 139.*

At this preliminary stage, the Plaintiffs have no way of knowing whether the ABW Companies observed corporate formalities. Nonetheless, the TAC alleges that the ABW Companies were part of the same family-run group of companies and had common management. (TAC PP 9, 56). The ABW Companies are also alleged to have shared common office space and employees. (*Id.* PP 7-9). Indeed, Amore, who is alleged to have caused some of the Plaintiffs' losses, later became the Chief Executive Officer of Group. (*Id.* PP 17, 59). Furthermore, after ABW closed down, Direct assumed much of its former business, including the handling of the Plaintiffs' account. (*Id.* PP 19, 68-70). The Plaintiffs allege, in that regard, that Direct was substituted for ABW as the source of the Plaintiffs' account statements "without explanation." (*Id.* P 71). They also note that when Direct was formed, the Secretary of State for the State of New York was directed to forward any process received on its behalf to ABW. (*Id.* P 72). Direct and ABW also are

alleged to [*30] have shared an e-mail domain name and customer service telephone number. (*Id.* P 74).

While these facts alone may not ultimately entitle the Plaintiffs to establish that Direct or Group is an alter ego of ABW, they do suggest a high degree of interrelatedness among the three ABW Companies. There also is no question that the TAC lays out a scheme which appears to constitute a blatant fraud. Tellingly, when the Plaintiffs got wind of that fraud, Steven Malin, who was the Chairman of Group, told Yap that Amore may have stolen some of Dover's funds. (*Id.* P 17). Amore, however, was no mere consultant or employee; rather, he was the Chief Executive Officer of Group.

The TAC also alleges that the Plaintiffs lost a considerable sum of money as a consequence of the trading conducted by Amore and ABW. Indeed, certain of their funds also may have been improperly converted at the very outset of their relationship with ABW when the Dover account was opened. Until there has been an opportunity for discovery, there is no way for the Plaintiffs to know whether these stolen funds found their way to Group or Direct.

At the motion to dismiss stage, a plaintiff's claims for relief should not [*31] be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).* Here, that certainly is not so. While the evidence ultimately may establish that Group and Direct observed corporate formalities and played no role in ABW's fraud or the conversion of the Plaintiffs' funds, the Plaintiffs certainly have alleged enough of an interrelationship between ABW and the other ABW

Companies to permit this fraud case to proceed against all of the Defendants. *See JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Serv., Inc., 295 F. Supp. 2d 366, 378 (S.D.N.Y. 2003)* (rejecting alleged alter ego's motion to dismiss because it "ignore[d] the substance of the [complaint]" and "impose[d] too high a burden on the plaintiff's pleading"); *see also Alter v. Bogoricin, 1997 U.S. Dist. LEXIS 17369, No. 97 Civ. 0662 (MBM), 1997 WL 691332, at *5 (S.D.N.Y. Nov. 6, 1997)* ("[P]laintiff's alter-ego allegations are judged by the liberal notice pleading standards of *Fed. R. Civ. P. 8(a)* [*32] ."). Accordingly, the motion to dismiss the TAC as against Group and Direct must be denied.

### IV. *Conclusion*

For the reasons set forth above, Assemi's motion to dismiss, (Docket No. 74), the ABW Companies' motion to stay this action and compel arbitration, (Docket No. 71), and the ABW Companies' motion to dismiss the alter ego claims against Group and Direct, (Docket No. 71), are denied.

In light of this disposition, the Court will hold a conference to set a discovery schedule on November 8, 2006, at 5 p.m. Further scheduling details are contained in a separate order bearing today's date.

SO ORDERED.

Dated: New York, New York

November 8, 2006

FRANK MAAS

United States Magistrate Judge

# EXHIBIT

# 5

1998 U.S. Dist. LEXIS 6564, *

**WELCH ALLEN, INC., Plaintiff, v. NEW IMAGE INDUSTRIES, INC., Defendant.**

**97-CV-240 (FJS)**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

*1998 U.S. Dist. LEXIS 6564*

**May 5, 1998, Decided**
**May 5, 1998, Filed**

**DISPOSITION:**    [*1] Plaintiff's motion to amend GRANTED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In an action alleging infringement of plaintiff claimant's patent, the claimant brought a motion to amend his complaint to include additional defendants, a corporation and an infringer.

**OVERVIEW:** The claimant, who owned a patent on a certain type of dental camera, brought an action for infringement of the patent against the alleged infringer. Subsequently, the claimant brought a motion to amend his complaint to add defendant, the corporation that acquired the infringer, to hold it liable for the actions of its subsidiary, the alleged infringer. The court granted the motion, finding that the allegations of the proposed amended complaint seeking to pierce the corporate veil of the acquiring corporation were sufficient to withstand a motion to dismiss and therefore that the amendment was proper.

**OUTCOME:** The court granted the motion to amend the complaint.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*
*Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Eligibility, Circumstances & Factors*
[HN1] *Fed. R. Civ. P. 15(a)* provides in part that leave to amend shall be freely given when justice so requires. In determining whether to grant a party's motion to amend, the court must evaluate the following five factors: whether the motion to amend is made in good faith; whether permitting the amendment would cause undue delay; whether the opposing party would by unfairly prejudiced; whether the plaintiff has previously amended the complaint; and whether amending the complaint would be futile.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*
[HN2] Even though leave to amend should be freely given, it is inappropriate to grant leave when the amendment would not survive a motion to dismiss.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN3] A motion under *Fed. R. Civ. P. 12(b)(6)* is based solely on the allegations in the complaint. In evaluating a motion to dismiss, the court must accept the factual allegations contained in the complaint as true and draw all reasonable inferences in favor of the plaintiff. A complaint is to be dismissed pursuant to *Fed. R. Civ. P. 12(b)(6)* only if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. In deciding this motion the court must consider whether the plaintiff is entitled to offer evidence of its claim. Recovery may appear remote and unlikely on the face of the pleading, but that is not the test for dismissal under *Rule 12(b)(6)*.

*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Alter Ego > Corporate Formalities*
*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Alter Ego > Fraud*
*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Alter Ego > Inadequate Capitalization*

[HN4] In patent cases, the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception. The corporate veil is to be pierced only when the corporate form has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego. In making this determination, courts look to variety of factors, including the intermingling of corporate and personal funds, undercapitalization of the corporation, failure to observe corporate formalities such as the maintenance of separate books and records, failure to pay dividends. However there is no mechanical rule as to how many and to what degree these factors must be present to pierce the corporate veil; the courts apply the preexisting and overarching principal 'that liability is imposed to reach an equitable result.

**Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview**
**Torts > Vicarious Liability > Corporations > Subsidiary Corporations**
[HN5] A parent corporation can be held liable for its subsidiary's actions where the parent controlled the actions of the subsidiary and where the parent could have stopped the infringement or where the parent uses the subsidiary as a corporate fiction to commit a fraud or injustice.

**Patent Law > Infringement Actions > Infringing Acts > Sale**
**Patent Law > Infringement Actions > Infringing Acts > Use**
[HN6] *35 U.S.C.S. § 271(a)* provides that except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States during the term of the patent thereof, infringes the patent.

**COUNSEL:** EDWARD CONAN, ESQ., BOND, SCHOENECK & KING, LLP, Syracuse, New York, for Plaintiff.

GERALD MATHEWS, ESQ., MENTER, RUDIN & TRIVELPIECE, P.C., Syracuse, New York, for Defendant.

**JUDGES:** Frederick J. Scullin, Jr., United States District Judge.

**OPINION BY:** Frederick J. Scullin, Jr.

**OPINION**

**MEMORANDUM-DECISION and ORDER**

**Introduction**

Plaintiff brought this cause of action in February 1997, alleging patent infringements pursuant to the Patent Laws of Title 35 of the U.S. Code, seeking injunctive relief. Presently before the Court is Plaintiff's motion to amend his complaint so to include additional defendants.

**Factual Background**

Plaintiff Welch Allyn, Inc. is a New York corporation that manufactures and markets medical, dental and industrial diagnostic instruments. Welch Allyn owns *Patent No. 4,491,865 ("'865 patent")* for its "Image Sensor Assembly." Plaintiff applied for the patent in 1982 and it issued in 1985. In 1987 Welch Allyn introduced the intraoral video imaging device (dental cameras) which incorporates the *'865 patent*. Welch Allyn has licensed this patent to other companies. Defendant New Image sells a device called the AcuCam, which [*2] Plaintiff alleges also incorporates technology from the *'865 patent*.

Defendant New Image was purchased in March 1997 by Dentsply International, Inc. ("DII"). After discovery derived from interrogatories and preliminary depositions, Plaintiff now seeks to amend the complaint so to add as defendants, DII and Henke Saas Wolf, Gmbh ("HSW"), an independent contractor that makes component parts of the allegedly infringing product. Defendant DII opposes Plaintiff's motion.

**Discussion**

**I. Motion to Amend**

[HN1] *Rule 15(a)* provides in part that "leave [to amend] shall be freely given when justice so requires." *Fed. R. Civ. P. 15(a)*. In determining whether to grant a party's motion to amend, the Court must evaluate the following five factors: (1) whether the motion to amend is made in good faith; (2) whether permitting the amendment would cause undue delay; (3) whether the opposing party would by unfairly prejudiced; (4) whether the plaintiff has previously amended the complaint; and (5) whether amending the complaint would be futile. See *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)*.

In the present case, Defendant argues that amendment would be futile [*3] because the Court cannot pierce DII's corporate veil so to color DII with the actions of its subsidiary New Image. The Court has previ-

ously found that [HN2] even though leave to amend should be freely given, "it is inappropriate to grant leave when the amendment would not survive a motion to dismiss." *Clarke v. TRW Inc., 921 F. Supp. 927, 932 (N.D.N.Y. 1996)*. Accordingly, the Court will evaluate Plaintiff's second proposed amended complaint under the standards applicable to a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*. Id.

[HN3] A 12(b)(6) motion is based solely on the allegations in the complaint. See *Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991)*. In evaluating a motion to dismiss, the Court must accept the factual allegations contained in the complaint as true and draw all reasonable inferences in favor of the plaintiff. See *Cooper v. Pate, 378 U.S. 546, 546, 12 L. Ed. 2d 1030, 84 S. Ct. 1733 (1964)*. A complaint will be dismissed pursuant to *Fed. R. Civ. P. 12(b)(6)* only if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. See *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L.* [*4] *Ed. 2d 80, 78 S. Ct. 99 (1957)*. In deciding this motion the Court must consider whether the plaintiff is entitled to offer evidence of its claim. "Recovery may appear remote and unlikely on the face of the pleading, but that is not the test for dismissal under *Rule 12(b)(6)*. *Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995)*.

## II. Piercing the Corporate Veil

The gravamen of Defendant's argument is that Plaintiff cannot pierce DII's corporate veil based upon the facts alleged in Plaintiff's second proposed amended complaint. As an initial matter, the Court notes that [HN4] in patent cases "the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception." *Internat'l Controls and Measurements Corp. v. Watsco, Inc., 853 F. Supp. 585, 590 (N.D.N.Y. 1994)*. The Second Circuit has set forth the standard for piercing the corporate veil:

The corporate veil will be pierced only when the corporate form has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation . . . and its separate identity so disregarded, that it primarily transacted the dominator's [*5] business rather than its own and can be called the other's alter ego. In making this determination, courts look to variety of factors, including the intermingling of corporate and personal funds, undercapitalization of the corporation, failure to observe corporate formalities such as the maintenance

of separate books and records, failure to pay dividends. . . [However] there is no mechanical rule as to how many and to what degree [these factors] must be present to pierce the corporate veil; the courts apply the preexisting and overarching principal 'that liability is imposed to reach an equitable result.' "

*Bridgestone / Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 17-18 (2d Cir. 1996)* (quoting *Brunswick Corp. v. Waxman, 599 F.2d 34, 36 (2d Cir. 1979))*. Similarly, this Court previously stated that [HN5] a parent corporation could be held liable for its subsidiary's actions where the parent controlled the actions of the subsidiary *and* where the parent could have stopped the infringement or where the parent uses the subsidiary as a corporate fiction to commit a fraud or injustice. See *Internat'l Controls, 853 F. Supp. at 590* (quoting A. Stucki [*6] *Co. v. Worthington Indus., Inc., 849 F.2d 593, 596 (Fed. Cir. 1988))*.

Plaintiff alleges that DII owns 100% of New Image; that the two companies have the same officers; that New Image uses the Dentsply name in its advertising at the direction of DII and that DII otherwise controls the actions of New Image. While Plaintiff may have a weak case for piercing DII's corporate veil, that is not the standard the Court employs in evaluating a *Rule 12(b)(6)* motion. Furthermore, Defendant has failed to address, to the Court's satisfaction, the fact that DII used its name in conjunction with an advertisement for the AcuCam III; an independent ground for holding DII liable for patent infringement. [1] Therefore, the Court finds Plaintiff alleges sufficient facts that, when taken as a whole, assumed to be true and viewed in a light most favorable to Plaintiff, may give rise to a cause of action against DII.

1    Title [HN6]  *35 U.S.C. § 271(a)* provides: "Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent thereof, infringes the patent."

[*7] **Conclusion**

Upon review of the record, the parties' submissions and the applicable law, it is hereby

ORDERED, that Plaintiff's motion to amend is GRANTED.

**IT IS SO ORDERED.**

Date: May 5, 1998

1998 U.S. Dist. LEXIS 6564, *

Syracuse, New York                                        United States District Judge

Frederick J. Scullin, Jr.